Joseph P. Brent [Bar No.: 214459]
jbrent@bfplawyers.com
David L. Fiol [Bar No.: 203546]
dfiol@bfplawyers.com
BRENT & FIOL, LLP.
1000 Fourth Street, Suite 750
San Rafael, California 94901
Telephone: (415) 839-8370
Facsimile: (415) 373-4420

Attorneys for Plaintiff TIFFANY HODGES, Guardian ad Litem and Trustee for DANIEL LEWIS and JARELL LEWIS; KAREN JOYCE LEWIS; and ALFREDO LEWIS

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN FRANCISCO

| | |
|---|---|
| TIFFANY HODGES, as Guardian ad Litem for JARELL LEWIS and DANIEL LEWIS, minors and sole heirs of NEIL LEWIS, deceased; KAREN JOYCE LEWIS; and ALFREDO LEWIS,<br><br>Plaintiffs,<br><br>vs.<br><br>THE HERTZ CORPORATION, FIREFLY RENT A CAR, LLC, RENTAL CAR TRANSPORT, LLC, DTG OPERATIONS, INC., AND DOLLAR THRIFTY AUTOMOTIVE GROUP, INC., and DOES 3 Through 50, Inclusive,<br><br>Defendants. | CASE NO.: 17 cv 03785-DMR<br><br>COMPLAINT FOR WRONGFUL DEATH AND SURVIVAL DAMAGES RENAMING DOE DEFENDANTS 1 AND 2 AS DTG OPERATIONS, INC., AND DOLLAR THRIFTY AUTOMOTIVE GROUP, INC., RESPECTIVELY |

Plaintiffs TIFFANY HODGES, as Guardian ad Litem for DANIEL LEWIS and JARELL LEWIS, minors and sole heirs of NEIL LEWIS, deceased, KAREN JOYCE LEWIS and ALFREDO LEWIS, allege:

## I. THE PARTIES

1. Plaintiff TIFFANY HODGES is the mother of DANIEL LEWIS and JARELL LEWIS, minors and the sole heirs of NEIL LEWIS, deceased.

2. On or around February 3, 2017, Tiffany Hodges was appointed the Guardian ad Litem and Trustee for Daniel Lewis and Jarell Lewis in a worker compensation proceeding that was filed concerning the incident giving rise to this Complaint at law. A copy of the Order is attached hereto as Exhibit 1. Ms. Hodges brings survival and wrongful death claims on behalf of the estate of Neil Lewis and his two sole heirs.

3. KAREN JOYCE LEWIS and ALFREDO LEWIS are the parents of the decedent and were dependent on him within the meaning of section 377.60 of the Code of Civil Procedure. They bring claims for the wrongful death of their son.

4. Defendant THE HERTZ CORPORATION is a Delaware corporation that transacts business in the State of California including the City and County of San Francisco and San Francisco International Airport. It did not designate a principal place of business in California in registering with the California Secretary of State.

5. At all relevant times, defendant THE HERTZ CORPORATION was a wholly owned subsidiary of Hertz Global Holdings, Inc., a publicly traded company. Defendant, THE HERTZ CORPORATION was its primary operating company. For ease of reference, we will refer to these entities as THE HERTZ CORPORATION.

6. Defendant FIREFLY RENT A CAR LLC is a Delaware Corporation that transacts business in the State of California including the City and County of San Francisco and San Francisco International Airport. It did not designate a principal place of business in California in registering with the California Secretary of State. It is a subsidiary of THE HERTZ CORPORATION.

7. Defendant RENTAL CAR TRANSPORT LLC. is a defunct Nevada limited liability company. Upon information and belief, at the time of the events that is the subject matter of this complaint, RENTAL CAR TRANSPORT, LLC did business in the State of California but had not registered to do business with the California Secretary of State. RENTAL CAR TRANSPORT LLC has formally denied worker compensation benefits to Tiffany Hodges as the Guardian ad Litem and Trustee for Daniel Lewis and Jarell Lewis. A copy of the denial letter is attached as Exhibit 2.

8. Defendant DTG OPERATIONS, INC. is an Oklahoma corporation that transacts business in the State of California including the City and County of San Francisco and San Francisco International Airport. It is a subsidiary of THE HERTZ CORPORATION.

9. Defendant DOLLAR THRIFTY AUTOMOTIVE GROUP, INC. is a Delaware corporation that transacts business in the State of California including the City and County of San Francisco and San Francisco International Airport. It has not registered with the California Secretary of State. It is a subsidiary of THE HERTZ CORPORATION.

10. The true names and capacities, whether individual, corporate, associate, or otherwise of defendants Does 3 through 50, inclusive, are unknown to plaintiff, who therefore sue said defendants by such fictitious names pursuant to California Code of Civil Procedure § 474. Plaintiff is informed and believes, and on that basis alleges, that each of the fictitiously named defendants is responsible in some manner for the acts and occurrences herein alleged, and that plaintiff's damages were caused by such defendants.

11. At all times herein mentioned, each defendant was the agent and employee of the other defendants in the commission of the acts herein alleged, and was acting in the course and scope of his/her/its authority as such agent and employee and with the permission and consent of all defendants.

12. At all times relevant times, each defendant conspired with, agreed to, and furthered the other defendants to commit the breach of duties and/or torts alleged herein. Each defendant knew that the other defendants' conduct constituted breach of duties and/or torts, and gave substantial assistance and/or encouragement to the other defendants to commit the breach of duties and/or torts alleged herein.

13. At all relevant times, each defendant aided and abetted the other defendants in committing the breach of duties and torts alleged herein. Each defendant knew that the other defendants' conduct constituted breaches of duties and/or torts, and each defendant gave substantial assistance and/or encouragement to the other defendants to commit the breaches and/or torts alleged herein.

14. At all relevant times, each defendant entered into a joint enterprise with the other defendants. Each defendant had an equal voice in controlling and directing the enterprise that resulted in the breach of duties to plaintiff and/or the torts alleged herein.

15. Whenever reference is made in this complaint to any act of defendants, such allegation shall mean that each defendant acted individually and jointly with the other defendants.

## II. VENUE

16. Venue in this action is proper in San Francisco County based upon the fact that defendant THE HERTZ CORPORATION is a foreign corporation that failed to designate a principal place of business within the State of California pursuant to Corporations Code Section 2105(a)(3); FIREFLY RENT A CAR LLC is a Limited Liability Company that failed to designate a principal place of business within the State of California pursuant to Corporations Code Section 17708.02(a)(3); and defendant RENTAL CAR TRANSPORT, LLC is a Limited Liability Company that has failed to register and designate a principal place of business within the State of California pursuant to Corporations Code Section 17708.02(a)(3); and defendants DTG OPERATIONS, INC., and DOLLAR THRIFTY AUTOMOTIVE GROUP, INC. are foreign corporations without a designated principal place of business in California.

## III. COMMON ALLEGATIONS

17. The rental car business is a highly regulated industry, especially concerning automobiles used at airports such as San Francisco International Airport ("SFO"). The Department of Homeland Security has identified SFO as a high profile area at risk for terrorist attacks and it is considered a security-sensitive environment. The City and County of San Francisco as well as the State of California and other legislative bodies have determined that the rental car industry involves unreasonable risks of harm to the general public and has promulgated legislation to minimize and/or control those risks.

18. At all relevant times defendants THE HERTZ CORPORATION, FIREFLY RENT A CAR, LLC., DTG OPERATIONS, INC., and DOLLAR THRIFTY AUTOMOTIVE GROUP,

INC. and Doe Defendants 3 through 50 and each of them were in the car rental business. These defendants will be referred to as the "Rental Car Defendants."

19. At all relevant times, and for consideration, the Rental Car Defendants and each of them entered into lease agreements with the City and County of San Francisco that allowed them to occupy space at San Francisco International Airport. San Francisco International Airport is under the jurisdiction and control of the City and County of San Francisco. The City and County of San Francisco was authorized to enter into lease agreements with the Rental Car Defendants pursuant to various ordinances, including section 2A.173 of the San Francisco Administrative Code. The lease agreements were franchises granted to the Rental Car Defendants by the public authority of the City and County of San Francisco and the San Francisco Airport Commission.

20. At all relevant times, the lease agreements themselves, the voluntary actions by the Rental Car Defendants, and the public franchise granted by the City and County of San Francisco created duties and/or nondelegable duties, undertakings, and responsibilities on the part of the Rental Car Defendants that include but were not limited to: (a) creating a safe environment for their workers, their subcontractors, contractors, invitees, licensees, affiliates, and for the public in general, (b) ensuring that their subcontractors, contractors, invitees, licensees, and affiliates properly complied with the Rental Car Defendants' duties under the lease agreements, (c) ensuring compliance with "Laws" including but not limited to OSHA regulations not only for themselves but for all subcontractors, contractors, invitees, licensees, and affiliates to create a safe environment; (d) ensuring that its subcontractors and others conducted themselves in a "first-class, businesslike, safe, efficient, courteous, and accommodating manner," and (e) ensuring that their subcontractors and others complied with SFO's Airport Rules.

21. The operative lease for THE HERTZ CORPORATION is attached hereto as Exhibit 2. See Section 3 et seq. On information and belief, the leases for the other Rental Car Defendants contain provisions substantially identical to those found in Exhibit 3.

22. At all relevant times, THE HERTZ CORPORATION was woefully mismanaged. Beginning in 2011, THE HERTZ CORPORATION's senior management including the CEO created a working environment that emphasized profit over proper and reasonable business

procedures that impacted the safety of the general public, including decedent. In public filings with the Securities and Exchange Commission, THE HERTZ CORPORATION admitted that its "Chief Executive Officer's management style and temperament created a pressurized operating environment at the Company, where challenging targets were set and achieving those targets was a key performance expectation." THE HERTZ CORPORATION'S management placed "inappropriate emphasis" on budgets and business plans, ultimately creating an environment whereby cutting corners and taking unreasonable risks was not only normal but expected – and all for the sake of increasing the company's bottom line. The relevant portions of the company's 10-k from 2014 is attached as Exhibit 4.

23. At all relevant times, in response to the unreasonable and inappropriate "pressurized operating environment" THE HERTZ CORPORATION decided to outsource labor related to transporting its vehicles from one location to another. The persons who do this work are known colloquially as "hikers."

24. At all relevant times, pursuant to the public franchise, their voluntary undertaking, and in order to fulfill the lease terms, THE HERTZ CORPORATION, DTG OPERATIONS, INC., and DOLLAR THRIFTY AUTOMOTIVE GROUP, INC. and the other Rental Car Defendants contracted with, hired, and otherwise created a relationship with defendant RENTAL CAR TRANSPORT, LLC to supply persons as "hikers" to assist and support the Rental Car Defendants' operations and business at SFO. These "hikers" transported vehicles owned, maintained, and operated by the Rental Car Defendants' to and from the leased premises at SFO and were integral to the Rental Car Defendants' operations there.

25. At all relevant times, THE HERTZ CORPORATION, DTG OPERATIONS, INC., and DOLLAR THRIFTY AUTOMOTIVE GROUP, INC., and the other Rental Car Defendants retained the right to control the manner and/or method of the work being performed by RENTAL CAR TRANSPORT, LLC. The right to control the manner and/or method of the work included retaining control over employment decisions made by RENTAL CAR TRANSPORT LLC with regard to hiring "hikers." Defendant THE HERTZ CORPORATION, DTG OPERATIONS, INC., and DOLLAR THRIFTY AUTOMOTIVE GROUP, INC., and the other Rental Car Defendants

required that RENTAL CAR TRANSPORT LLC conduct reasonable and adequate checks of the qualifications for "hikers" prior to hiring them. Such reviews included but were not limited to thorough background checks to ensure that they were not violent or dangerous persons but fit to perform the duties of a hiker; they included that RENTAL CAR TRANSPORT LLC perform checks to ensure that hikers were licensed to operate motor vehicles; that RENTAL CAR TRANSPORT LLC perform checks to ensure that the hikers operated the vehicles safely and reasonably and that they followed SFO airport rules and regulations; ensure that the "hikers" follow the Rental Car Defendant's internal policies and procedures for moving cars as well as those requirements the Rental Car Defendants had under the SFO lease.

26. As part of THE HERTZ CORPORATION'S quest to increase profits and cut corners, it failed to do a reasonable analysis of defendant RENTAL CAR TRANSPORT, LLC'S competence despite its obligation to do so under the airport lease. THE HERTZ CORPORATION, DTG OPERATIONS, INC., and DOLLAR THRIFTY AUTOMOTIVE GROUP, INC. and the other Rental Car Defendant's failed to perform a reasonable analysis related to RENTAL CAR TRANSPORT, LLC'S business practices including failing to reasonably examine (a) its hiring policies and procedures, (b) its supervisory and oversight procedures, (c) its past work performance, (d) its financial integrity, and (e) its implementation and maintenance of a system of standards so that its work was performed in a reasonable manner and did not jeopardize the safety of the general public, including the decedent, Neil Lewis.

27. At all relevant times, THE HERTZ CORPORATION, DTG OPERATIONS, INC., and DOLLAR THRIFTY AUTOMOTIVE GROUP, INC.'S decision to contract with RENTAL CAR TRANSPORT LLC was motivated in whole and/or part by the "pressurized operating environment" created by HERTZ'S management to increase profit and take unreasonable corner-cutting risks. The decision to hire and contract with RENTAL CAR TRANSPORT LLC was not based on whether that company could adequate and/or reasonable to perform the contract obligations – and RENTAL CAR TRANSPORT LLC could not do so because of its shoddy business practices – but rather on how much money THE HERTZ CORPORATION, DTG OPERATIONS, INC., and DOLLAR THRIFTY AUTOMOTIVE GROUP, INC. could save in

labor costs by outsourcing required services to a sketchy organization like RENTAL CAR TRANSPORT, LLC.

28. At all relevant times, decedent Neil Lewis was employed as a "hiker" by defendant RENTAL CAR TRANSPORT, LLC. Decedent's duties as a "hiker" included transporting rental cars owned, leased, controlled, and/or operated by the Rental Car Defendants on and around their leased premises at San Francisco International Airport.

29. At all relevant times, defendant, RENTAL CAR TRANSPORT, LLC., hired, employed, engaged, contracted with or otherwise authorized Rodney Williams to work as a "hiker" to transport vehicles. Rodney Williams' duties as a "hiker" included transporting rental cars owned, leased, controlled, and/or operated by the Rental Car Defendants on and around their leased premises at San Francisco International Airport

30. At all relevant times, defendants and each of them knew or reasonably should have known that Rodney Williams was not fit to be employed because of his violent and dangerous disposition and his misuse of motor vehicles. At the time RENTAL CAR TRANSPORT hired Rodney William, he had a lengthy history of criminal activities, including four felony convictions. Three of those felony convictions involved the use of a firearm. One felony occurred while he was operating a vehicle: the police stopped the vehicle Mr. Williams was driving and found a firearm under his driver's seat. On information and belief, Rodney Williams was convicted of these four felony crimes prior to turning 26 years of age.

31. In addition to the four felony convictions, Mr. Rodney Williams had been arrested for other violent acts, including an arrest on May 21, 2014 by the San Francisco Police Department for the murder of Derrick Whitfield.

32. On information and belief, Rodney Williams was approximately 26 years old and while still on probation for one or more of his felony offenses when defendant RENTAL CAR TRANSPORT, LLC hired him. It was unreasonable to hire Rodney Williams. Defendants and each of them knew or reasonably should have known that Rodney Williams was unfit to perform his job duties, in part because of his violent and dangerous disposition in addition to his misuse of

vehicles. Defendants and each of them knew or reasonably should have known that Rodney Williams posed a danger to others, including decedent.

33. At all relevant times, decedent and/or others communicated to defendants and each of them that Rodney Williams was threatening decedent. At all relevant times, the defendants knew that decedent felt threatened by Rodney Williams. The defendants and each of them ignored the communications and scheduled Rodney Williams to work at the same time as decedent. Despite the knowledge of the danger Rodney Williams posed to decedent, defendants and each of them failed to take any action to prevent, minimize, supervise, or otherwise monitor the encounters that Rodney Williams had with decedent.

34. On July 7, 2015, the defendants and each of them scheduled Rodney Williams to work with decedent. Their work included performing operations arising out of the Rental Car Defendants' business and operations on SFO's premises. While Rodney Williams was driving a vehicle owned, controlled, and maintained by THE HERTZ CORPORATION Rodney Williams instigated a fight with decedent Neil Lewis and stabbed Neil Lewis to death. The stabbing incident arose out of THE HERTZ CORPORATION and the Rental Car Defendants business on the leased premises and operations therein.

35. At all relevant times, defendant THE HERTZ CORPORATION, DTG OPERATIONS, INC., and DOLLAR THRIFTY AUTOMOTIVE GROUP, INC. and/or the other Rental Car Defendants controlled, supervised, managed, and maintained access to the vehicle used by Rodney Williams in the deadly fight he instigated with decedent, Neil Lewis.

36. The decedent did not die immediately after the fight but survived for a period of time before succumbing to his wounds.

37. Rodney Williams fled the scene and was arrested approximately two weeks later in Sacramento, CA.

38. On or around March 21, 2106, a San Mateo jury found Rodney Williams guilty of second degree murder in the death of decedent Neil Lewis.

39. The nondelegable duties and responsibilities created by the public franchise, the lease agreements, and/or the voluntary undertaking of defendants and each of them extended to decedent Neil Lewis.

40. The defendants, and each of them, owed a duty to act reasonably toward plaintiff, and they had a duty under Section 1714 of the Civil Code that requires all persons to act in a reasonable manner toward others.

41. The defendants and each of them owed a duty of care to plaintiff to that only those persons who were competent, fit and those who did not pose a danger to others including decedent, performed services for them.

42. At all relevant times, defendants knew or reasonably should have known that Rodney Williams was a violent and/or vicious person who was unfit, incompetent, and/or posed a danger to others, including decedent.

43. At all relevant times, THE HERTZ CORPORATION, DTG OPERATIONS, INC., and DOLLAR THRIFTY AUTOMOTIVE GROUP, INC. and the other Rental Car Defendants and each of them knew or reasonably should have known that RENTAL CAR TRANSPORT LLC. was unfit to perform the work that the Rental Car Defendants required. The defendants and each of them knew or reasonably should have known that RENTAL CAR TRANSPORT LLC. lacked reasonable quality control practices, lacked reasonable employment vetting and practices, and that its supervision, monitoring, training and oversight of its employees, agents, and/or independent contractors was unreasonable and/or negligent. Defendant THE HERTZ CORPORATION, DTG OPERATIONS, INC., and DOLLAR THRIFTY AUTOMOTIVE GROUP, INC. and the other Rental Car Defendants knew or reasonably should have known that RENTAL CAR TRANSPORT LLC. was not following their requirements for hiring appropriate hikers and was not following their requirements for managing, supervising, and overseeing the hikers.

44. At all relevant times prior to the stabbing incident, defendants and each of them knew that Rodney Williams had threatened the decedent, and the defendants stood in a special relationship to decedent.

45. At all relevant times, defendants, and each of them, breached their duty of care in that they did or failed to do one or more of the following: negligently controlled, managed, supervised, scheduled, and trained Rodney Williams; negligently hired, selected, and/or retained Rodney Williams; retained, selected, and/or hired Rodney Williams knowing that he was a violent and/or vicious person; retained, selected, and/or hired Rodney Williams knowing that he was a violent and/or vicious person and knowing that he posed a danger to decedent; negligently and/or knowingly violated OSHA and Cal-OSHA standards including failing to provide a safe and healthful environment to plaintiff; negligently and/or knowingly failed to provide a safe environment; negligently selected, contracted with, retained, and/or supervised RENTAL CAR TRANSPORT LLC; THE HERTZ CORPORATION negligently provided Rodney Williams with the motor vehicle used to perpetrate the crime; negligently violated the San Francisco International Airport Rules, and/or otherwise was negligent.

46. As a proximate result of defendants' negligent conduct, Rodney Williams murdered decedent, Neil Lewis.

## IV. <u>FIRST CAUSE OF ACTION FOR WRONGFUL DEATH BASED ON NEGLIGENCE (on behalf of all plaintiffs)</u>

47. Plaintiff realleges and incorporates herein by reference paragraphs 1 through 42 set forth above as if fully set forth herein.

48. Prior to the death of decedent, minor plaintiffs DANIEL LEWIS and JARELL LEWIS were dependent on him for their support and maintenance. At all times prior to his death, decedent was a faithful and dutiful father to these plaintiffs.

49. Prior to the death of decedent, KAREN JOYCE LEWIS and ALFREDO LEWIS were financially dependent on decedent. At all times prior to his death, decedent was a faithful and dutiful son to these plaintiffs.

50. As a proximate result of the negligence of defendants, and of the consequent death of decedent, plaintiffs have sustained pecuniary loss resulting from the loss of the society, comfort, attention, services, guidance, and support of decedent.

51. As a further proximate result of the negligence of defendants and of the consequent death of decedent, plaintiffs incurred funeral and burial expenses.

## V. **SECOND CAUSE OF ACTION FOR SURVIVAL DAMAGES BASED ON NEGLIGENCE (on behalf of Tiffany Hodges as Guardian ad Litem for Daniel Lewis and Jarell Lewis).**

52. Plaintiff realleges and incorporates herein by reference paragraphs 1 through 46 set forth above as if fully set forth herein.

53. Minor plaintiffs DANIEL LEWIS and JARELL LEWIS are the sole successors in interest of Neil Lewis and succeed to this cause of action because there is no personal representative of the estate of Neil Lewis.

54. Plaintiff TIFFANY HODGES, as Guardian ad Litem of DANIEL LEWIS and JARELL LEWIS, brings this complaint in her capacity as Guardian ad Litem of the sole successors in interest of the decedent. Plaintiff TIFFANY HODGES has executed and filed the declaration under penalty of perjury required by California Code of Civil Procedure Section 377.32.

55. On or about July 7, 2015, after the foregoing cause of action arose in his favor, Neil Lewis, who would have been the plaintiff in this action if he had lived, died.

56. As a proximate result of the negligence of defendants, and immediately prior to his death, personal property of decedent, including but not limited to the clothing he was wearing when murdered, was destroyed.

57. Defendants' conduct was malicious and oppressive and in conscious disregard of decedent's rights. Defendants, and each of them, ratified, authorized, and approved all the acts and conduct of their agent/employee and thus warrants an assessment of punitive damages in an amount appropriate to punish defendants and deter others from engaging in similar wrongful conduct.

WHEREFORE, Plaintiffs pray for a judgment against defendants, and each of them, as follows:

a. For medical, hospital and related expenses according to proof;

b. For damages to personal property according to proof;

c. For funeral and burial expenses, according to proof;

d. For general damages according to proof;

e. For punitive damages according to proof;

f. For costs of suit herein incurred; and

g. For such other and further relief as the court may deem proper.

DATED: February 21, 2018 BRENT & FIOL, LLP.

By:____/s/ Joseph P. Brent____________________
JOSEPH P. BRENT, Attorney for Plaintiff, TIFFANY HODGES, as Guardian ad Litem for DANIEL LEWIS and JARELL LEWIS, minors, and sole heirs of Neil Lewis, deceased; KAREN JOYCE LEWIS; and ALFREDO LEWIS

## DEMAND FOR JURY TRIAL

Plaintiff TIFFANY HODGES, as Guardian ad Litem for DANIEL LEWIS and JARELL LEWIS, minors and sole heirs of Neil Lewis, deceased, KAREN JOYCE LEWIS, and ALFREDO LEWIS hereby demands a jury trial in this matter.

DATED: February 21, 2018 BRENT & FIOL, LLP.

By:___/S/ Joseph P. Brent____________________
JOSEPH P. BRENT, Attorneys for Plaintiff, TIFFANY HODGES, Individually and as Guardian ad Litem for DANIEL LEWIS and JARELL LEWIS, minors, and heirs of NEIL LEWIS, deceased; KAREN JOYCE LEWIS; and ALFREDO LEWIS

**EXHIBIT 1**

STATE OF CALIFORNIA
**Division of Workers' Compensation**
**Workers' Compensation Appeals Board**

| | |
|---|---|
| **NEIL LEWIS (DECEASED); DANIEL LEWIS and JARELL LEWIS (ALLEGED DEPENDENTS),**<br>*Applicants,*<br>vs.<br>**FOX RENT-A-CAR, *et al.*,**<br>*Defendants.* | **Case No. ADJ10607892**<br><br>**ORDER APPOINTING GUARDIAN AD LITEM AND TRUSTEE FOR MINOR APPLICANTS** |

**PETITION HAVING BEEN FILED** by applicants herein on February 1, 2017,

**IT APPEARING THAT** applicants DANIEL LEWIS and JARELL LEWIS, alleged dependents of decedent NEIL LEWIS, are minors,

**IT FURTHER APPEARING THAT** non-dependent applicant TIFFANY HODGES is the minor applicants' mother and has legal custody of the minor applicants, and

**GOOD CAUSE OTHERWISE APPEARING THEREFOR,**

**IT IS ORDERED THAT** TIFFANY HODGES be, and she hereby is, appointed Guardian ad Litem and Trustee for minor applicants DANIEL LEWIS and JARELL LEWIS.

DATE: February 3, 2017

**Eugene Gogerman**
WORKERS' COMPENSATION
ADMINISTRATIVE LAW JUDGE

NOTICE TO: Bernhard Baltaxe, Esq. @ Smith & Baltaxe LLP
Pursuant to Rule 10500, you are designated to serve this/these document(s) forthwith on all parties shown on the Official Address Record (copy attached).
ON: February 6, 2017
BY: A. Paraiso

Document ID: 8670915530351181824

STATE OF CALIFORNIA
DEPARTMENT OF INDUSTRIAL RELATIONS
DIVISION OF WORKERS' COMPENSATION

02-06-2017

# OFFICIAL ADDRESS RECORD

| **Case Number:** ADJ10607892 | |
|---|---|
| DANIEL LEWIS | Dependent, 178 BRIGHTON AVE SAN FRANCISCO CA 94112 |
| FOX RENT A CAR | Employer, 780 NORTH MCDONNELL SAN FRANCISCO CA 94112 |
| HANNA BROPHY SAN FRANCISCO | Law Firm, PO BOX 12488 OAKLAND CA 94604 |
| JARELL LEWIS | Dependent, 178 BRIGHTON AVE SAN FRANCISCO CA 94112 |
| LIBERTY MUTUAL ROCKLIN | Claims Administrator, PO BOX 779008 ROCKLIN CA 95677 |
| **NEIL LEWIS DECEASED** | **Injured Worker** |
| SMITH BALTAXE SAN FRANCISCO | Law Firm, 825 VAN NESS AVE STE 502 SAN FRANCISCO CA 94109, BBALTAXE@SMITHBALTAXE.COM |
| TIFFANY HODGES | Other Applicant, 178 BRIGHTON AVE SAN FRANCISCO CA 94112 |
| TIFFANY HODGES | Guardian Ad Litem, 178 BRIGHTON AVE SAN FRANCISCO CA 94112 |

**EXHIBIT 2**

FARMERS INSURANCE

Send all correspondence to:
Email: wcclaimsdocs@[illegible].com
Work Comp Imaging Center
PO Box 108843
Oklahoma City OK 73101-8843
Fax: (866) 846-3114

August 14, 2015

Estate of NEIL LEWIS
178 BRIGHTON AVE
SAN FRANCISCO CA 94112

| | | |
|---|---|---|
| RE: | Claim No.: | WC10116766 |
| | Employee: | LEWIS, NEIL |
| | Employer: | RENTAL CAR TRANSPORT LLC |
| | Policy No.: | 0A09478871 |
| | Date of Injury: | 07/07/2015 |

**NOTICE REGARDING DENIAL OF DEPENDENCY BENEFITS**

Dear Estate of Neil Lewis:

Mid Century Insurance Company is handling the workers' compensation claim of NEIL LEWIS on behalf of RENTAL CAR TRANSPORT LLC. This notice is to advise you of the status of dependency benefits payment for the workers' compensation injury on the date shown above. A copy of this and all notices will be sent to all potential dependents.

After careful consideration of all available information, we are denying liability for the claim for workers' compensation dependency benefits because due to a preliminary employer level investigation that revealed the attack was purely animosity unconnected to his employment. As such the resulting unfortunate death of Mr. Neil Lewis did not arise out of his employment nor was in the course of his employment.

*The State of California requires this notice to include the following information:*

You have the right to disagree with decisions affecting your claim. If you have any questions regarding the information provided to you in this notice, please call: DOLORES HATTIER at 818-540-2257. However, if you are represented by an attorney, you should call your attorney, not the claims adjuster. If you want further information on your rights to benefits or disagree with our decision, you may contact your local state Information and Assistance Office of the Division of Workers' Compensation by calling: 415-703-5020 (San Francisco).

For recorded information and a list of offices, call (800) 736-7401. You may also visit the DWC website at: http// www.dir.ca.gov/DWC/dwc_home_page.htm.

You also have a right to consult with an attorney of your choice. Should you decide to be represented by an attorney, you may or may not receive a larger award, but, unless you are determined to be ineligible for an award, the attorney's fee will be deducted from any award you might receive for disability benefits. The decision to be represented by an attorney is yours to make, but it is voluntary and may not be necessary for you to receive your benefits.

To resolve a dispute, you may apply to the Workers' Compensation Appeals Board.

Sincerely,
Mid Century Insurance Company

DOLORES HATTIER
Claims Representative

CC: RENTAL CAR TRANSPORT LLC

Enclosure(s):

State Forms

**EXHIBIT 3**

# LEASE AGREEMENT
# FOR
# RENTAL CAR CENTER OPERATIONS

**AT**

**SAN FRANCISCO INTERNATIONAL AIRPORT**

by and between

**THE HERTZ CORPORATION,**
as tenant

and

**CITY AND COUNTY OF SAN FRANCISCO**
**ACTING BY AND THROUGH ITS AIRPORT COMMISSION,**
as landlord

Gavin Newsom, Mayor

**AIRPORT COMMISSION**
Hon. Larry Mazzola, President
Hon. Linda S. Crayton, Vice President
Hon. Caryl Ito
Hon. Eleanor Johns
Hon. Richard J. Guggenhime

John L. Martin
Airport Director

November, 2008

Lease No. 08-0153

# TABLE OF CONTENTS

**MAJOR LEASE TERM SUMMARY** .......... i

**1. PREMISES**
1.1 Extent of Leasehold .......... 1
1.2 Allocation of Premises .......... 3
1.3 Relocation, Expansion, Contraction .......... 7
1.4 Remeasurement of Premises .......... 9
1.5 Changes to Airport .......... 9
1.6 Common Areas .......... 9

**2. TERM**
2.1 Commencement and Expiration .......... 10
2.2 Tenant Improvements and Required Opening Day .......... 10
2.3 City's Option to Extend .......... 10
2.4 Holding Over .......... 10

**3. USE AND OPERATION**
3.1 Permitted Use .......... 11
3.2 No Exclusivity .......... 11
3.3 Operation of Business .......... 11
3.4 Transportation Fee .......... 11
3.5 Hours of Operation .......... 11
3.6 Customer Transactions and Transportation .......... 12
3.7 References to Airport .......... 12
3.8 Reservations by City .......... 12
3.9 Other Operational Requirements .......... 12
3.10 Prohibited Activities .......... 13
3.11 Audit of Operations .......... 13
3.12 Representative of Tenant .......... 13
3.13 Investigation Reports .......... 13
3.14 Compliance with Laws .......... 13

**4. RENT**
4.1 Definitions .......... 14
4.2 Adjustments to Minimum Annual Guarantee .......... 16
4.3 Monthly Space Rent Payments .......... 16
4.4 Rent Adjustment .......... 17
4.5 Common Use Formula .......... 17
4.6 Limited Use Formula .......... 17
4.7 Monthly Concession Rent Payments .......... 17
4.8 Sales Reports .......... 18
4.9 Airport Rent Credit Incentives .......... 18
4.10 Rental Car Concessionaire Incentive Program .......... 18
4.11 Rental Car Customer Incentive Program .......... 19
4.12 Annual Report and Adjustment .......... 19
4.13 [Intentionally Deleted] .......... 19
4.14 Books and Records; Audit Rights .......... 19
4.15 Other Reports and Submissions .......... 20
4.16 Additional Rent .......... 21
4.17 Prepay Rent .......... 21
4.18 Nature of Lease .......... 21
4.19 Severe Decline in Enplanements .......... 22

**5. ASSIGNMENT OR SUBLETTING**
5.1 No Assignment ..... 24
5.2 Changes in Tenant ..... 24
5.3 No Release ..... 25
5.4 Subleasing ..... 25
5.5 Acceptance of Rent ..... 25
5.6 Waiver ..... 25

**6. TAXES, ASSESSMENTS AND LIENS**
6.1 Taxes ..... 26
6.2 Other Liens ..... 26

**7. INVESTMENTS; ALTERATIONS**
7.1 Minimum Investment ..... 26
7.2 City's Approval Rights ..... 26
7.3 Structures and Fixtures ..... 27
7.4 Notice and Permits ..... 27
7.5 Title to Alterations ..... 27
7.6 Effect of Alterations on Airport ..... 28
7.7 Construction Period Operations ..... 28
7.8 Removable Property and Equipment ..... 28
7.9 Labor Harmony ..... 28

**8. UTILITIES**
8.1 Services Provided ..... 29
8.2 Utility Costs ..... 29
8.3 Shared Telecommunications Services ..... 29
8.4 Waiver of Damages ..... 30

**9. MAINTENANCE AND REPAIR**
9.1 "As-Is" Condition ..... 30
9.2 Tenant's Maintenance Obligations ..... 30
9.3 City's Responsibilities ..... 31
9.4 Waivers of Repair Rights ..... 31

**10. SIGNS AND ADVERTISING** ..... 32

**11. WAIVER; INDEMNITY; INSURANCE**
11.1 Waiver ..... 32
11.2 Indemnity ..... 32
11.3 Losses ..... 32
11.4 Immediate Obligation to Defend ..... 33
11.5 Notice ..... 33
11.6 Insurance ..... 33
11.7 Form of Policies ..... 33
11.8 Delivery of Policies or Certificates ..... 34
11.9 Subrogation ..... 34

**12. DEPOSIT**
12.1 Form of Deposit ..... 34
12.2 Maintenance of Deposit ..... 34
12.3 Alternative Forms of Deposit ..... 35
12.4 Use of Deposit ..... 35
12.5 Other Agreements ..... 35

**13. DAMAGE OR DESTRUCTION**
13.1 Partial Destruction of Premises....36
13.2 Total Destruction of Premises....36
13.3 Partial Destruction of Consolidated Rental Car Facility....36
13.4 Damage Near End of Term....37
13.5 No Abatement of Rent; Tenant's Remedies....37

**14. DEFAULT; REMEDIES**
14.1 Events of Default....37
14.2 Statutory Notices....38
14.3 Remedies....38
14.4 City's Right to Perform....39
14.5 Rights Related to Termination....39
14.6 Cumulative Rights....39
14.7 Prepayment....39
14.8 Fines....41
14.9 City Lien....41
14.10 Commencement of Legal Actions....41
14.11 Waiver of Notice....41

**15. SURRENDER**....42

**16. HAZARDOUS MATERIALS**
16.1 Definitions....42
16.2 Tenant's Covenants....43
16.3 Environmental Indemnity....43
16.4 Environmental Audit....43
16.5 Closure Permit....43
16.6 Environmental Compliance Requirements....44

**17. EMINENT DOMAIN**
17.1 Definitions....45
17.2 General....46
17.3 Total Taking; Automatic Termination....46
17.4 Partial Taking; Election to Terminate....46
17.5 Tenant Monetary Obligations; Award....46
17.6 Partial Taking; Continuation of Lease....46
17.7 Temporary Takings....47

**18. CITY AND OTHER GOVERNMENTAL PROVISIONS**
18.1 MacBride Principles – Northern Ireland....47
18.2 Charter....47
18.3 Tropical Hardwood and Virgin Redwood Ban....47
18.4 No Representations....47
18.5 Effect of City Approvals....47
18.6 Limitation on Damages....48
18.7 Sponsor's Assurance Agreement....48
18.8 Federal Nondiscrimination Regulations....48
18.9 Federal Affirmative Action Regulations....48
18.10 Federal Disadvantaged Business Enterprise (DBE) Regulations....49
18.11 City's Nondiscrimination Ordinance....49
18.12 Conflict of Interest....50
18.13 Prevailing Rates of Wage....50
18.14 Declaration Regarding Airport Private Roads....50
18.15 No Relocation Assistance; Waiver of Claims....50

18.16 Drug-Free Workplace .....51
18.17 Compliance with Americans With Disabilities Act .....51
18.18 Sunshine Ordinance .....51
18.19 Pesticide Prohibition .....51
18.20 First Source Hiring Ordinance .....51
18.21 Labor Peace/Card Check Rule .....51
18.22 Requiring Minimum Compensation .....52
18.23 Airport Intellectual Property .....54
18.24 Requiring Health Benefits for Covered Employees .....54
18.25 Notification of Limitations on Contributions .....56
18.26 Food Service Waste Reduction Ordinance .....56

**19. GENERAL PROVISIONS**

19.1 Notices .....56
19.2 No Implied Waiver .....57
19.3 Entire Agreement .....57
19.4 Amendments .....57
19.5 Interpretation of Lease .....57
19.6 Nature of Lease .....58
19.7 Successors and Assigns .....58
19.8 No Third-Party Beneficiaries .....58
19.9 No Joint Venture .....58
19.10 Brokers .....58
19.11 Severability .....58
19.12 Governing Law .....58
19.13 Attorney's Fees .....58
19.14 Cumulative Remedies .....58
19.15 Time of Essence .....58
19.16 Reservations by City .....59
19.17 Survival of Indemnities .....59
19.18 Quiet Enjoyment and Title .....59
19.19 No Right of Redemption .....59
19.20 Accord and Satisfaction .....59
19.21 Joint and Several Liability .....60
19.22 Estoppel Statements .....60
19.23 Authority .....60
19.24 Consents .....60
19.25 Options Personal .....60
19.26 Counterparts .....60
19.27 Most Favored Nations .....60

Signature Page .....61

List of Exhibits .....62

Exhibit A – Description of Premises
Exhibit B – Summary of City's Maintenance Responsibility
Exhibit C-1 – Form of Performance Bond
Exhibit C-2 – Form of Letter of Credit

# LEASE AGREEMENT FOR THE CONSOLIDATED RENTAL CAR CENTER AT SAN FRANCISCO INTERNATIONAL AIRPORT

## MAJOR LEASE TERM SUMMARY

For the convenience of Tenant and City (as such terms are defined below), this Major Lease Term Summary (this "**Summary**") summarizes certain terms of this Lease (as defined below). This Summary is not intended to be a detailed or complete description of this Lease, and reference must be made to the other Sections below for the particulars of this Lease. In the event of any inconsistency between the terms of this Summary and any other provision of this Lease, such other provision shall prevail. Capitalized terms used elsewhere in this Lease and not defined elsewhere shall have the meanings given them in this Summary.

**Effective Date:** JAN 08 2009, 200__.

**Tenant/Operator/ Car Rental Concessionaire:** The Hertz Corporation, a Delaware corporation.

**Tenant's Notice Address:**
The Hertz Corporation
6151 West Century Boulevard, Suite 600
Los Angeles, CA 90045
Attn: Connie Gurich, Director, Properties
Fax No. (310) 568-3454
Tel. No. (310) 568-3459

WITH A COPY TO:
225 Brae Boulevard
Park Ridge, NJ 07656
Attn: Vice President, Global Real Estate & Concessions
Tel. No. 201-307-2771

**City:** The City and County of San Francisco, a municipal corporation, acting by and through its Airport Commission.

**City's Notice Address:**
San Francisco International Airport
International Terminal, North Shoulder Bldg., 5th Floor
Attn: Airport Director
P. O. Box 8097
San Francisco, CA 94128
Fax No. (650) 821-5005
Tel. No. (650) 821-5000.

**City's Rent Payment Address:**
San Francisco International Airport
Attn: Accounting
Terminal 2, 4th Floor
P. O. Box 7743
San Francisco, CA 94120

**City's Insurance/ Deposit Notice Address:**
San Francisco International Airport
Attn: Revenue Development and Management
Terminal 2, 4th Floor
P. O. Box 8097
San Francisco, CA 94128
Fax No. (650) 821-4519
Tel. No. (650) 821-4500.

**Premises:** (§ 1) — Approximately 685,921 square feet of space in the Consolidated Rental Car Center, as more fully described on *Exhibit A*.

**Term:** (§ 2) — Approximately **Five (5) years**, commencing on the Rent Commencement Date, plus up to **one hundred and twenty (120) days** construction period. The Airport Commission will have one option to extend the term by five (5) years, exercisable by the Airport Commission in its sole and absolute discretion.

**Commencement Date:** (§ 2) — The date on which the Airport Director gives notice to Tenant that the Premises are ready for Tenant to take possession.

January 1, 2009
(actual date to be inserted upon determination)

**Rent Commencement Date:** (§ 2) — The **earlier** of: (a) the date Tenant opens for business therein, and (b) the date that is one-hundred and twenty (120) days after the Commencement Date.

January 1, 2009.
(actual date to be inserted upon determination)

**Expiration Date:** (§ 2) — 11:59 p.m. on December 31, 2013.

**Reference Year:** (§ 4.19) — The calendar year immediately prior to the year in which this Lease is awarded: 2007.

**Permitted Use:** (§ 3) — Tenant shall use the Premises for the operation of a rental car business pursuant to the Lease and for no other purpose. Without limiting the generality of the foregoing, Tenant shall operate the Premises in strict conformity with the requirements herein, including those set forth in Section 3 of the Lease.

**Base Rent:** (§ 4) — Per Lease Year (as defined below):

- the greater of the Minimum Annual Guarantee (as defined below), or
- percentage rent equal to **ten percent (10%)** of Gross Revenues (as defined below); plus

Subject to adjustments upward.

**Space Rent:** (§ 4) — The sum of the following:

- Structure Rent equals $10.13 per square foot per year;
- Surface Rent equals $3.10 per square foot per year; and
- Fifth Floor Rent equals the same as Surface Rent rate.

Subject to adjustments upward.

**Lease Year:** — For the First Lease Year, the period commencing on the Rent Commencement Date and terminating on December 31st. For each subsequent Lease Years, the period commencing January 1 and ending on December 31 of each year, or expiring on the Expiration Date, as the case may be.

| | |
|---|---|
| **Minimum Annual Guarantee:** (§ 4.1) | Ten Million Three Hundred Ninety-Nine Dollars ($10,399,000.00) (the "Initial MAG"), per annum; (Eight Hundred Sixty Six Thousand Five Hundred Eighty-Three Dollars and Thirty-Three Cents ($866,583.33) per month), subject to (a) adjustments upward as described hereto, and (b) suspension and reinstatement under certain circumstances as described hereto. |
| **MAG Adjustment Date:** (§ 4.2) | The first anniversary of the Rent Commencement Date or the first day of the first calendar month following such anniversary if the Rent Commencement Date does not fall on the first day of a calendar month, and each anniversary of such adjustment date thereafter.<br><br>January 1 .<br>(actual date to be inserted upon determination) |
| **Rent:** (§ 4) | Base Rent, together with all other amounts owing by Tenant to City hereunder. |
| **Deposit Amount:** (§ 12.2) | Equal to **one-half (1/2)** of the current MAG plus **one-half (1/2)** of the current Space Rent. |
| **Resolution:** | Number 08-0153, approved by the Airport Commission on August 19, 2008. |
| **Initial Tenant Representative:** (§ 3.12) | Connie Gurich<br>Tel. No. (310) 568-3459 |
| **Other Agreements:** (§ 12.5) | Concession Agreement No. 97-0052; and<br>Lease Agreement No. 97-0052. |

Initial of Authorized Representative of City ____________

Initial of Authorized Representative of Tenant ____________

# LEASE AGREEMENT FOR THE RENTAL CAR CENTER OPERATIONS SAN FRANCISCO INTERNATIONAL AIRPORT

THIS LEASE AGREEMENT (this "**Lease**"), dated as of the Effective Date, is entered into by and between Tenant (referred to herein on occasion as "Tenant", "Operator", or "Car Rental Concessionaire"), and the City and County of San Francisco, a municipal corporation ("**City**"), acting by and through its Airport Commission ("**Commission**"). This Lease is made with reference to the following facts:

A. City owns the San Francisco International Airport (the "**Airport**") located in the County of San Mateo, State of California, which Airport is operated by and through the Airport Commission (the "**Commission**"), the chief executive officer of which is the Airport Director ("**Director**"). The Airport's "**Rental Car Facility**" is comprised of a five-story garage and associated quick turnaround facilities ("**QTA**"), vehicle staging and storage space, all as described in Exhibit A hereto, and satellite buildings now or hereafter constructed. Tenant acknowledges that, from time to time, the Airport undergoes certain construction and renovation projects. Unless otherwise specified, the term "**Airport**" or "**Rental Car Facility**" as used herein shall mean the Airport or the Rental Car Facility, respectively, as the same may be expanded, retracted, improved, modified, renovated, or changed in any way. Unless otherwise specified below, references to the "**City**" shall mean the City, acting by and through its Airport Commission.

B. The operation of automobile rental services at Airport is a desired service for the accommodation and convenience of the airline passengers and the public, and it is the intent of City that this service be available at Airport.

C. Airport intends to contract the Rental Car Facility that will accommodate up to **nine (9)** on-Airport rental car companies.

D. Following a Request for Bids (the "**Bid**") competitive process pursuant to Section 2A.173 of the San Francisco Administrative Code, the Commission has determined that Tenant is among the highest or best responsible bidder(s). Pursuant to the Resolution, Commission has awarded this Lease to Tenant.

E. Tenant has agreed to enter into a Maintenance Agreement for the Common Use Areas with all other tenants of the Rental Car Facility.

F. Pursuant to Resolution No. 08-0153, Commission authorized the execution of this Lease.

Accordingly, Tenant and City agree as follows:

## 1. PREMISES

1.1 Extent of Leasehold. On the terms, conditions, and covenants in this Lease, City hereby leases to Tenant and Tenant hereby leases from City, the Premises. In addition, Tenant shall possess the non-exclusive right of ingress and egress to and from the Premises as may be necessary on areas designated by Director, subject to Airport Rules and Regulations, as amended from time to time (as amended, the

"**Airport Rules**"), provided that Tenant's exercise of such right shall not impede or interfere unduly with the operation of the Airport by City, its tenants, customers, and other authorized occupants. Tenant shall not place or install any racks, stands or other display of merchandise or trade fixtures in any Airport property outside the Premises, without the express prior consent of Director. In no event will Tenant engage in any activity on the Airport outside the Premises for the recruitment or solicitation of business. For purposes of this Lease relating to Tenant's responsibilities, the "**Premises**" shall mean the area(s) shown on ***Exhibit A***, the "**Premises**" is comprised of "**Exclusive Space**", "**Common Use Space**" and "**Limited Common Use Space**" as described below.

(a) Exclusive Space: Exclusive Space is space leased by Tenant for its exclusive use. Tenant is solely responsible for payment of rent on Exclusive Space. Tenant's Exclusive Space is described as follows:

i. 9,462 square feet of garage space on Level(s) 1 through 4 of the Rental Car Center, of which 8,633 square feet shall be for administrative purposes ("**Administrative Space**"), and 829 square feet shall be for customer service counter space ("**Counter Space**") as described on Exhibit A.

ii. 343,609 square feet shall be for ready stalls on Levels 1, 2 and 4 of the Rental Car Center.

iii. 217,551 square feet shall be in the QTA and Roof Area, of which 39,383 shall be in the Fuel/Wash Canopy Area, 99,525 square feet shall be Lot 1 Surface Area, 65,618 shall be in the Rear Lot, and 13,025 shall be on Level 5.

(b) Common Use Space: Common Use Space is space used in common with all tenants of the Rental Car Facility. Tenant is responsible for a portion of rent allocable to Common Use Space as described in Section 4.5 herein. Tenant's Common Use Space is described as follows:

i. 35,090 square feet of garage space on Level(s) 1 - 4 of the Rental Car Center.

ii. 65,186 square feet shall be in the QTA & Roof Area.

(c) Limited Common Use Space: Limited Common Use Space is space used in common with a limited number of companies leasing a specific area ("**Shared Area**"). Tenant is responsible for a portion of rent allocable to the Limited Common Use Space as described in Section 5.4 herein. Tenant's Limited Common Use Space is described as follows:

i. 15,023 square feet of garage space on Level 2 of the Rental Car Facility.

1.2 Allocation and Reallocation of Space at Rental Car Facility. Operator along with all other rental car tenants of the Rental Car Facility must present a unanimously agreed-upon space selection plan, which must include a plan for the allocation of costs and a phased implementation schedule, for the Airport's approval no later than 45 days after the Bids for the Lease for Rental Car Operations at San Francisco International Airport have been received by City. In the event the tenants are unable to reach a consensus as to the location of each company at the Rental Car Facility, the Director will use the following methodology in determining allocation and location of space. The Director's decision on the location of each Tenant will be deemed final.

Operators with multiple brands may elect, but are not required, to co-locate in all areas of the Rental Car Facility and QTA. Subject to minimum space allocations, Operators will be required to rent space based on the following:

(a) Counters and Back Office Space. Operators will select counters in order of market share. Multi-branded bidders may elect to co-locate their brands. If multi -branded bidders elect to co-locate their brands, their combined brand market shares will be considered for counter selection purposes. Multi-branded operators who do not elect to co-locate will select their counters in the market share order.

If, as a result of this bid, it is necessary to allocate counter space to a new entrant brand and there is not a vacant counter to be allocated for this purpose, a new counter will be created from existing counter space for this purpose. See Exhibit A "Premises." The Director will give a 30 day notice to the Operator who is affected by the creation of the new entrant counter space to allow for the removal of their proprietary equipment, finishes and fixtures. All cost for the removal of the proprietary equipment is the sole responsibility of the affected Operator.

Where multi-branded bidders elect to co-locate their brands:

i. The area vacated by a brand will have all proprietary equipment, fixtures and fittings removed and will leave the space in a condition consistent with the terms and conditions in the Lease.

ii. The cost to vacate the counter and back office space will be the responsibility of the multi-branded bidders.

iii. Any costs to remodel the co-located counter and back office area are the responsibility of the multi-branded bidders.

Where an incumbent's counter area is to be subdivided to create space for another brand, the costs to reconfigure the counter and back office to (1) demise the space; (2) create access through the counter; and (3) accommodate ADA access to the counter is the responsibility of the new occupant. All proprietary work to complete the counter and back office space is the responsibility of the new entrant occupying that space.

Prior to the start of any remodel work, the operators must submit plans to the Airport for review and approval. Following the Airport's approval of the remodel plan submission, the operators will have one hundred and twenty (120) days to complete the work and start its operations unless otherwise agreed in writing by the Airport Director.

Following the completion of the remodel work the ninth operator will provide as-built drawings to the Airport for its use.

Reallocation: Counter Space and Back Office space will not be reallocated during the term of the Lease.

(b) Administrative space. Administrative space will be grandfathered for incumbent operators who are successful bidders. If, as a result of the bid, there is a new entrant brand, administrative space will be provided to that operator. All costs to provide the proprietary fixtures, finishes, and equipment are the sole responsibility of the new entrant.

Reallocation: Administrative space will not be reallocated during the term of the Lease.

(c) Ready/Return Space. Incumbent brands will be grandfathered as to the location of their ready/return areas, except that multi-branded bidders who are not currently co-located may elect to co-locate their brands into one of their current locations.

If, as a result of the bid, there is a new entrant brand, that new entrant will be given a ready/return area on the third floor of the garage with a minimum of fifty four (54) spaces.

The number of ready/return spaces will be allocated according to the percentage of each brands bid divided into the aggregate total of all the MAGs.

Where multi-branded bidders elect to co-locate their brands:

i. The area vacated by a brand will have all proprietary equipment, fixtures and fittings removed and will leave the space in a condition consistent with the terms and conditions in the Lease

ii. The cost to vacate the ready and return area will be the responsibility of the multi-branded bidders.

iii. Any costs to remodel the co-located ready and return area are the responsibility of the multi-branded bidders.

Where an incumbent's ready and return area is to be subdivided to create space for a potential ninth operator, the costs to reconfigure the ready and return area to demise the space is the responsibility of the ninth operator. The Director will give a 30 day notice to the incumbent affected by the creation of the new entrant's ready and return area to allow for the removal of their proprietary equipment, finishes and fixtures. All costs for the removal of the proprietary equipment are the sole responsibility of the affected incumbent.

If a ninth operator is awarded a Lease they will be responsible for the costs to remodel their assigned ready and return area, which will include the costs to (1) demise the space; (2) to secure the space, (3) to provide proprietary improvements and (4) to participate in the shared security system for the garage floor is the responsibility of the new entrant. Prior to the start of any remodel work the ninth operator must submit plans to the Airport for review and approval. Following the Airport's approval of the remodel plan submission, the ninth operator will have one hunderd and twenty (120) days to complete the work and start its operations unless otherwise agreed in writing by the Airport Director.

Following the completion of the remodel work the ninth operator will provide as-built drawings to the Airport for its use.

(d) 5th Floor Vehicle Storage Area.

i. The incumbent brands will be grandfathered as to the location of their vehicle storage areas, except that multi-branded bidders who are not currently co-located may elect to co-locate their brands into one of their current positions.

ii. The number of vehicle storage spaces will be allocated according to the percentage of each brands bid divided into the aggregate total of all the MAGs.

iii. The Airport reserves the right to use a portion of the 5th floor for parking of non-rental car company tenants.

iv. Following the allocation of the remaining spaces on the 5th level, the incumbent operators will provide an allocation drawing to the Airport for its use.

Reallocation: The location of the vehicle storage areas will not be reallocated during the term of this Lease. The number of storage spaces assigned to each operator/brand will be reallocated according to market share on the 1st day of the 37th month of the Lease. Beginning 6 months prior to this date, the Rental Car Companies (“**RACs**”) will have 45 days to agree on a reallocation plan. If the RACs are unable to agree, the City will formulate a plan to be used for the reallocation. All costs for reallocation will be paid by the RACs.

(e) QTA space. Fuel/wash canopy areas are grandfathered in their current configuration for incumbent operators who are successful bidders, except that multi-branded bidders who are not currently co-located may elect to co-locate their brands into one of their current locations.

If, as a result of the bid, there is a ninth brand, the new operator will share QTA space with the incumbent brand with the next lowest market share. Where a ninth operator is awarded a Lease they will:

i. Work together with the incumbent to mutually agree how to allocate the space.

ii. If as a result of their Lease a portion of the space needs to be remodeled, it is the ninth brands responsibility to pay the costs and oversee the remodel work. Prior to the start of any remodel work the ninth operator must submit plans to the Airport for review and approval. Following the award of the Lease or the Airport’s approval of the remodel plan submission, the ninth operator will have 120 days to complete the work and start its operations unless otherwise agreed in writing by the Airport Director.

iii. The ninth operator will be required to enter into an operating Lease for the fueling system that is acceptable to the incumbent operator and the Airport.

If the ninth brand is assigned a vacant operating area:

i. They will be responsible to pay the costs and to oversee any required model work and the installation of their proprietary equipment fixtures and fittings. Prior to the start of any remodel work the ninth operator must submit plans to the Airport for review and

approval. Following the award of the Lease or the Airport's approval of the remodel plan submission, the ninth operator will have 120 days to complete the work and start its operations unless otherwise agreed in writing by the Airport Director.

ii. The ninth operator will be assigned a minimum of one stacking lane (approximately 19 nose-to-tail spaces) and shared access to the circulation lanes within the assigned QTA and stacking and staging area. If, as a result of the bid, a vacancy is created at the QTA, the ninth brand will take that space.

iii. Stacking/storage space at the QTA will be allocated according to the percentage of each brands bid divided into the aggregate total of all the MAGs.

iv. Fuel/wash canopy areas space will not reallocated during the term of this Lease. Stacking/storage space will be reallocated according to market share at the same time and by the same methodology as the reallocation of ready/return spaces in the garage. Any costs incurred by reallocation will be paid by the RACs.

(f) Market Share Determination. For purposes of determining the order of market shares, if a multi-branded bidder elects to co-locate, their combined market share will be considered. For example, if National and Enterprise were to co-locate, their combined market share would not be the next smallest market share to the potential new entrant and they would not be required to share space with a potential new entrant. However, if National and Enterprise submit a co-branded bid but elect not to co-locate at the QTA, their individual market shares would be considered for this purpose.

(g) Common Use Space. Operator will also be required to rent its proportionate share of Common Use Space, based on the proportion its Exclusive Space bears to the total Exclusive Space leased by all lessees of the Rental Car Facility, and its proportional share of Limited Common Use Space, based on the proportion its Exclusive Space on a floor or other area shared by others bears to the total Exclusive Space leased by all users of said floor or other area. For the purposes of the proportionate allocation of the Common Use space, rent if any operator has a market share of less than 2% their individual market share allocation will be 2%. For the distribution of the remaining 98% market share, the allocation will be based upon reported gross revenues from all companies reporting revenues to the Airport, for the twelve-month period ending December 31, 2007.

(h) Minimum Space Allocation. No operator will receive less than an area accommodating 54 ready/return positions and 17 linear feet of customer service counter, in addition to administrative, operational and QTA space to be allocated in accordance with market share and it proportionate share of Common Use and Limited Common use space as described.

i. Tenant Improvements. Operator may at its own expense and subject to the requirements of the Lease, construct, place or erect its own and common tenant improvements, furnishings and equipment, including, without limitation, its counter inserts, communication systems, car fueling and washing systems, individual signage, and finishes within its exclusive administration and service space.

ii. Reallocation. The location of the ready/return areas will not be reallocated during the term of this Lease. The number of ready/return and storage spaces assigned to each operator/brand will be reallocated according to the market share on January 1, 2012 (the "Reallocation

Date"). Beginning six (6) months prior to the Reallocation Date, the RACs will have 45 days to agree on a reallocation plan. If the RACs are unable to agree on a plan, the City will formulate a plan to be used for the reallocation of the ready/return, 5th floor, and QTA stacking spaces and the RACs will be subject to its adherence. All costs for reallocation will be paid by the RACs, however, that the following spaces comprising Premises shall not be subject to such reallocation: Administrative Space, Counter Space and QTA Fuel Wash/Canopy Space. In the event that City exercises its option to extend the Lease term as provided in Section 2.3 hereof, all spaces comprising the Premises, excluding Administrative Space and QTA Fuel Wash/Canopy Space, will be subject to reallocation on January 1, 2014 and on January 1, 2017. Beginning six months prior to these dates, the RAC s will have forty-five (45) days to agree on a relocation plan.

iii. Changes in Operators. In the event space becomes available in the Rental Car Facility, the Airport will, in its sole discretion, either reallocate the space to the remaining companies or re-bid the available space.

iv. Method of Allocation. Initial space allocation will be based on calendar year 2007. Any subsequent space reallocation pursuant to this Section 1.2 shall be determined in accordance with the market share based upon the twelve-month period ending September 30 of the year prior to the year in which the reallocation becomes effective. The Airport Director may stipulate a different twelve-month period should it be appropriate.

1.3 Relocation, Expansion, Contraction. At any time during the Term, City may require that (i) Tenant relocate and surrender all or part of the Premises (such change to the Premises referred to as a "**Required Relocation**"), and/or (ii) the Premises be contracted or expanded (such change to the Premises referred to as a "**Premises Change**") on the terms set forth in this Section 1.3. City shall give notice (the "**Change Notice**") setting forth a description of the Required Relocation or the Premises Change, as applicable, the approximate effective date thereof (the "**Target Effective Date**"), and with respect to a Required Relocation, the location of comparable on-Airport replacement premises. The Change Notice shall be given no less than six (6) months prior to the Target Effective Date.

(a) With respect to a Required Relocation, if the replacement premises are deemed unsatisfactory to Tenant, then Tenant may terminate this Lease by giving notice thereof to City within thirty (30) days after the Change Notice is given. In the event Tenant gives such notice of termination, then this Lease shall terminate on the Target Effective Date, and on such date, Tenant shall surrender the Premises in the condition required by this Lease. (ii) Provided Tenant does not terminate this Lease pursuant to the foregoing, Tenant shall surrender the Premises and relocate to the replacement premises on a date (the "**Surrender Date**") determined by City (which shall be no earlier than the Target Effective Date). On the Surrender Date, Tenant shall surrender the Premises in the condition required below. In the event of a relocation pursuant to this Section 1.2(b), Tenant shall refurbish, redecorate, and modernize the interiors and exteriors of the replacement premises, such that the replacement premises are of at least the same quality as the original premises. As part of City's approval of Tenant's plans and specifications and Tenant's budget for its remodeling, City may specify a "Maximum Reimbursement Amount," which is an amount agreed upon by Tenant and Airport prior to the commencement of such work. Once the remodeling of the replacement premises is completed, and City has approved the work, Tenant must submit to City (i) a certificate from Tenant's architect certifying that the remodeling was completed in strict compliance with the plans and specifications approved by City, (ii) copies of paid invoices

showing the costs actually paid by Tenant for the remodeling of the replacement premises and Tenant's out-of-pocket moving costs, and (iii) lien releases from all contractors, subcontractors, and materialmen entitled to payment in connection with the remodeling of the replacement premises. Following its review and approval of those submissions, City will reimburse Tenant for all reasonable costs of remodeling the replacement premises and moving its merchandise and other personal property to the replacement premises from the original Premises; provided that in no event will City be required to reimburse Tenant for more than the Maximum Reimbursement Amount and further provided that City may, in City's sole discretion, make such reimbursement by issuing Tenant a rent credit. In no event will City be obligated to pay or reimburse Tenant for any other costs or expenses, including business interruption costs.

(b) With respect to a Premises Change where the square footage of the original Premises will be expanded or contracted by more than ten percent (10%), Tenant may terminate this Lease by giving notice thereof to City within thirty (30) days after the Change Notice is given. In the event Tenant gives such notice of termination, then this Lease shall terminate on the Target Effective Date and on such date, Tenant shall surrender the Premises in the condition required below. (ii) Provided Tenant does not terminate this Lease pursuant to the foregoing, Tenant shall cause the Premises to be expanded or contracted as described in the Change Notice on or before the date described therein. As part of City's approval of Tenant's plans and specifications and Tenant's budget for its expansion/contraction work, City may specify a "Maximum Reimbursement Amount." Once the expansion/contraction work is completed, and City has approved the work, Tenant must submit to City (i) a certificate from Tenant's architect certifying that the expansion/contraction work was completed in strict compliance with the plans and specifications approved by City, (ii) copies of paid invoices showing the costs actually paid by Tenant for the remodeling and Tenant's out-of-pocket moving costs, and (iii) lien releases from all contractors, subcontractors, and materialmen entitled to payment in connection with the expansion/contraction work. Following its review and approval of those submissions, City will reimburse Tenant for all reasonable costs of the expansion/contraction work; provided that in no event will City be required to reimburse Tenant for more than the Maximum Reimbursement Amount and further provided that City may, in City's sole discretion, make such reimbursement by issuing Tenant a rent credit. In no event will City be obligated to pay or reimburse Tenant for any other costs or expenses, including business interruption costs.

(c) With respect to a Required Relocation, the Space Rent shall be increased, or decreased, as the case may be, pro rata, to reflect the increase or decrease, as the case may be, in the size of the replacement premises compared to the original premises.

(d) With respect to a Premises Change where the square footage of the original premises will be expanded or contracted by more than ten percent (10%), the Space Rent shall be increased, or decreased, as the case may be, pro rata to reflect the increase or decrease, as the case may be, in the size of the expanded or contracted premises compared to the original premises.

(e) Any Required Relocation or Premises Change described herein can be effected on the terms and conditions set forth above without need for a formal amendment of this Lease.

Notwithstanding anything to the contrary herein, City shall not require a Required Relocation or a Premises Change unless City shall have considered other reasonable alternatives and rejected them.

1.4 Remeasurement of Premises. At any time and from time to time, Director may cause City to conduct a space audit pursuant to which City remeasures the Premises using the Airport's then-current measurement specifications, and in such event, the Lease terms based on square footage shall be deemed automatically adjusted to reflect such remeasurement.

1.5 Changes to Airport. Tenant acknowledges and agrees that (a) City shall have the right at all times to change, alter, expand, and contract the Airport, including the Rental Car Facility; (b) City has made no representations, warranties, or covenants to Tenant regarding the design, construction, pedestrian traffic, enplanements, airline locations, or views of the Airport or the Premises. Without limiting the generality of the foregoing, Tenant acknowledges and agrees that the Airport (i) is currently undergoing, and may from time to time hereafter undergo, renovation, construction, and other Airport modifications; and (ii) may from time to time adopt rules and regulations relating to security and other operational concerns that may affect Tenant's business. Although City will use reasonable efforts to minimize the effect of such changes on Tenant's business, Tenant acknowledges that such activity may have some effect on Rental Car operations located at the Airport. Such construction and renovation programs might involve barricading, materials storage, noise, the presence of workers and equipment, rearrangement, utility interruptions, and other inconveniences normally associated with construction and renovation. Although City will use reasonable efforts to minimize the effect of the such changes on Tenant's business, Tenant acknowledges that such activity may have some effect on Rental Car operations located at the Airport, and Tenant shall not be entitled to any rent credit or other compensation therefore. At any time and from time to time, City may, without the consent of Tenant, and without affecting Tenant's obligations under this Lease, at City's sole discretion, (a) change the shape, size, location, number and extent of the improvements in any portion of the Airport, including without limitation the concourses, piers, boarding areas, retail areas and security areas located within the Terminal Building, (b) build additional stories above or below the Airport buildings, including of the Terminal Building or the Consolidated Rental Car Facility, (c) eliminate or relocate public entrances to the Premises so long as there is at all times one public entrance to the Premises, (d) construct multi-level, elevated or subterranean parking facilities, and (e) expand or contract the Airport, including redefining the Airport boundaries so as to include additional lands within the Airport or exclude lands from the Airport or both. Without limiting waivers set forth elsewhere in this Lease, Tenant hereby waives all claims against City and releases City from all Losses (as defined below) that Tenant suffers or incurs arising out of or in connection with any changes to the Airport or any portion of the Airport and Tenant further agrees that Tenant will not be entitled to any rent abatement or any other rent relief in connection with any changes to the Airport or any portion of the Airport.

1.6 Common Areas. The term **"common areas"** means all areas and facilities located within the Airport that are designated by City from time to time for the general use and convenience of the tenants of the Airport and other occupants of the airport, and airline passengers and other visitors to the Airport such as concourses, sidewalks, elevators, escalators, moving walkways, parking areas and facilities, restrooms, pedestrian entrances, driveways, loading zones and roadways. City may, in its sole discretion, and without any liability to Tenant (a) change the common areas, (b) increases or decreases the common areas (including the conversion of common areas to leaseable areas and the conversion of leaseable areas to common areas), and (c) impose parking charges. City will, in its sole discretion, maintain the common areas, establish and enforce Airport Rules concerning the common areas, close temporarily portions of the common areas for maintenance purposes, and make changes to the common areas including changes in the location of security check points, driveways, entrances, exits, parking spaces, parking areas, and the direction of the flow of traffic. City reserves the right to make additional Airport Rules affecting the Airport throughout the Term, including the requirement that Tenant participate in a parking validation program.

## 2. TERM

2.1 Commencement and Expiration. The term of this Lease (the "Term") shall commence on the Commencement Date and expire on the Expiration Date, unless terminated prior thereto as provided herein. If for any reason (including, without limitation, the existing tenant's failure to vacate timely the Premises) City cannot deliver possession of the Premises to Tenant on the Commencement Date, this Lease shall remain in effect, City shall not be subject to any liability, and such failure shall not extend the Term hereof. In such event, and provided such delay is not caused by the act or omission of Tenant, or Tenant's principal, affiliate, contractor, employee, agent, licensee or invitee (a "**Tenant Entity**"), the Rent Commencement Date shall be extended day for day to reflect such delay. If for any reason City is unable to deliver possession of the Premises to Tenant on the date that is one hundred eighty (180) days after the Commencement Date, each of City and Tenant shall have the right to terminate this Lease by notice to the other. After the Rent Commencement Date has occurred, upon Director's request, Tenant will execute a written acknowledgment of the Commencement Date and the Rent Commencement Date. In the event Tenant fails to execute and return promptly such acknowledgment to City, the dates described therein shall be deemed conclusive.

2.2 Tenant Improvements and Required Opening Day: Operator may at its own expense and subject to the requirements of the Lease, construct, place or erect its own and common tenant improvements, furnishings and equipment, including, without limitation, its counter inserts, communication systems, car fueling and washing systems, individual signage, and finishes within its exclusive administration and service space. Tenant shall (a) take possession of the Premises on the Commencement Date, (b) cause the initial improvements necessary and appropriate to commence or continue operations in the Premises (the "**Initial Improvements**") to be substantially completed on or before the one hundred twentieth day of occupying the premises and (c) cause the Premises to be open for business on or before the Rent Commencement Date. In the event the Premises are not complete and/or open for business on or before the one hundred twentieth day of assuming the premises, City will incur substantial damages, the exact amount of which are extremely difficult to fix. Accordingly, for each day after the one hundred twentieth day, until the day on which Tenant completes or opens the Premises for business, Tenant shall pay to City **Five Hundred Dollars ($500)** (in addition to Rent as provided below), as liquidated damages. The parties have agreed that this amount represents a reasonable approximation of the damages likely to be suffered by City in the event Tenant shall fail to open on or before the Rent Commencement Date. In the event the Premises are not open for business on the date that is one hundred twenty (120) days after assuming the premises, City shall have the option to terminate this Lease, exercisable by notice to Tenant.

2.3 City's Option to Extend Term. City shall have one option, exercisable by City in its sole and absolute discretion, to extend the term of this Lease for one five-year period under the same terms and conditions as stated herein except that the rental rate shall be adjusted pursuant to Section 4.2 herein. To exercise the option, City shall give written notice to Tenant of its intention to exercise the option no less than six (6) months prior to the expiration of the initial term of this Lease.

2.4 Holding Over. If, without objection by City, Tenant holds possession of the Premises after the Expiration Date, Tenant shall become a tenant from month to month, upon the terms of this Lease. No such holdover shall be deemed to operate as a renewal or extension of the Term. Such month-to-month tenancy may be terminated by City or Tenant by giving thirty (30) days' notice of termination to the other at any time. Tenant shall have no rights to renew or extend the Term of this Lease.

## 3. USE AND OPERATION

3.1 Permitted Use. Tenant shall use the Premises for the operation of a rental car business pursuant to the Lease and for no other purpose ("**Permitted Use**"). In the event Tenant desires to use the Premises for any purpose other than the Permitted Use (including selling an item or service outside the scope of the Permitted Use), Tenant may submit a request to Director. Director may, in his sole and absolute discretion, approve or deny such request. Any such decision shall be binding on Tenant. Operator shall have the non-exclusive right during the term of this Lease to operate an automobile rental service at and from the Rental Car Facility. Operator understands and agrees that it is restricted under this Lease to activities deemed necessary to the operation of an automobile rental service only. Operator shall not engage in any other business or commercial or retail sales activity at Airport, nor permit others to engage in same, unless such business or activity, directly related to the permitted operations under this Lease has been approved in writing by the Director. In the event any question or disputes arises as to the sale of any specific item or service or category of items or services, Operator may submit a request in writing to Director asking that the matter be reviewed. Director shall give a decision in writing and such determination shall be considered as final authority on the matter. Operator shall abide by and conform to the decision of the Director.

3.2 No Exclusivity. Tenant acknowledges and agrees that Tenant has no exclusive rights to conduct the business of the Permitted Use and that City may arrange with others for similar activities at the Airport.

3.3 Operation of Business. Subject to the terms of this Lease, Tenant will operate Tenant's business in the Premises so as to maximize Gross Revenues (as defined below) and in accordance with the requirements set forth in this section relating to, among other things, merchandise requirements and price requirements. Without limiting the generality of the foregoing, Tenant shall (a) conduct the business in a first-class, businesslike, safe, efficient, courteous and accommodating manner; (b) carry a wide-range of vehicles, sufficient quantity, and quality late models; (c) maximize the provision of environmentally friendly vehicles to rent; (d) employ sufficient and experienced staff. In the event Director shall give notice to Tenant that any of the foregoing covenants (a) - (d) are not being satisfied, Tenant shall immediately discontinue or remedy the objectionable practice. In addition, Tenant shall render the following public services: make reasonable change, give directions, and assist the public generally. Tenant shall take all reasonable measures in every proper manner to maintain, develop, and increase the business conducted by it. Tenant will not divert or cause to be diverted any business from the Airport.

3.4 Transportation Fee. Operators are required to collect and remit to the City an AirTrain Fee on a per transaction basis from rental car customers using the rental car facilities. During the Term, Operators agree to comply with the aforementioned requirement regardless of any changes to any law (local, state or federal law) that may relieve Operator of such requirement to collect and remit to the City an AirTran Fee or similar intended fee. Customers arriving at the Car Rental Facility by means other than the AirTrain will not be required to pay the AirTrain fee. In no event shall any rental car company's waivers exceed one percent (1%) of that company's rental contracts. The AirTrain fee is to be collected and remitted to the City shall be in such an amount as the City may determine in its sole discretion. The City reserves the right to adjust the AirTrain fee at any time during the term of the Lease.

3.5 Hours of Operation. The automobile rental service shall be operated not less than twenty-four (24) consecutive hours each day, seven (7) days per week, including holidays unless otherwise permitted by written consent from Director. The Director reserves the right to approve and change hours of operation.

Operator understands and agrees that its operations under this Lease are a service to airline passengers and the users of Airport, and that Operator shall conduct its operations in a first-class, businesslike, efficient, courteous, and accommodating manner. Director shall have the right to make reasonable objections to the cleanliness, safety and model year of automobiles available for rental, the character of the service rendered to the public, and the appearance and condition of the Premises. Operator agrees to promptly discontinue or remedy any such objectionable practice. Failure to comply with the foregoing shall constitute a material breach of this Lease. Director shall have the right to establish additional operational requirements from time to time.

Operator understands and agrees that its operation at Airport necessitates the rendering of public services such as giving directions and assisting the public generally.

3.6 Customer Transactions and Transportation. As established by Airport Commission Resolution No. 96-0146, all on-Airport rental car transactions will take place at the Rental Car Facility. Off-Airport rental car companies will also be permitted to pick-up and drop-off customers at the Rental Car Facility.

3.7 References to Airport. Tenant shall not, without the prior written consent of Director, reference City or the Airport for any purpose other than the address of the business to be conducted by Tenant in the Premises, nor will Tenant do or permit the doing of anything in connection with Tenant's business or advertising which in the judgment of City may reflect unfavorably on City or the Airport, or confuse or mislead the public as to the relationship between City and Tenant.

3.8 Reservations by City. Tenant shall ensure City of emergency access to all Airport premises at which Tenant is conducting its automobile rental service by providing emergency telephone numbers at which Tenant or Tenant's agent may be rendered on a 24-hour basis.

3.9 Other Operational Requirements. Tenant must dispose of all trash and debris in areas and in containers designated by Director. If City provides common trash areas, Tenant is required to establish a permit to use the trash containers for a charge determined by Director from time to time. Tenant may not place or leave or permit to be placed or left in or upon any part of the common areas or corridors adjacent to the Premises any garbage, debris or refuse.

Tenant acknowledges that the operational requirements of the Airport as an airport facility, including without limitation security requirements, are of paramount importance. Tenant acknowledges and agrees that it must conduct its business in a manner that does not conflict with the operational requirements of the Airport as an airport facility and that fully accommodates those requirements. Without limiting other waivers herein, Tenant waives all claims for any Losses arising out of or connected to the operation of the Airport as an airport facility. Without limitation on the foregoing, Tenant must:

(a) comply with the Airport Rules;

(b) cause all deliveries and dispatches of merchandise, supplies, fixtures, equipment and furniture to be made and conveyed to or from the Premises by means and during hours established by Director in Director's sole discretion. City has no responsibility regarding the delivery or dispatch of Tenant's merchandise, supplies, fixtures, equipment and furniture. Tenant may not at any time park its trucks or other delivery vehicles in common areas; and

(c) not park within the parking areas of the Airport except in those areas, if any, designated by City pursuant to permits obtained from the Airport's Permit Bureau. Nothing herein shall imply that Tenant shall be able to secure any on-Airport parking privileges.

3.10 Prohibited Activities. Without limiting any other provision herein, Tenant shall not, without the prior written consent of Director: (a) use or permit the use of the Premises for the conduct in or on the Premises to sell vehicles; (b) operate any vending machines, newspaper racks, pay telephones, or other coin, token, or credit card-operated devices; (c) cause or permit anything to be done, in or about the Premises, or bring or keep anything thereon which might (i) increase in any way the rate of fire insurance on the Terminal Building Complex or any of its contents; (ii) create a nuisance; (iii) in any way obstruct or interfere with the rights of others in the Terminal Building Complex or injure or annoy them; (e) commit or suffer to be committed any waste upon the Premises; (f) use, or allow the Premises to be used, for any improper, immoral, unlawful or objectionable purpose; (g) place any loads upon the floor, walls or ceiling which endanger the structure or obstruct the sidewalk, passageways, stairways or escalators, in front of, within, or adjacent to the Terminal Building Complex; (h) use any advertising or promotional medium that may be seen, heard, or otherwise experienced outside the Premises (such as searchlights, barkers or loudspeakers); (i) distribute handbills or circulars to Airport patrons or to cars in the parking lots, or engage in any other advertising in the Airport; (j) engage in any activity on the Airport outside the Premises for the recruitment or solicitation of business; or (k) do or permit to be done anything in any way tending to injure the reputation of City or appearance of the Airport.

3.11 Audit of Operations. At any time and from time to time, City may conduct an audit of Tenant's operations at the Airport (in addition to City's right to audit pursuant to Section 4.14 [Books and Records; Audit Rights] hereof) to confirm that such operations comply with the requirements set forth herein. Tenant shall cooperate with such audit. In the event such audit shows that Tenant is not complying with such requirements, without limiting City's ability to call a default hereunder, City may require that Tenant reimburse City for the costs of such audit. Tenant shall promptly remedy any noncompliance shown in any such audit.

3.12 Representative of Tenant. Tenant shall at all reasonable times retain in the Terminal Building Complex at least one qualified representative authorized to represent and act for it in matters pertaining to its operation, and shall keep Director informed in writing of the identity of each such person. The initial person so designated is the Initial Tenant Representative.

3.13 Investigation Reports. Tenant shall, if required by Director, employ, at its own cost and expense, an investigative organization mutually agreed upon by Tenant and the Airport Director for the purpose of making investigations and observations and preparing a written report of the carrying out of any pricing policies, revenue control, and operational techniques being used on the Premises. Tenant shall cause such investigation and observation to be made at such reasonable times and in the manner directed by Director, and the investigator shall deliver forthwith to Director a true and complete written copy of any such reports made to Tenant.

3.14 Compliance with Laws. Tenant shall promptly, at its sole expense, cause the Premises (including any permitted Alterations (as defined below)), and Tenant's and any Tenant Entity's use of the Premises and operations therein, to comply at all times with all Laws (as defined below). Notwithstanding the foregoing, this Section 3.14 shall not impose on Tenant any liability to make any structural alterations to the Terminal's roof, foundation, bearing and exterior walls and subflooring; or heating, ventilating, air conditioning, plumbing, electrical, fire protection, life safety, security and other mechanical, electrical and communications systems of the Terminal (collectively, "**Building Systems**"), except to the extent the

same is (x) installed by Tenant or Tenant Entity, or (y) necessitated by Tenant's Alterations or by any act or omission of Tenant or any Tenant Entity. As used herein, the term "Laws" shall mean all present and future laws, ordinances, rules, judgments, decrees, injunctions, regulations, permits, authorizations, orders and requirements, to the extent applicable to Tenant or the Premises or any portion of any of them whether or not in the contemplation of the parties, including, without limitation, all consents or approvals required to be obtained from, and all rules and regulations of, and all building and zoning laws of, all federal, state, county and municipal governments, the departments, bureaus, agencies or commissions thereof, authorities, board of officers, any national or local board of fire underwriters, or any other body or bodies exercising similar functions, having or acquiring jurisdiction of the Site or any portion thereof, including the Occupational Safety and Health Act and all other applicable laws relating to workplace safety or toxic materials, substances or wastes, Title XV (commencing with Section 3082) of the California Civil Code relating to works of improvement and all other applicable laws relating to construction projects, the provisions of the American with Disabilities Act, 42 U.S.C. Section 12101 et. seq. and any governmental regulations with respect thereto (the "**ADA**") (including, without limitation, the requirements under the ADA for the purposes of "public accommodations", as that term is used in the ADA), Title 24 of the California Administrative Code, all Environmental Laws, the Airport Rules, the Tenant Improvement Guide (including any design criteria) as the same may be amended from time to time (the "**TI Guide**"), and the requirements referenced in Section 19 [City and Other Governmental Provisions] hereof.

## 4. RENT

4.1 Definitions. For the purposes of this Lease, the following capitalized terms shall have the following meanings:

(a) "**Gross Revenues**" means all monies paid or payable to or considerations of determinable value received by the Operator, after discounts and/or coupons deducted at the completion of rental. Gross Revenue shall be determined by the total of charges on the face of the customer's receipt at the time of rental. Included in Gross Revenue are a single or combination of the following:

i. All charges, including, but not limited to, time and mileage charges and separately stated fees for rental of Vehicles and other related or incidental services, and any other items or services which may be authorized by Airport, made at or from the Airport, regardless of where the Vehicles or services are delivered to or returned;

ii. All amounts charged to any person(s) or entity(ies) entering into a rental agreement with Operator ("**the Customer**") for insurance offered by Operator incidental to the rental of such Vehicles, including but not limited to personal accident insurance;

iii. All charges attributable to any "Vehicle", which includes but is not limited to any car, van, bus, truck or sport utility vehicle, originally rented at the Airport which is exchanged at any other location of Operator;

iv. All proceeds from the long-term lease of Vehicles from any location on the Airport;

v. The amount charged to Operator's Customers and which is separately stated on the rental agreement as an optional charge for waiver by Operator of its right to recover from customer for damage to or loss of the Vehicle rented;

vi. The amount charged to Operator's Customers at the commencement or the conclusion of the rental transaction for the cost of furnishing and/ or replacing fuel provided by Operator and

vii. The amount charged by Operator, as allowed by current legislation, that represents all rent payable to the Airport for operation at the rental car facility ("**Concession Fees**") allocable to individual customers.

viii. Tenant shall list separately, on any customer rental agreements, contracts or invoices, the concession fee payable by Tenant to the City for the privilege of doing business at the Airport under this Agreement. Tenant shall list such concession fee as a "Concession Recovery Fee" on all such customer rental agreements, contracts or invoices. Tenant agrees that at no time will the concession fee listed on the customer rental agreement, contract or invoice, exceed eleven and eleven one-hundredths percent (11.11%).

Only the following shall be **excluded** from the term "Gross Revenues":

i. Any Federal, State, County or City sales or other similar taxes or surcharges separately stated to and collected from customer of Operator; or

ii. Any amounts received as insurance proceeds or otherwise for damage to automobiles or other property of Operator, or for loss, conversion or abandonment of such automobiles; or

iii. Revenue from the wholesale transfer of salvage vehicles; or

iv. All non-revenue rentals to employees of Operator; or

v. Discounts allowed by the Airport to customers renting qualified green vehicles as specified in Section 4.11 of the Lease; or.

vi. The retroactive adjustment by Operator of Gross Revenues designated as volume discounts or any other designation or for any other purpose is prohibited.

(b) "**Base Index**" means the most recent Consumer Price Index published immediately prior to the Commencement Date.

(c) "**Base Rent**" means the higher of the MAG and 10% of gross revenues, per Lease Year.

(d) "**Base Year Enplanements**" means the total Enplanements for the twelve month period preceding the Commencement Date.

(e) "**Comparison Index**" means the most recent Consumer Price Index published immediately prior to each MAG Adjustment Date.

(f) "**Comparison Year Enplanements**" mean the total Enplanements for the twelve month period preceding each MAG Adjustment Date.

(g) "**Consumer Price Index**" means that index published by the United States Department of Labor, Bureau of Labor Statistics known as "All Urban Consumers-All Items for the San

Francisco-Oakland-San Joes Area (1982-84=100), Series Id: CUURA22SAO." In the event such index is discontinued, then "**Consumer Price Index**" shall mean an index chosen by Director which is, in Director's reasonable judgment, comparable to the index specified above.

(h) "**Enplanements**" means the total number of passengers boarding airline carriers.

(i) "**Minimum Annual Guarantee" (MAG)** means minimum rent guaranteed for each year of the term, as specified in the Summary.

(j) "**MAG Adjustment Date**" has the meaning given it in the Summary.

(k) "**Space Rent**" means the Structure Rent, Surface Rent, and Fifth Floor Rent, collectively.

4.2 Adjustments to Minimum Annual Guarantee. Effective on each anniversary of the Rent Commencement Date, commencing with the second lease year, the minimum annual guarantee shall equal 8.5% of the operators Gross Revenues with respect to the twelve month period immediately preceding such anniversary. However, in no event will the minimum annual guarantee be less than the MAG for the first year of the term.

4.3 Monthly Space Rent Payments. Effective on the Rent Commencement Date, Tenant shall pay City rent totaling $5,143,102.03 per year; $428,591.84 per month, representing the full rates as set forth below.

(a) **Structure Rent** shall be at the rate of $10.13 per square foot per year, of which $7.48 per square foot per year represents cost recovery for construction and financing of the Garage and QTA, and $1.30 per square foot per year represents unimproved land value, $0.88 for the Airport's operations and maintenance costs associated with maintaining the rental car center, and $0.47 per square foot per year represents the financing savings realized from the use of General Airport Revenue Bond financing instead of special facility bond financing, which has been determined to be a total of One Million Dollars per year. Tenant shall pay Structure Rent for:

i. Exclusive Space in the Garage, Level(s) 1 – 4 and QTA space as described in Sections 1.1(a) (i) and 1.1(a) (ii), respectively, as said spaces may be adjusted from time to time pursuant to the provisions of Section 1.3.

ii. Common Use Space in the Garage, Level(s) 1 – 4 and QTA space as described in Sections 1.1(b)(i) and 1.1(b)(ii), respectively, as said space may be adjusted from time to time pursuant to the provisions of Section 1.3, in accordance with the Common Use Formula specified in Section 4.5 hereof.

iii. Limited Common Use Space in the Garage, Level 2 and QTA space as described in Sections 1.1(c)(i) and 1.1(c)(ii), respectively, as said space may be adjusted from time to time pursuant to the provisions of Section 1.3, in accordance with the Limited Common Use Formula specified in Section 4.4 hereof.

(b) **Surface Rent** shall be at the rate of $3.10 per square foot per year, of which $.80 per square foot per year represents cost recovery for construction and financing of the site

improvements, and $2.30 per square foot per year represents unimproved land value. Tenant shall pay Surface Rent for:

i. Exclusive Space (surface) as described in Section 1.1(a) 4, as said space may be adjusted from time to time pursuant to the provisions of Section 1.2.

ii. Common Use Space (surface) as described in Section 1.1(b)4, as said space may be adjusted from time to time pursuant to the provisions of Section 1.2., in accordance with the Common Use Formula specified in Section 4.3 hereof.

iii. Limited Common Use Space (surface) as described in Section 1.1(c)4 hereof, as said space may be adjusted from time to time pursuant to the provisions of Section 1.3., in accordance with the Limited Use Formula specified in Section 4.6 hereof.

(c) **Fifth Floor Rent**. Fifth Floor Space, whether Exclusive, Common Use or Limited Common Use Space, shall be charged at the Surface Rent rate described in Section 4.3(b) hereof.

4.4 Adjustments to Annual Space Rent. On each Rent Adjustment Date, the Annual Space Rent will be adjusted as follows: if the Comparison Index shall exceed the Base Index, then the Annual Rent with respect to the upcoming Lease Year shall be increased to equal the following amount:

$$\text{Initial Annual Rent} \quad \times \quad \frac{\text{Comparison Index}}{\text{Base Index}}$$

Notwithstanding anything to the contrary herein, in no event will the Annual Space Rent for any Lease Year of the Term be lower than the Annual Space Rent with respect to the prior Lease Year. If City exercises its option to extend the term of this Lease, the land value portion of the rental rate(s) described above will be adjusted to reflect the then-current market value of unimproved land in the vicinity of Airport. Unimproved land value shall be determined by market value appraisal performed by City's Director of Property, using comparable sales and/or rental data, adjusted to reflect any particular physical and environmental characteristics and regulatory limitations which distinguish the Premises from comparable land.

4.5 Common Use Formula. "**Common Use Formula**" is a formula for calculating the appropriate charges to be levied on each tenant occupying the Rental Car Facility leasing Common Use Space, whereby each tenant of the Rental Car Facility shall pay that proportion of the rent attributable to the Common Use Space as its Exclusive Space bears to the total amount of Exclusive Space leased by all tenants of the Rental Car Facility.

4.6 Limited Common Use Formula. "**Limited Use Formula**" is a formula for calculating the appropriate charges to be levied on tenants leasing Limited Common Use Space, whereby each tenant utilizing a Shared Area shall pay that proportion of the rent attributable to the Limited Common Use Space as its Exclusive Space in said Shared Area bears to the total amount of Exclusive Space in said Shared Area leased by all tenants of said Shared Area.

4.7 Monthly Concession Rent Payments. Tenant shall pay, per Lease Year, the greater of the MAG or 10% of Gross Revenues. Tenant shall pay, as concession rent for the Premises, estimated monthly Base Rent in advance on or before the first (1st) day of each calendar month of the Term as set forth below:

(a) On or before the Rent Commencement Date and the first (1st) day of each calendar month thereafter, Tenant shall pay the current monthly MAG to the City's Rent Payment Address. If the Rent Commencement Date occurs on a date other than the first day of a calendar month, then the monthly MAG for such first month (the "**First Month**") shall be prorated based on a 30-day month.

(b) On or before the twentieth (20th) day of each calendar month after the First Month, concurrently with its submission of the Sales Reports described below covering the prior calendar month, Tenant shall pay to City the deficiency, if any, between the Base Rent payable by Tenant with respect to such prior calendar month (based on the Gross Revenues achieved with respect to such prior month), and the amount actually paid by Tenant pursuant to the foregoing subsection (a) with respect to such month.

(c) All payments hereunder shall be paid to City's Rent Payment Address, or at such other place as City may from time to time designate in writing.

(d) The MAG with respect to the first Lease Years of the Term will be prorated, based on a 365-day year. Without limiting the generality of the foregoing, as the Initial MAG is an annual amount, the Minimum Annual Guarantee with respect to the first Lease Year shall be prorated, based on a 365-day year, to reflect the fact that the first Lease Year shall be less than a full 12-month period.

(e) All Rent shall be paid in lawful money of the United States, free from all claims, demands, setoffs, or counterclaims of any kind.

(f) Any Rent not paid when due shall be subject to a service charge equal to the lesser of the rate of one and one-half percent (1½%) per month, and the maximum rate permitted by law. Acceptance of any service charge shall not constitute a waiver of Tenant's default on the overdue amount or prevent City from exercising any of the other rights and remedies available to City.

4.8 Sales Reports. On or before the twentieth (20th) day of each calendar month after the First Month, Tenant shall submit to City a report (the "**Sales Report**") showing all Gross Revenues achieved with respect to the prior month by location, segregated by each source or general type of article sold or service rendered. Such report shall be certified as being true and correct by Tenant and shall otherwise be in form and substance satisfactory to Director. As described below, City shall have the right, in addition to all other rights herein, to impose a fine in the event Tenant shall fail to submit such Sales Report timely. Operators with multiple brands must detail each brand's sales on their Sales Report.

4.9 Qualified Green Vehicle Rental Incentives. The City of San Francisco is committed to lessening the negative environmental impact of all operations and concessions at AIRPORT. In support of this goal, the city is electing to partner with the on-airport rental car concessionaires in a program intended to provide incentives to the rental car concessionaires to increase their rental of vehicles meeting an Environmental Protection Agency ("**EPA**") Green Vehicle score, as well as incentives to encourage rental car customers to select environmentally friendly vehicles when they rent at San Francisco International Airport.

4.10 Rental Car Concessionaire Incentive Program. RACs will be encouraged to meet specific targets for Qualified Green Vehicle rentals (transactions). Vehicles meeting an EPA Green Vehicle Guide score

of 17 or higher will be considered Qualified Green Vehicles. The incentive targets will be reviewed and/or revised at the end of Lease Year 2, and possibly changed or abolished for the remainder of the term.

| | |
|---|---|
| 2009 | 15% |
| 2010 | 15% |

To qualify for the incentive credit, RACs will be required to track and report their rentals of Qualified Green Vehicles at AIRPORT on a monthly basis. At the close of each lease year, if a RAC operator has met the annual qualifying target, the City will calculate the credit owed to concessionaire by calculating the amount of the difference between the 10% concession fee paid by concessionaire for each of the Qualified Green Vehicle transactions, and an imputed 8% concession fee for these same rentals. An equivalent amount to this differential will be credited to concessionaire's rent due and owing to the City for the succeeding year.

4.11 Rental Car Customer Incentive Program. The City intends to encourage rental car customers to select vehicles with an EPA Green Vehicle Guide score of 18 or higher when they rent a vehicle at Airport by offering to subsidize a $15 per transaction credit on the gross revenue charges for each such rental. This will require the RACs to reflect the $15 credit on the face of the transaction agreement and to report the qualified transactions to the City on a monthly basis. The individual RAC operator will then, with adequate backup, be allowed to take a monthly credit for the amount offered as a discount to the rental car customer for a qualified rental. As no concession fee will be collected from the customer or paid the City for this discounted amount of the gross revenues due and owing for the qualified rental, no proportionate concession fee will be due and owing as a credit to the RAC operator. The $15.00 credit is to be netted out Gross Revenues before the Concession Reocvery Fee is computed on the renter's invoice. The incentive targets will be reviewed and/or revised at the end of Lease Year 2, and possibly changed or abolished for the remainder of the term.

| | |
|---|---|
| 2009 | 15% |
| 2010 | 15% |

4.12 Annual Report and Adjustment. Within ninety (90) days after the end of each Lease Year, Tenant shall submit to Director an unqualified year-end financial report certified by a Certified Public Accountant showing Gross Revenues achieved with respect to the prior Lease Year. Tenants will refer to the EPA Green Vehicle Guide, distributed in January of the applicable Lease Year, to determine their potential in qualifying for the Incentive Program. If such report shows that the total Base Rent actually paid by Tenant with respect the prior calendar year was less than the Base Rent payable with respect to such year, then Tenant shall immediately pay to City such deficiency. If such report shows that the Base Rent actually paid by Tenant with respect to such prior Lease Year exceeded the Base Rent payable with respect to such year, then such excess shall be applied as a rent credit to amounts next coming due. Notwithstanding anything to the contrary herein, in no event will the Base Rent payable to City be less than the Minimum Annual Guarantee. In addition, Tenant shall submit to City such other financial or other reports as Director may reasonably require.

4.13 [INTENTIONALLY DELETED].

4.14 Books and Records; Audit Rights. Tenant shall maintain for a period of five (5) years after the Expiration Date, or, in the event of a claim by City, until such claim of City for payments hereunder shall have been fully ascertained, fixed and paid, separate and accurate daily records of Gross Revenues,

whether for cash, credit, or otherwise. Tenant must require each subtenant, concessionaire, licensee, and assignee to maintain the same records. All such books and records shall be kept in accordance with "generally accepted accounting principles", consistently applied, showing in detail all business done or transacted in, on, about or from or pertaining to the Premises, and Tenant shall enter all receipts arising from such business in regular books of account, and all entries in any such records or books shall be made at or about the time the transactions respectively occur. The books and source documents to be kept by Tenant must include records of inventories and receipts of merchandise, daily receipts from all sales and other pertinent original sales records and records of any other transactions conducted in or from the Premises by all persons or entities conducting business in or from the Premises. Pertinent original sales records include: (i) cash register tapes, including tapes from temporary registers, (ii) serially pre-numbered sales slips, (iii) the original records of all mail and telephone orders at and to the Premises, (iv) settlement report sheets of transactions with subtenants, concessionaires, licensees and assignees, (v) original records indicating that merchandise returned by customers was purchased at the Premises by such customers, (vi) memorandum receipts or other records of merchandise taken out on approval, (vii) detailed original records or any exclusions or deductions from Gross Revenues, (viii) sales tax records, and (ix) all other sales records, if any, that would normally be examined by an independent accountant pursuant to generally accepted auditing standards in performing an audit of Gross Revenues. Tenant must keep the required books, source documents and records of Gross Revenues available for inspection by City and its agents and employees at the Premises or at another location within the continental United States at all times during regular business hours. In addition, Tenant shall maintain monthly and annual reports of Gross Revenues derived from its operation under this Lease, using a form and method as is directed by Director. Such forms and methods shall be employed by Tenant throughout the term of this Lease. Upon Director's written request, Tenant shall make available immediately to City and/or its auditors any and all books, records and accounts pertaining to its operations under this Lease. The intent and purpose of the provisions of this section are that Tenant shall keep and maintain records which will enable City and City's Controller to ascertain, determine and audit, if so desired by City, clearly and accurately, Gross Revenues achieved, and the adequacy of the form and method of Tenant's reporting thereof.

Should any examination, inspection, and audit of Tenant's books and records by City disclose an underpayment by Tenant of the total Base Rent due, Tenant shall promptly pay to City such deficiency, and if such deficiency exceeds two percent (2%) of the total Base Rent due, Tenant shall also promptly reimburse City for all costs incurred in the conduct of such examination, inspection, and audit. Further, should any examination, inspection, and audit of Tenant's books and records by City disclose an underpayment by Tenant of the total Base Rent due and such deficiency exceeds five percent (5%) of the total Base Rent due, City shall have the right to terminate this Lease. In the event that City deems it necessary to utilize the services of legal counsel in connection with collecting the reimbursement for such examination, inspection, and audit, then Tenant shall reimburse City for reasonable attorneys' fees and litigation expenses as part of the aforementioned costs incurred.

4.15 Other Reports and Submissions. Tenant shall furnish City with such other financial or statistical reports as Director from time to time may reasonably require. Upon request by Director, Tenant shall furnish to City copies of its quarterly California sales and use tax returns covering the Premises operations as well as that pertinent portion of both the California and Federal income tax returns and possessory interest tax returns on the Premises operations at the time of filing, and any amendments thereto. All copies of such returns must be certified as exact copies of the original documents by a Certified Public Accountant. Tenant and all subtenants (to the extent permitted) shall also promptly notify Director of and furnish to City copies of any audit reports covering this facility conducted by the California Franchise Tax Board or the Board of Equalization.

4.16 Additional Rent. Tenant shall pay to City any and all charges and other amounts under this Lease as additional rent, at the same place where Base Rent is payable. City shall have the same remedies for a default in the payment of any such additional charges as for a default in the payment of Base Rent.

4.17 Prepay Rent. Notwithstanding anything to the contrary herein, in the event Tenant shall fail to pay any Rent when due hereunder, Director shall have the right to require Tenant to pay estimated monthly Rent (including Base Rent, utility charges, and all other amounts) one (1) month in advance of when such payment would otherwise be due. Such prepayment would be based on the highest monthly Rent previously due from Tenant. Such right shall be exercised by a notice from Director to Tenant, which notice may be given any time after such default by Tenant, regardless of whether the same is cured by Tenant.

4.18 Nature of Lease. Under no circumstances will City be expected or required to make any payment of any kind with respect to Tenant's use or occupancy of the Premises, except as may be otherwise expressly set forth herein. Except as may be specifically and expressly provided otherwise in this Lease, no occurrence or situation arising during the Term, nor any present or future Law, whether foreseen or unforeseen, shall relieve Tenant from its liability to pay all of the sums required by this Lease, or relieve Tenant from any of its other obligations under this Lease, or give Tenant the right to terminate this Lease in whole or in part. Tenant waives any rights now or hereafter conferred upon it by any existing or future Law to terminate this Lease or to receive any abatement, diminution, reduction, or suspension of payment of such sums, on account of such occurrence or situation. Except as otherwise expressly provided herein, this Lease shall continue in full force and effect, and the obligations of Tenant hereunder shall not be released, discharged or otherwise affected, by reason of: (a) any damage to or destruction of the Premises or any portion thereof or any improvements thereon, or any taking thereof in eminent domain; (b) any restriction or prevention of or interference with any use of the Premises or the improvements or any part thereof; (c) any bankruptcy, insolvency, reorganization, composition, adjustment, dissolution, liquidation or other proceeding relating to City, Tenant or any constituent partner of Tenant or any sublessee, licensee or concessionaire or any action taken with respect to this Lease by a trustee or receiver, or by any court, in any proceeding; (d) any claim that Tenant or any other person has or might have against City; (e) any failure on the part of City to perform or comply with any of the terms hereof or of any other agreement with Tenant or any other person; (f) any failure on the part of any sublessee, licensee, concessionaire, or other person to perform or comply with any of the terms of any sublease or other agreement between Tenant and any such person; (g) any termination of any sublease, license or concession, whether voluntary or by operation of law; or (h) any other occurrence whatsoever, whether similar or dissimilar to the foregoing in each case whether or not Tenant shall have notice or knowledge of any of the foregoing. The obligations of Tenant hereunder shall be separate and independent covenants and agreements. Tenant hereby waives to the full extent permitted by applicable law, all rights now or hereafter conferred by statute, including without limitation the provisions of Civil Code Sections 1932 and 1933, to quit, terminate or surrender this Lease or the Premises or any part thereof, or to any abatement, suspension, deferment, diminution or reduction of any rent hereunder.

4.19 Severe Decline in Enplanements.

(a) Defined Terms. For purposes of this Section, the following capitalized terms shall have the following meanings:

i. **"Relevant Boarding Area"** shall mean all boarding areas.

ii. **"Enplanements"** shall have the meaning given it in Section 4.1. For purposes of this Section 4.12, all Enplanement comparisons shall be done by Relevant Boarding Area.

iii. **"Reference Month(s)"** shall mean the corresponding month in the Reference Year.

iv. **"Reference Year"** shall have the meaning given it in the Summary.

v. **"Percentage Rent"** shall have the meaning given it in the Summary.

vi. **"Severe Decline in Enplanements for Three Months"** shall mean that the actual Enplanements achieved during a one month period is less than 80% of the actual Enplanements of the same Reference Month in the Reference Year, and such shortfall continues for three (3) consecutive months.

vii. **"Enplanement Stabilization for Two Months"** means that actual Enplanements for a particular month equals or exceeds 80% of the actual Enplanements of the same Reference Month in the Reference Year, and such threshold is achieved for two (2) consecutive months.

(b) MAG Suspension. If at any time during the term, there is a Severe Decline in Enplanements for Three Months, then the MAG shall be temporarily suspended as follows:

i. The MAG suspension shall be effective on the first day of the month immediately following the Severe Decline in Enplanements for Three Months.

ii. During such MAG suspension period, Tenant shall be required to pay only the Percentage Rent, unless and until the MAG is reinstated as provided below. On or before the 20th day of each month, Tenant will submit to City a Sales Report showing Tenant's Gross Revenues achieved with respect to the prior month, together with the Percentage Rent calculated on such Gross Revenues, cumulated by Lease Year.

iii. If the Lease provides that the Percentage Rent is based on a tiered gross revenue structure, for purposes of determining the Percentage Rent payable, the annual Gross Revenues shall continue to cumulate as provided in the Lease. For example, if Tenant's Lease Year is November 1 through October 31, then for purposes of calculating Percentage Rent for April 2003, all gross revenues achieved to date (from November 1 through April 30) will be cumulated.

(c) MAG Reinstatement. Once there is Enplanement Stabilization for Two Months, then the MAG is reinstated, and will continue unless and until there is another Severe Decline in Enplanements for Three Months, as follows:

i. Such MAG reinstatement will be effective on the first day of the month following an Enplanement Stabilization for Two Months.

ii. In the event the MAG is reinstated after the commencement of a "Lease Year" or other period of time for annual gross revenue accumulation specified in the Lease, the MAG will be pro-rated accordingly.

(d) Determination of Enplanements and "True-Ups." The parties acknowledge that Enplanements for a particular month are not usually determined as of the first day of the following month. Accordingly, unless and until the MAG is suspended as provided herein, Tenant shall continue to pay the MAG as and when required hereunder. If and when a MAG is later suspended pursuant to Section 4.12(b), then City shall issue a rent credit to reflect any resulting overpayment in rent. If and to the extent Tenant has any outstanding obligations to City hereunder, City may decline to issue such rent credit or reduce the rent credit by the amount outstanding. If and when the MAG is reinstated, Tenant shall pay to City within five (5) business days after City shall have given notice to Tenant of such reinstatement, the deficiency, if any, between the Percentage Rent paid by the Tenant and the MAG, for the month(s) following such reinstatement.

(e) Enplanement Determinations. Director shall have the sole discretion as to the Enplanement calculations, and whether there exists a Severe Decline in Enplanements for Three Months and/or an Enplanement Stabilization for Two Months.

(f) No Effect. The MAG suspension shall have no effect on (i) any adjustments specified in this Lease to be made to the MAG, including those based on increases in the Consumer Price Index; or (ii) the Deposit Amount.

(g) Effect of Default. Notwithstanding anything to the contrary herein, in the event Tenant shall default under this Lease, the Airport Director may immediately reinstate the MAG, without giving to Tenant the benefit of any notice or right to cure as may otherwise be provided under this Lease.

(h) Subtenants. Without limiting the provisions of Section 5 [Assignment or Subletting] if Tenant subleases any portion of the Premises, Tenant shall offer to such subtenant(s) the same types of MAG suspension as are provided herein.

(i) Example. The following is intended merely to provide an example of the mechanics of the foregoing provisions, and the numbers provided are not intended to be projections or guarantees. ***Assume*** (a) the Premises are in Boarding Area F, (b) the Lease is awarded on February 15, 2003, and (c) Reference Year Enplanements for Boarding Area F, by Reference Month in the Reference Year (January 1- December 31, 2002) are:

| | Jan 2002 | Feb 2002 | Mar 2002 | Apr 2002 | May 2002 | Jun 2002 | Jul 2002 | Aug 2002 | Sep 2002 | Oct 2002 | Nov 2002 | Dec 2002 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Enp ('000) | 800 | 800 | 800 | 900 | 1,100 | 1,200 | 1,300 | 1,200 | 1,100 | 900 | 800 | 900 |

***Assume*** further that actual Enplanements for Boarding Area F by Reference Month for 2005 are as follows:

| | Jan 2005 | Feb 2005 | Mar 2005 | Apr 2005 | May 2005 | Jun 2005 | Jul 2005 | Aug 2005 | Sep 2005 | Oct 2005 | Nov 2005 | Dec 2005 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Enp ('000) | 900 | 900 | 700 | 700 | 800 | 800 | 900 | 1100 | 700 | 800 | 700 | 800 |
| % of Ref. Month | 112.5 | 112.5 | 87.5 | **77.8** | **72.2** | **72.2** | 69.2 | 91.7 | 63.6 | **88.9** | **87.5** | 88.9 |

Then, there occurs a Severe Decline in Enplanements for Three Months with respect to the months April 2005 – June 2005, and the MAG shall be suspended effective July 1, 2005. There occurs an Enplanement Stabilization for Two Months with respect to the months October 2005 – November 2005, and the MAG shall be reinstated effective December 1, 2005.

## 5. ASSIGNMENT OR SUBLETTING

5.1 No Assignment. Tenant shall not assign, sublet, encumber, or otherwise transfer, whether voluntary or involuntary or by operation of law, the Premises or any part thereof, or any interest herein, without City's prior written consent, which consent may be granted or denied in City's sole and absolute discretion (the term "**Transfer**" shall mean any such assignment, subletting, encumbrance, or transfer). City's consent to one Transfer shall not be deemed a consent to subsequent Transfers. Any Transfer made without City's consent shall constitute a default hereunder and shall be voidable at City's election.

5.2 Changes in Tenant. The merger of Tenant with any other entity or the transfer of any controlling ownership interest in Tenant, or the assignment or transfer of a substantial portion of the assets of Tenant, whether or not located on the Premises, shall constitute a Transfer. Without limiting the generality of the foregoing, if Tenant is a partnership, a withdrawal or change, voluntary, involuntary or by operation of law of the partner or partners owning twenty-five percent (25%) or more of the partnership, or the dissolution of the partnership, or the sale or transfer of at least twenty-five percent (25%) of the value of the assets of Tenant, shall be deemed a Transfer. If Tenant is a corporation or limited liability company, any dissolution, merger, consolidation or other reorganization of Tenant, or the sale or other transfer of a controlling percentage of the capital stock or membership interests of Tenant, or the sale or transfer of at least twenty-five percent (25%) of the value of the assets of Tenant, shall be deemed a Transfer. The phrase "**controlling percentage**" means the ownership of, and the right to vote, stock or interests

possessing at least twenty-five percent (25%) of the total combined voting power of all classes of Tenant's capital stock or interests issued, outstanding and entitled to vote for the election of directors. Without limiting the restrictions on asset transfers, this paragraph shall not apply to stock or limited liability company interest transfers of corporations or limited liability companies the stock or interests of which is traded through an exchange or over the counter.

5.3 No Release. In no event will City's consent to a Transfer be deemed to be a release of Tenant as primary obligor hereunder. In the event that one entity purchases, merges, or buys out another entity, the sum of all MAG's will constitute the new MAG.

5.4 Subleasing. Without limiting City's discretion in approving or disapproving a proposed Transfer, if and to the extent City permits Tenant to sublease the Premises, the following shall apply: (a) Prior to negotiating a sublease agreement, Tenant must submit to City a sublease proposal for City's approval, which approval may be granted or withheld in City's absolute and sole discretion; (b) Every sublease must be on a Standard Sublease Agreement form approved by Director, and the actual sublease must be approved by Director; (c) Each and every covenant, condition or obligation imposed upon Tenant by this Lease and each and every right, remedy or benefit afforded City by this Lease will not be impaired or diminished as a result of any sublease agreement; (d) No subtenant shall be obligated to pay to Tenant, and Tenant shall not be permitted to charge any rent, percentage rent, bonus rent, key money, administration fee, or the like, which exceeds, in the aggregate, the total sums that Tenant pays to City under this Lease for the portion of the Premises subleased by the subtenant under its sublease agreement (the "**Excess Rent**"). If, notwithstanding the foregoing prohibition, Tenant receives any Excess Rent, Tenant shall pay the same to City; (e) Tenant assigns to City all rent and other payments due from all subtenants under any sublease agreements; ***provided however***, Tenant is hereby granted a license to collect rents and other payments due from subtenants under their sublease agreements until the occurrence of an Event of Default, regardless of whether a notice of that default has been given by City. At any time, at Director's option, City may notify a subtenant of this assignment and upon such notice the subtenant will pay its rent other payments directly to City. City will credit Tenant with any rent received by City under such assignment, but the acceptance of any payment on account of rent from any subtenants as a result of an Event of Default will in no manner whatsoever serve to release Tenant from any liability under this Lease. No payment of rent or any other payment by a subtenant directly to City or other acceptance of such payments by City, regardless of the circumstances or reasons therefor, will in any manner whatsoever be deemed an atonement by the subtenants to City in the absence of either a specific written agreement signed by City to such an effect.

5.5 Acceptance of Rent. The acceptance of rent by City from any person or entity does not constitute a waiver by City of any provision of this Lease or consent to any Transfer. City's consent to one Transfer will not be deemed to be consent to any subsequent Transfer. If Tenant defaults in the performance of any of the terms of this Lease, City may proceed directly against the transferor (or if there has been more than one Transfer, then each transferor) without necessity of exhausting remedies against Tenant. City may consent to subsequent Transfers or amendments or modifications to this Lease with transferees, without notifying transferor (or if there has been more than one Transfer, then each transferor) and without obtaining its or their consent thereto and such action shall not relieve any transferor of liability under this Lease as amended.

5.6 Waiver. Tenant waives the provisions of Civil Code Section 1995.310 with respect to remedies available to Tenant should City fail to consent to a Transfer.

## 6. TAXES, ASSESSMENTS AND LIENS

6.1 Taxes.

(a) Tenant recognizes and understands that this Lease may create a possessory interest subject to property taxation and that Tenant may be subject to the payment of property taxes levied on such interest. Tenant further recognizes and understands that any Transfer permitted under this Lease and any exercise of any option to renew or other extension of this Lease may constitute a change in ownership for purposes of property taxation and therefore may result in a revaluation of any possessory interest created hereunder. Tenant shall pay all taxes of any kind, including possessory interest taxes, that may be lawfully assessed on the leasehold interest hereby created and to pay all other taxes, excises, licenses, permit charges and assessments based on Tenant's usage of the Premises, all of which shall be paid when the same become due and payable and before delinquency.

(b) Tenant shall report any Transfer, or any renewal or extension hereof, to the County of San Mateo Assessor within sixty (60) days after such Transfer transaction, or renewal or extension. Tenant further agrees to provide such other information as may be requested by the City to enable the City to comply with any reporting requirements under applicable law with respect to possessory interests.

6.2 Other Liens. Tenant shall not permit or suffer any liens to be imposed upon the limitation, mechanics', materialmen's and tax liens, as a result of its activities without promptly discharging the same. Notwithstanding the foregoing, Tenant may in good faith contest any such lien if Tenant provides a bond in an amount and form acceptable to City in order to clear the record of any such liens. Tenant shall assume the defense of and indemnify and hold harmless City against any and all liens and charges of any and every nature and kind which may at any time be established against said premises and improvements, or any part thereof, as a consequence of any act or omission of Tenant or as a consequence of the existence of Tenant's interest under this Lease.

## 7. INVESTMENTS; ALTERATIONS

7.1 Minimum Investment. The amount required to provide a first class operation and satisfy the Airport's Design Review Committee (DRC) and approval from Airport Building Inspection and Code Enforcement (BICE).

7.2 City's Approval Rights. Tenant shall not make or suffer to be made any alterations, additions, or improvements to the Premises or any part thereof or attach any fixtures or equipment thereto, including the Initial Improvements (collectively, "**Alterations**") without City's prior written consent. Without limiting the generality of the foregoing, the initial layout and design of all Alterations shall conform to Commission's established architectural design scheme for the Terminal Building Complex and the provisions of Airport's TI Guide. Prior to the construction of any Alterations (including the Initial Improvements), Tenant shall submit detailed plans and specifications to the Airport's Design Review Committee for approval. Tenant shall include with its plans and specifications schematic renderings of the public retail area, materials, a color board(s) and a detailed layout of the overall merchandising plan. All decisions by the Airport's Design Review Committee shall be made subject to the approval of the Airport Commission. City's approval rights will extend to and include architectural and aesthetic matters and City reserves the right to reject any designs submitted and to require Tenant to resubmit designs and layout proposals until they meet City's approval. The Rent Commencement Date shall not be extended if

City elects to reject any designs or layout proposals submitted. In the event of disapproval by City of any portion of the plans and specifications, Tenant will promptly submit necessary modifications and revisions thereof. No changes or alterations will be made in said plans or specifications after approval by City. City agrees to act within a reasonable period of time upon such plans and specifications and upon requests for approval of changes or alterations in said plans or specifications. One copy of plans for all improvements or subsequent changes therein or alterations thereof will, within fifteen (15) days after approval thereof by City, be signed by Tenant and deposited with City as an official record thereof. All Alterations shall be effected through the use of contractors approved by City who shall furnish to City upon demand such completion bonds and labor and material bonds as City may require so as to assure completion of the Alterations on a lien-free basis. Without limiting the requirements set forth above, Tenant acknowledges and agrees that Tenant may be required to obtain approvals for any desired Alterations from the Airport's Quality Control Department.

7.3 Structures and Fixtures. Tenant shall, at its sole cost and expense, design, erect, construct and install all fixtures, furnishings, carpeting, decorations, finishings, equipment, counters, or other necessary Alterations for its operation under this Lease. All construction shall be in conformity with the latest edition of the Airport TI Guide, and in conformity with the approved plans and specifications submitted by Tenant, and shall meet all applicable local building codes and ordinances as well as all other Laws. Any work to be preformed by tenant in a public area, as determined by Director, may be subject to review by the Airports Design Review Committee. Tenant shall submit complete plans and specifications to the Airport, and prior to the commencing any construction work, obtain Director's written approval of said plans and specifications. Tenant shall make no change or alteration in the plans and specifications without prior written approval of Airport. In the event that Tenant fails to submit plans and specifications which meet the approval of City within ninety (90) days after the Effective Date, City may terminate this Lease. Nothing herein contained shall be construed to delay or otherwise affect the Commencement Date or the Rent Commencement Date.

7.4 Notice and Permits. Tenant shall give written notice to Director not less than seven (7) days prior to the commencement of any work in construction, alteration or repairs of the Premises, in order that City may post appropriate notices of non-responsibility, and agrees that such notices may remain posted until the acceptance of such work by City. Tenant shall obtain, and pay all fees for all permits required by the City or other legal jurisdictions, for improvements that it is required to construct or install and it shall furnish copies of all such permits to City prior to the commencement of any work. Tenant shall submit "As Built" drawings showing the actual location of all 'Tenants' constructed improvements upon Premises.

7.5 Title to Alterations. Title to all Alterations of such a nature as cannot be removed without damage to the Facility, including all carpeting, decorations, finishings, and counters, shall vest in City on the Expiration Date. All permanent buildings, structures, and improvements, including pipelines, storage tanks, pumps, electric controls, and other like facilities and appurtenances, thereto erected or by installed by Tenant hereafter constructed or placed upon the premises or in rights of way and easements given by City to Tenants, and all alterations, modifications and in enlargements thereof and improvements therein shall not be deemed trade fixtures, but shall become part of the premises, subject to Tenants rights of possession, use and occupancy during the term of this lease in accordance with the terms and conditions thereof. Notwithstanding the provisions of this section, City retains the rights to require tenant to remove at the termination of this lease any buildings, structures, and improvements installed by the Tenant. All other equipment of such nature as to constitute trade fixtures shall remain the property of Tenant. On the Expiration Date, Tenant may remove said trade fixtures or Director may require that Tenant remove same at Tenant's expense. Prior to the Rent Commencement Date, Tenant shall submit to Director a proposed

list of such trade fixtures; said list may be subsequently amended during the term of this Lease to reflect any changes in said trade fixtures. Tenant agrees and understands that "**fixture**" is defined as a thing affixed to premises that is bolted, nailed, screwed, cemented and/or plastered. For the purpose of this Lease, fixtures shall include slat wall, counters and the like, attached to the physical structure of the premises in any matter whatsoever. On the Expiration Date, all fixtures, other than those deemed trade fixtures by City, shall become the property of City. Tenant shall be liable to City for City's costs for storing, removing and disposing of any alterations of Tenant's personal property, and of restoration of the Premises.

7.6 Effect of Alterations on Airport. If and to the extent that Tenant's activities or proposed Alterations trigger an obligation or requirement on the part of City to make changes to the Airport premises (including ADA requirements), Tenant shall indemnify, defend, and hold harmless City from and against any and all Losses (as defined below) arising out of such activities or Alterations.

7.7 Construction Period Operations. In the event Tenant desires to operate and conduct operations constituting the Permitted Use prior to substantial completion of the Initial Improvements and the Rent Commencement Date, then prior to the Commencement Date, Tenant shall give notice thereof to Director requesting Director's approval of such interim operations. Such notice shall specify the nature of such operations, including the proposed area for such operations, the hours of such operations, and the inventory to be offered for sale. Director shall have the right to grant or deny such approval in Director's sole and absolute discretion. In the event Director grants approval of such interim operations, then such operations shall be on such items and conditions required by Director, including the following terms and conditions: (a) Director may revoke Director's approval at any time, and following such revocation, Tenant must immediately cease such operations until the Rent Commencement Date; (b) Such interim operations may be conducted only in the area designated by Director. Tenant's responsibilities and liabilities with respect to such designated area shall be the same responsibilities and liabilities that Tenant has with respect to the Premises, except that Tenant shall not be obligated to perform the Initial Improvements or any other Alterations on such designated area; (c) As rent for the interim period, Tenant shall pay to City their Rent as outlined in section 4. All such rent shall be due and payable on the twentieth (20th) day of the month following each month of operation, and otherwise as provided in Section 4 of the Lease. Tenant shall be solely responsible for making the designated area useable for Tenant's interim operations, and for protecting such area from construction and other activities in the Premises. At Director's request, Tenant shall restore such area to the condition existing prior to Tenant's use thereof.

7.8 Removable Property And Equipment. At any time during the period that this Lease is in effect, if not in default thereunder, Tenant may remove all or any personal property, title to which is in Tenant, which Tenant theretofore has placed or installed upon the Premises and the cost of which has not been reimbursed by City, provided that upon said removal, shall repair at its own expense any damage resulting therefrom.

7.9 Labor Harmony. The parties acknowledge that it is of the utmost importance to City, Tenant, and all those occupying or to occupy space in the Rental Car Facility that there be no interruption in the progress of the construction work. Accordingly, City and Tenant agree as follows:

(a) In any contract or undertaking which Tenant may make with a contractor for work in the Premises, provision shall be made for the dismissal from the job of workmen whose work is unskilled or otherwise objectionable, in the Director's (and, for this purpose, "the Director" shall include a reference to the Airport's Architect) reasonable judgment. Tenant shall cause

any such workmen to be discharged from the project within twenty-four (24) hours after Director shall give notice to Tenant requiring such discharge.

(b) Tenant shall use, and Tenant shall require its contractor and subcontractors to use, their respective best efforts to prevent work stoppages on the Premises, and/or elsewhere on the Airport, to the extent attributable to work being performed on the Premises, irrespective of the reason of any such stoppage. In the event that the conduct or presence of any employee(s) of Tenant or Tenant's contractor(s) or subcontractor(s) causes a labor dispute or work stoppage, Tenant shall have such employee(s) immediately removed from the Airport upon Director's request.

(c) Tenant shall include, and shall cause its contractor to include, the following clause in all contracts with its general contractors and subcontractors:

Harmony Clause

There shall be no manifestations on the project of any dispute between any labor organization and any Tenant contractor or subcontractor, including but not limited to, any area standards picketing against said contractor or subcontractor. Should there be any manifestation of a labor dispute between any Tenant contractor or subcontractor and any union, which results in a stoppage of work on the part of said contractor or subcontractor's employees or the employees of any other employer or supplier on the project or at the Airport, which in the sole judgment of the Director will cause, or is likely to cause, unreasonable delay in the progress of construction or operation of any business at the Airport, then upon written notice from Director, Tenant shall declare the contractor or subcontractor in default of its contract, and upon such notice, Tenant shall have the right to take such steps as are necessary to finish the uncompleted portion of the work to be performed by the contractor or subcontractor.

(d) Without limiting the generality of indemnities elsewhere in this Lease, Tenant shall indemnify, defend, and hold harmless City and each City Entity for any and all Losses which arise from the actions taken pursuant to this Section 7.9.

## 8. UTILITIES

8.1 Services Provided. City shall provide in the Consolidated Rental Car Facility the following utility services: reasonable amounts of water, electricity, telephone, sewage outlets, heating, ventilation, and air conditioning, to a point determined by the Director. All extensions of the facilities requested by Tenant for said utility services from said points shall be at the sole cost and expense of Tenant. In the event of any change desired by Tenant as to said points of supply by City, the expense of making such changes or alterations shall be at the sole cost of Tenant.

8.2 Utility Costs. Tenant shall pay the whole cost for all utility services as invoiced to Tenant by City and for such other special services which it may require in the Premises, and Tenant hereby expressly waives the right to contest any utility rates.

8.3 Shared Telecommunications Services. Tenant acknowledges that City has implemented or may in the future implement a shared telecommunications service program (**"STS Program"**) to provide telecommunications services. The STS Program may involve City's provision of telephone, tele-facsimile, local access, long distance service, internet, intranet, and other computer and telecommunications services. In such event, at City's option, Tenant shall participate in the STS Program by engaging City or its agent to provide such services at Tenant's expense, provided that the charges for

such services are generally competitive. All payments for STS services shall be due and payable when invoiced by City.

8.4 Waiver of Damages. Tenant hereby expressly waives any and all claims for damages arising or resulting from failures or interruptions of utility services to the Premises, including electricity, gas, water, plumbing, sewage, telephone, communications, heat, ventilation, air conditioning, or for the failure or interruption of any public or passenger conveniences. Without limiting the generality of the foregoing, Tenant shall have no rights to abate Rent or terminate this Lease in the event of any interruption or failure of utility services.

## 9. MAINTENANCE AND REPAIR

9.1 "As-Is" Condition. TENANT SPECIFICALLY ACKNOWLEDGES AND AGREES THAT CITY IS LEASING THE PREMISES TO TENANT ON AN "AS IS WITH ALL FAULTS" BASIS AND THAT TENANT IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM CITY OR ITS AGENTS, AS TO ANY MATTERS CONCERNING THE PREMISES, INCLUDING: (i) the quality, nature, adequacy and physical condition and aspects of the Premises, including, but not limited to, landscaping, utility systems, (ii) the quality, nature, adequacy, and physical condition of soils, geology and any groundwater, (iii) the existence, quality, nature, adequacy and physical condition of utilities serving the Premises, (iv) the development potential of the Premises, and the use, habitability, merchantability, or fitness, suitability, value or adequacy of the Premises for any particular purpose, (v) the zoning or other legal status of the Premises or any other public or private restrictions on use of the Premises, (vi) the compliance of the Premises or its operation with any applicable codes, laws, regulations, statutes, ordinances, covenants, conditions and restrictions of any governmental or quasi-governmental entity or of any other person or entity, (vii) the presence of Hazardous Materials on, under or about the Premises or the adjoining or neighboring property, (viii) the quality of any labor and materials used in any improvements on the real property, (ix) the condition of title to the Premises, and (x) the agreements affecting the Premises, including covenants, conditions, restrictions, ground leases, and other matters or documents of record or of which Tenant has knowledge.

9.2 Tenant's Maintenance Obligations. Except as provided in 9.3 below, Tenant, at all times during the Term and at Tenant's sole cost and expense, shall keep the Premises and every part thereof in good condition and repair, and in compliance with applicable Laws, including the replacement of any facility of City used by Tenant which requires replacement by reason of Tenant's use thereof, excepting (a) ordinary wear and tear, and (b) damage due to casualty with respect to which the provisions of Section 13 [Damage or Destruction] shall apply. Tenant hereby waives all right to make repairs at the expense of City or in lieu thereof to vacate the Premises as provided by California Civil Code Section 1941 and 1942 or any other law, statute or ordinance now or hereafter in effect. In addition, except as provided in Section 9.3 below, if it becomes reasonably necessary during the term of this Lease, as determined by Director, Tenant shall be jointly and severally responsible with all other tenants of the Rental Car Facility to, at their own expense, for the maintenance and repair of the improvements, equipment and facilities used in common with other tenants of the Rental Car Facility, described as Common Use Space or Limited Common Use Space on Exhibit A. Without limiting the generality of the foregoing, at all times, Tenant shall be solely liable for the facade of the Premises separating the Premises from the Facility common areas, including the external face thereof, all windows and display areas therein, and all finishes thereon. Tenant shall be responsible for cleaning and other cosmetic maintenance and repair of the Common Use and Limited Common Use Premises, including those structural elements maintained by City pursuant to Section 9.3. As provided below in Section 14.4 [City's Right to Perform], in the event Tenant fails to

perform its maintenance and repair obligations hereunder, City shall have the right to do so, at Tenant's expense. The parties acknowledge and agree that Tenant's obligations under this Section are a material part of the bargained-for consideration under this Lease. Tenant's compliance obligations shall include, without limitation, the obligation to make substantial or structural repairs and alterations to the Premises (including the Initial Improvements), regardless of, among other factors, the relationship of the cost of curative action to the Rent under this Lease, the length of the then remaining Term hereof, the relative benefit of the repairs to Tenant or City, the degree to which curative action may interfere with Tenant's use or enjoyment of the Premises, the likelihood that the parties contemplated the particular requirement involved, or the relationship between the requirement involved and Tenant's particular use of the Premises. No occurrence or situation arising during the Term, nor any present or future requirement, whether foreseen or unforeseen, and however extraordinary, shall relieve Tenant of its obligations hereunder, nor give Tenant any right to terminate this Lease in whole or in part or to otherwise seek redress against City. Tenant waives any rights now or hereafter conferred upon it by any existing or future requirement to terminate this Lease, to receive any abatement, diminution, reduction or suspension of payment of Rent, or to compel City to make any repairs to comply with any such requirement, on account of any such occurrence or situation.

Without limiting the generality of Section 14.4, in the event Tenant fails to perform any obligation under the Lease, including its obligation to maintain and repair as provided herein, City may, but shall not be obligated to, perform the same at Tenant's expense.

9.3 City's Responsibilities. City's maintenance and repair responsibilities with respect to the Rental Car Facility shall be limited to the following:

(a) City shall provide major structural maintenance, repair and replacement (if necessary) of the 'Premises' structure, foundations, load bearing walls, non-load bearing walls, ramps, stairs, floor slabs, roof, and the exterior surfaces of walls.

(b) City shall maintain, repair and replace (if necessary) the Premises': 1) heating, air conditioning and ventilation central supply units; 2) electrical, water and sewer main supply lines and distribution system including central plumbing risers; 3) fire detection systems, sprinkler systems, alarm/security systems, elevators, escalators, automatic doors and public address system. The maintenance, repair and replacement of all other systems including all systems installed by Tenant, or located within the Premises shall be the obligation of Tenant.

Exhibit B, attached hereto, summarizes the maintenance responsibility of City as set forth in Section 9.3 above.

Notwithstanding anything to the contrary herein, City shall have no obligation to perform any maintenance or repair if such maintenance and repair arose from the negligence or misconduct of Tenant as to which Tenant shall be solely liable.

9.4 Waivers of Repair Rights. Tenant expressly waives all rights to make repairs at the expense of City or to terminate this Lease because of City's failure to keep the premises in good order, condition, and repair as provided for in Sections 1941 and 1942 of the Civil Code of the State of California.

## 10. SIGNS AND ADVERTISING

Tenant may, at its own expense, install and operate necessary and appropriate identification signs on the Premises, subject to the approval of Director and the requirements of the TI Guide, including but not limited to, the approval of the number, size, height, location, color and general type and design. Such approval shall be subject to revocation by Director at any time. Without express written consent of Director, Tenant shall not display any advertising, promotional, or informational pamphlets, circulars, brochures or similar materials. Without limiting the foregoing restrictions on advertising, in no event will there be permitted on the Premises any advertising of cigarettes or tobacco products.

If Tenant defaults under the provisions of this Section, City may elect to impose a fine of $100 per violation per day. City's right to impose the foregoing fine shall be in addition to and not in lieu of any and all other rights hereunder, in the Airport Rules, or at law or in equity. City shall have no obligation to Tenant to impose fines on or otherwise take action against any other tenant at the Airport. The parties have agreed that a violation of any of the above terms shall result in City incurring damages which are impractical or impossible to determine. The parties have agreed that the fine stated above is a reasonable approximation of such damages. Any fines shall constitute "additional rent".

## 11. WAIVER; INDEMNITY; INSURANCE

11.1 Waiver. Tenant, on behalf of itself and its assigns, waives its rights to recover from and releases and discharges City and all City Entities and their respective heirs, successors, personal representatives and assigns, from any and all Losses whether direct or indirect, known or unknown, foreseen or unforeseen, that may arise on account of or in any way connected with (a) the physical or environmental condition of the Premises or any law or regulation applicable thereto, (b) any damage that may be suffered or sustained by Tenant or any person whosoever may at any time be using or occupying or visiting the Premises, or in or about the Airport, or (c) any act or omission (whether negligent, non-negligent or otherwise) of Tenant or any Tenant Entity, whether or not such Losses shall be caused in part by any act, omission or negligence of any of City, Commission, its members, or any officers, agents, and employees of each of them, and their successors and assigns (each, a "**City Entity**"), except if caused by the sole gross negligence or willful misconduct of City. In connection with the foregoing waiver, Tenant expressly waives the benefit of Section 1542 of the California Civil Code, which provides as follows: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR EXPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN TO HIM MUST HAVE MATERIALLY AFFECTED THE SETTLEMENT WITH THE DEBTOR."

11.2 Indemnity. In addition to, and not in limitation of the foregoing, Tenant shall forever indemnify, defend, hold and save City and each City Entity free and harmless of, from and against any and all Losses caused in whole or in part by or arising out of (a) any act or omission of Tenant or any Tenant Entity, (b) Tenant's use of the Premises or operations at the Airport, or (c) any default by Tenant or any Tenant Entity hereunder, whether or not Losses shall be caused in part by any act, omission or negligence of City or any City Entity. The foregoing indemnity shall not extend to any Loss caused by the sole gross negligence or willful misconduct of City.

11.3 Losses. For purposes hereof "**Losses**" shall mean any and all losses, liabilities, judgments, suits, claims, damages, costs and expenses (including reasonable attorneys' fees, investigation costs, remediation costs, and court costs), of any kind or nature.

11.4 Immediate Obligation to Defend. Tenant specifically acknowledges that it has an immediate and independent obligation to defend City or the City Entity from any claim which is actually or potentially within the scope of the indemnity provision of this Section 12 or any other indemnity provision under this Lease, even if such allegation is or may be groundless, fraudulent or false, and such obligation arises at the time such claim is tendered to Tenant and continues at all times thereafter.

11.5 Notice. Without limiting the foregoing waiver and indemnity, each party hereto shall give to the other prompt and timely written notice of any Loss coming to its knowledge which in any way, directly or indirectly, contingently or otherwise, affects or might affect either, and each shall have the right to participate in the defense of the same to the extent of its own interest.

11.6 Insurance. Tenant shall procure and maintain during the Term the following insurance:

(a) Workers' Compensation Insurance with Employer's Liability limits not less than $1,000,000 each accident.

(b) Comprehensive General Liability Insurance with limits not less than $1,000,000 each occurrence Combined Single Limit for Bodily Injury and Property Damage, including Contractual Liability, Personal Injury, Products Liability and Completed Operations Coverages.

(c) Comprehensive Automobile Liability Insurance with limits not less than $2,000,000 each occurrence Combined Single Limit for Bodily Injury and Property Damage, including Employer's non-ownership liability and hired auto coverages.

(d) Property Insurance on an all risk form covering all Premises tenant improvements, fixtures, and equipment insuring against the perils of fire, lightning, extended coverage perils, vandalism and malicious mischief in the demised premises in an amount equal to the full replacement value of tenant improvements, fixtures and equipment.

(e) Business Interruption Insurance insuring that the Base Rent will be paid to City for a period of at least one (1) year if Tenant is unable to operate its business at the Premises. Said insurance shall also cover business interruptions due to failures or interruptions in telecommunications services, strikes, employee lockouts, riots, or other civil commotion. To calculate Base Rent during any such interruption of business, the Gross Revenues for the 12-month period immediately preceding the incident causing the business interruption shall be used.

Tenant may self-insure to meet its insurance requirements provided that such self-insurance plan is approved by City's Risk Manager.

11.7 Form of Policies. All insurance required by Tenant hereunder shall be pursuant to policies in form and substance and issued by companies satisfactory to City and City's City Attorney. City may, upon reasonable notice and reasonable grounds increase or change the required insurance hereunder, in which event Tenant shall obtain such required insurance. Without limiting the generality of the foregoing, all Comprehensive General Liability Insurance, and Comprehensive Automobile Liability Insurance, policies shall be endorsed to provide the following:

(a) Name as additional insured the City and County of San Francisco, the Airport Commission and its members, and all of the officers, agents, and employees of each of them (collectively, "**Additional Insureds**");

(b) That such policies are primary insurance to any other insurance available to the Additional Insureds, with respect to any claims arising out of this Lease, and that insurance applies separately to each insured against whom claim is made or suit is brought.

(c) That the insurance company shall give thirty (30) days prior written notice to City of cancellation, non-renewal or reduction in coverage or limits, delivered to City at City's Insurance/Deposit Notice Address.

11.8 Delivery of Policies or Certificates. Within five (5) business days after Director's request, and in any event on or before the Commencement Date, Tenant shall provide to City copies of its insurance certificates thereof evidencing the above insurance, at City's Insurance/ Deposit Notice Address. The City reserves the right to examine Tenant's actual insurance policies on a case by case basis.

11.9 Subrogation. Notwithstanding anything to the contrary herein, Tenant waives any right of recovery against City for any loss or damage to the extent the same is required to be covered by Tenant's insurance hereunder. Tenant shall obtain from its insurer, if possible, a waiver of subrogation the insurer may have against City or any City Entity in connection with any Loss covered by Tenant's property insurance policy.

## 12. DEPOSIT

12.1 Form of Deposit. On or before the date specified by the Director, Tenant will deliver to Director a security deposit (the "**Deposit**") in the Deposit Amount. Such Deposit shall be in the form of (a) a surety bond payable to City, naming City as obligee, in the form attached as ***Exhibit C-1***, and otherwise in form satisfactory to City's City Attorney, and issued by a surety company satisfactory to Director, or a (b) letter of credit naming City as beneficiary, in the form attached as ***Exhibit C-2***, and otherwise in form satisfactory to City's City Attorney, issued by a bank satisfactory to Director. Notwithstanding the foregoing, as may be provided in the Airport Commission Policy on Concession Deposits (Resolution No. 04-0153, August 3, 2004) as the same may be amended from time to time, Tenant shall be permitted to submit as the Deposit alternative forms of deposit as specified therein. Such Deposit shall be renewed annually such that at all times, the Deposit is equal to one-half (½) the Initial Minimum Annual Guarantee, all at Tenant's cost. Such Deposit shall be kept in full force and effect during the Term to ensure the faithful performance by Tenant of all covenants, terms, and conditions of this Lease, including payment of Rent. The sum designated as the "Deposit" is and will remain the sole and separate property of City until actually repaid to Tenant (or at City's option, the last assignee (if any) of Tenant's interest hereunder), said sum not being earned by Tenant until all provisions precedent for its payment to Tenant have been fulfilled. For Deposits in the form of a bond or letter of credit, Tenant shall cause the surety company or bank issuing such bond or letter of credit to give Director notice in writing by registered mail at least forty-five (45) days prior to the expiration date of such bond or letter of credit of its intention not to renew said bond or letter of credit.

12.2 Maintenance of Deposit. The Deposit is equal to one-half (1/2) the initial Minimum Annual Guarantee, all at Tenant's cost. Tenant shall cause the bond or letter of credit to be kept in full force and effect during the Term and any holdover period to ensure the faithful performance by Tenant of all covenants, terms, and conditions of this Lease, including payment of Rent. If and to the extent City

accepts a Deposit which has an expiration date or cancellation/termination provision, Tenant shall cause the surety company or bank issuing such bond or letter of credit to give Director notice in writing by registered mail at least forty-five (45) days prior to the expiration date of such bond or letter of credit of its intention not to renew or to cancel or terminate said bond or letter of credit. Tenant shall cause such bond or letter of credit to be renewed, extended, or replaced, at Tenant's sole cost, at least thirty (30) days before the expiration date or cancellation date of the bond or letter of credit, with another bond or letter of credit that complies with the requirements herein. If Tenant fails to do so, City may, without notice to Tenant, draw on the entirety of the Deposit and hold the proceeds thereof as security hereunder. Tenant shall cause all notices to be given to City under this Section 12 to be given to City at City's Insurance/Deposit Notice Address.

12.3 Alternative Forms of Deposit. Notwithstanding the foregoing, if and to the extent alternative form(s) of Deposit are permitted pursuant to the Airport Bid Deposit and Performance Guarantee Policy, as authorized by Commission Resolution No. 04-0153, as such Policy may e amended from time to time, then Tenant may provide such alternative forms of Deposit.

12.4 Use of Deposit. If Tenant fails to pay Rent or otherwise defaults with respect to any provision of this Lease, City may use, apply or retain all or any portion of the Deposit for the payment of Rent or other charge in default or for the payment of any other sum to which City may become obligated by reason of Tenant's default or to compensate City for any loss or damage which City may suffer thereby. If City so uses or applies all or any portion of the Deposit, Tenant, within ten (10) days after request therefore, shall deposit other security acceptable to Director with City in an amount sufficient to restore the Deposit to the full amount thereof, and Tenant's failure to do so shall be a breach of this Lease. City shall not be required to keep the Deposit or any proceeds thereof, as applicable, separate from its general accounts. Any proceeds of the Deposit is and will remain the sole and separate property of City until actually repaid to Tenant, said sum not being earned by Tenant until all provisions precedent for its payment to Tenant have been fulfilled. If Tenant performs all of Tenant's obligations hereunder, the Deposit, or the proceeds thereof, or so much thereof as has not theretofore been applied by City, shall be returned, without payment of interest or other increment for its use, to Tenant (or, at City's option, to the last assignee, if any, of Tenant's interest hereunder) within sixty (60) days after the expiration of the Term, and after Tenant has vacated the Premises. No trust relationship is created herein between City and Tenant with respect to the Deposit or any proceeds thereof.

12.5 Other Agreements. If Tenant defaults with respect to any provision of any other agreement between City and Tenant, including the Other Agreements, City may use, apply or retain all or any portion of the Deposit for payment of any sum owing to City or to which City may become obligated by reason of Tenant's default or to compensate City for any loss or damage which City may suffer thereby. Likewise, if Tenant defaults with respect to any provision under this Lease, City may use, apply, or retain all or any portion of any deposit provided under any other agreement between City and Tenant, including the Other Agreements, for payment of any sum owing to City or to which City may become obligated by reason of Tenant's default or to compensate City for any loss or damage which City may suffer thereby. In the event the Deposit or any other deposit is so used, Tenant shall deposit other security acceptable to Director with City in an amount sufficient to restore the Deposit to the full amount thereof.

## 13. DAMAGE OR DESTRUCTION

13.1 Partial Destruction of the Premises.

(a) In the event the improvements on the Premises for which Tenant bears all maintenance and repair responsibility pursuant to Section 9.2 are damaged by any casualty which is required to be insured against pursuant to this Lease, then Tenant shall repair such damage as soon as reasonably possible, at its own cost, and this Lease shall continue in full force and effect.

(b) In the event such improvements for which Tenant bears all maintenance and repair responsibility pursuant to Section 9.2 are damaged by any casualty not covered under an insurance policy required to be maintained pursuant to this Lease, then City may, at City's option, either (i) repair such damage as soon as reasonably possible at City's expense, in which event this Lease shall continue in full force and effect, or (ii) give written notice to Tenant within sixty (60) days after the date of occurrence of such damage of City's intention to terminate this Lease. Such termination shall be effective as of the date specified in such notice.

(c) Notwithstanding the foregoing, if such damage is caused by an act or omission to act of Tenant or a Tenant Entity, then Tenant shall repair such damage, promptly at its sole cost and expense.

(d) In the event City elects to terminate this Lease pursuant to this Section 13.1, Tenant shall have the right within ten (10) days after receipt of the required notice to notify City of Tenant's intention to repair such damage at Tenant's expense, without reimbursement from City, in which event this Lease shall continue in full force and effect and Tenant shall proceed to make such repairs as soon as reasonably possible. If Tenant does not give such notice within the ten (10) day period, this Lease shall be terminated as of the date specified in City's notice. City shall not be required to repair any injury or damage by fire or other cause, or to make any restoration or replacement of any paneling, decorations, office fixtures, partitions, railings, ceilings, floor covering, equipment, machinery or fixtures or any other improvements or property installed in the Premises by Tenant or at the direct or indirect expense of Tenant. Tenant shall be required to restore or replace same in the event of damage.

13.2 Total Destruction of Premises. If the improvements on the Premises are totally destroyed during the Term from any cause whether or not covered by the insurance required herein (including any destruction required by any authorized public authority), this Lease shall automatically terminate as of the date of such total destruction.

13.3 Partial Destruction of Consolidated Rental Car Facility. If fifty percent (50%) or more of the Consolidated Rental Car Facility shall be damaged or destroyed by an insured risk, or if fifteen percent (15%) or more of the Consolidated Rental Car Facility shall be damaged or destroyed by an uninsured risk, notwithstanding that the Premises may be unaffected thereby, each of City and Tenant may elect to terminate this Lease by giving notice to the other within ninety (90) days from the date of occurrence of such damage or destruction, in which event the Term of this Lease shall expire on a mutually agreed upon date and Tenant shall thereupon surrender the Premises to City as required hereunder.

13.4 Damage Near End of the Term. If during the last year of the Term the improvements on the Premises are partially destroyed or damaged, City may at City's option terminate this Lease as of the date of occurrence of such damage by giving written notice to Tenant of City's election to do so within thirty (30) days after the date of occurrence of such damage. In the event City elects to terminate this Lease pursuant hereto, Tenant shall have the right within ten (10) days after receipt of the required notice to notify City in writing of Tenant's intention to repair such damage at Tenant's expense, without reimbursement from City, in which event this Lease shall continue in full force and effect and Tenant shall proceed to make such repairs as soon as reasonably possible.

13.5 Abatement of Rent; Tenant's Remedies. If the Premises are partially destroyed or damaged, Tenant shall have no claim against City for any damage suffered by reason of any such damage, destruction, repair or restoration. Tenant waives California Civil Code Sections 1932(2) and 1933(4) providing for termination of hiring upon destruction of the thing hired.

In no event will Tenant be entitled to an abatement of Rent resulting from any damage, destruction, repair, or restoration described herein.

## 14. DEFAULT; REMEDIES

14.1 Event of Default. The occurrence of any one or more of the following events shall constitute a breach of this Lease and an "**Event of Default**" hereunder:

(a) Tenant shall fail duly and punctually to pay Rent or to make any other payment required hereunder, when due to City, and such failure shall continue beyond the date specified in a written notice of such default from Director, which date shall be no earlier than the third (3rd) day after the effective date of such notice. Notwithstanding the foregoing, in the event there occurs two (2) defaults in the payment of Rent or other payment during the Term, thereafter Tenant shall not be entitled to, and City shall have no obligation to give, notice of any further defaults in the payment of Rent or other payment. In such event, there shall be deemed to occur an "**Event of Default**" immediately upon Tenant's failure to duly and punctually pay Rent or other payment hereunder; or

(b) Tenant shall become insolvent, or shall take the benefit of any present or future insolvency statute, or shall make a general assignment for the benefit of creditors, or file a voluntary petition in bankruptcy, or a petition or answer seeking an arrangement for its reorganization, or the readjustment of its indebtedness under the federal bankruptcy laws, or under any other law or statute of the United States or of any state thereof, or consent to the appointment of a receiver, trustee, or liquidator of any or substantially all of its property; or

(c) A petition under any part of the federal bankruptcy laws, or an action under any present or future insolvency law or statute, shall be filed against Tenant and shall not be dismissed within thirty (30) days after the filing thereof; or

(d) There shall occur a Transfer without the prior approval of the City; or

(e) Tenant shall voluntarily abandon, desert or vacate the Premises; or

(f) Any lien shall be filed against the Premises as a result of any act or omission of Tenant, and shall not be discharged or contested by Tenant in good faith by proper legal proceedings within twenty (20) days after receipt of notice thereof by Tenant; or

(g) Tenant shall fail to provide, maintain, increase, or replace, the Deposit as required herein; or

(h) Tenant shall fail to obtain and maintain the insurance required hereunder, or provide copies of the policies or certificates to City as required herein; or

(i) Tenant shall fail to keep, perform and observe each and every other promise, covenant and agreement set forth in this Lease, and such failure shall continue for a period of more than three (3) days after delivery by Director of a written notice of such failure (the "**First Notice**"); or if satisfaction of such obligation requires activity over a period of time, if Tenant fails to commence the cure of such failure within three (3) days after receipt of the First Notice, or thereafter fails to diligently prosecute such cure, or fails to actually cause such cure within one hundred twenty (120) days after the giving of the First Notice; or

(j) Tenant shall use or give its permission to any person to use any portion of Airport or the Terminal Buildings used by Tenant under this Lease for any illegal purpose, or any purpose not approved by Director; or

(k) There shall occur a default under any other agreement between Tenant and City, including the Other Agreements, if any, and such default is not cured as may be provided in such agreement; provided, however, that nothing herein shall be deemed to imply that Tenant shall be entitled to additional notice or cure rights with respect to such default other than as may be provided in such other agreement.

14.2 Statutory Notices. Notwithstanding anything to the contrary in this Section 14, any written notice, other than as specifically set forth in this Section 14, required by any statute or law now or hereafter in force is hereby waived by Tenant to the fullest extent available under law. Any notice given by City pursuant to Section 14.1 may be the notice required or permitted pursuant to Section 1161 et seq. of the California Code of Civil Procedure or successor statutes, and the provisions of this Lease will not require the giving of a notice in addition to the statutory notice to terminate this Lease and Tenant's right to possession of the Premises. The periods specified in Section 14.1 within which Tenant is permitted to cure any default following notice from City will run concurrently with any cure period provided by applicable laws.

14.3 Remedies. Upon the occurrence and during the continuance of an Event of Default, City shall have the following rights and remedies in addition to all other rights and remedies available to City at law or in equity:

City shall have the rights and remedies provided by California Civil Code Section 1951.2 (damages on termination for breach), including the right to terminate Tenant's right to possession of the Premises. In the event this Lease is so terminated, City may recover from Tenant the following damages:

(a) The "**worth at the time of the award**" of the unpaid Rent earned to the time of termination hereunder;

(b) The "**worth at the time of the award**" of the amount by which the unpaid Rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could be reasonably avoided; and

(c) The "**worth at the time of the award**" of the amount by which the unpaid Rent for the balance of the Term after the time of award exceeds the amount of such rental loss that Tenant proves could be reasonably avoided; and

(d) Any other amount necessary to compensate City for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom.

For purposes of the foregoing, the "**worth at the time of award**" of the amounts referred to in clauses (i) and (ii) above is computed by allowing interest at the lower of 18% per annum and the highest rate legally permitted under applicable law. The "**worth at the time of award**" of the amount referred to in clause (iii) above is computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus 1% (one percent). Notwithstanding any other provisions hereof, any efforts by City to mitigate damages caused by Tenant's breach of this Lease shall not constitute a waiver of City's right to recover damages hereunder and shall not affect the right of City to indemnification pursuant to the provisions of Section 12 [Waiver; Indemnity; Insurance] hereof. For purposes of calculating City's damages comprising Base Rent based on Gross Revenues, that amount will be computed by determining the highest Base Rent accruing in any Lease Year during the immediately preceding three Lease Years or such shorter period if the Term prior to termination was less than three Lease Years. Tenant agrees that Tenant's obligations under this Lease, including the payment of Base Rent, are independent covenants and are not conditioned on the covenants or warranties of City.

City shall have the right and remedy described in California Civil Code Section 1951.4. City may elect not to terminate this Lease and let this Lease continue, in which case City may enforce all its rights and remedies under this Lease, including the right to recover Rent as it becomes due under this Lease. Acts of maintenance or preservation or efforts to relet the Premises or the appointment of a receiver upon the initiative of City to protect City's interest under this Lease shall not constitute a termination of Tenant's right to possession.

City shall have the right and power, as attorney in fact for Tenant, to enter and to sublet the Premises, to collect rents from all subtenants and to provide or arrange for the provision of all services and fulfill all obligations of Tenant (as permitted in accordance with the terms of this Lease) and City is hereby authorized on behalf of Tenant, but shall have absolutely no obligation, to provide such services and fulfill such obligations and to incur all such expenses and costs as City deems necessary in connection therewith. Tenant shall be liable immediately to City for all costs and expenses City incurs in collecting such rents and arranging for or providing such services or fulfilling such obligations. City is hereby authorized, but not obligated, to relet the Premises or any part thereof on behalf of Tenant, to incur such expenses as may be necessary to effect a relet and make said relet for such term or terms, upon such conditions and at such rental as City in its sole discretion may deem proper. Tenant shall be liable immediately to City for all reasonable costs City incurs in reletting the Premises required by the reletting, and other costs. If City relets the Premises or any portion thereof, such reletting shall not relieve Tenant of any obligation hereunder, except that City shall apply the rent or other proceeds actually collected by it as a result of such reletting against any amounts due from Tenant hereunder to the extent that such rent or other proceeds compensate City for the nonperformance of any obligation of Tenant hereunder. Such payments by Tenant shall be due at such times as are provided elsewhere in this Lease, and City need not

wait until the termination of this Lease, by expiration of the Term hereof or otherwise, to recover them by legal action or in any other manner. City may execute any lease made pursuant hereto in its own name, and the lessee thereunder shall be under no obligation to see to the application by City of any rent or other proceeds, nor shall Tenant have any right to collect any such rent or other proceeds. City shall not by any reentry or other act be deemed to have accepted any surrender by Tenant of the Premises or Tenant's interest therein, or be deemed to have otherwise terminated this Lease, or to have relieved Tenant of any obligation hereunder, unless City shall have given Tenant express written notice of City's election to do so as set forth herein.

City shall have the right to have a receiver appointed upon application by City to take possession of the Premises and to collect the rents or profits therefrom and to exercise all other rights and remedies pursuant to this Section 14.3.

City shall have the right to enjoin, and any other remedy or right now or hereafter available to a landlord against a defaulting tenant under the laws of the State of California or the equitable powers of its courts, and not otherwise specifically reserved herein.

City may elect to terminate any other agreement between Tenant and City, including the Other Agreements, if any.

14.4 City's Right to Perform. All agreements and provisions to be performed by Tenant under any of the terms of this Lease shall be at its sole cost and expense and without any abatement of Rent. If Tenant shall fail to make any payment or perform any act on its part to be performed hereunder and such failure shall continue for ten (10) days after notice thereof by City, City may, but shall not be obligated to do so, and without waiving or releasing Tenant from any obligations of Tenant, make any such payment or perform any such other act on Tenant's part to be made or performed as provided in this Lease. All sums so paid by City and all necessary incidental costs shall be deemed additional rent hereunder and shall be payable to City on demand, and City shall have (in addition to any other right or remedy of City) the same rights and remedies in the event of the nonpayment thereof by Tenant as in the case of default by Tenant in the payment of Rent.

14.5 Rights Related to Termination. In the event of any termination based on any breach of the covenants, terms and conditions contained in this Lease, City shall have the option at once and without further notice to Tenant to enter upon the Premises and take exclusive possession of same. City may remove or store any personal property located therein, at the sole cost and expense of Tenant without City being liable to Tenant for damage or loss thereby sustained by Tenant. Upon such termination by City, all rights, powers and privileges of Tenant hereunder shall cease, and Tenant shall immediately vacate any space occupied by it under this Lease, and Tenant shall have no claim of any kind whatsoever against City or any City Entity by reason of such termination, or by reason of any act by City or any City Entity incidental or related thereto. In the event of the exercise by City of such option to terminate, Tenant shall have no right to or claim upon any improvements or the value thereof, which may have been previously installed by Tenant in or on the Premises.

14.6 Cumulative Rights. The exercise by City of any remedy provided in this Lease shall be cumulative and shall in no way affect any other remedy available to City under law or equity.

14.7 Prepayment. As provided in Section 4.17 [Prepay Rent], if Tenant defaults in the payment of Rent, City may require prepayment of Rent. Such right shall be in addition to and not in lieu of any and all other rights hereunder, or at law or in equity.

14.8 Fines. If Tenant defaults under any of the Lease terms specified below, Director may elect to impose the fines described below on the basis of per violation per day:

| Violation | Section | Fine |
|---|---|---|
| Violation of Premises Clause | 1 | $500 |
| Violation of Use Section | 3 | $500 |
| Failure to cause operations or Premises to comply with Laws | 3.13 | $500 |
| Failure to submit required documents and reports, including Sales Reports | 4.4, 4.5, and others | $500 |
| Construction or Alterations without City approval | 7 | $300 |
| Failure to make required repairs | 9 | $500 |
| Unauthorized advertising or signage | 10 | $100 |
| Failure to obtain/maintain insurance | 11 | $300 |
| Failure to obtain or maintain Deposit | 12 | $300 |
| Failure to abide by any other term in this Lease | | $300 |

Director's right to impose the foregoing Fines shall be in addition to and not in lieu of any and all other rights hereunder, in the Airport Rules, or at law or in equity. City shall have no obligation to Tenant to impose Fines on or otherwise take action against any other tenant at the Airport. Such Fines shall constitute "**Additional Rent.**"

14.9 City Lien. Tenant hereby grants to City a lien upon and security interest in all fixtures, chattels and personal property of every kind now or hereafter to be placed or installed in or on the Premises, and agrees that in the event of any default on the part of Tenant City has all the rights and remedies afforded the secured party by the chapter on "Default" of the Uniform Commercial Code in the state wherein the Premises are located on the date of this Lease and may, in connection therewith, also (a) enter on the Premises to assemble and take possession of the collateral, (b) require Tenant to assemble the collateral and make its possession available to the City at the Premises, (c) enter the Premises, render the collateral, if equipment, unusable and dispose of it in a manner provided by the Uniform Commercial Code on the Premises. Tenant agrees to execute such instruments as City may request to perfect such lien, and designates also Director his attorney-in-fact for purposes of executing such documents.

14.10 Commencement of Legal Actions. Any legal action by City to enforce any obligation of Tenant or in the pursuit of any remedy hereunder shall be deemed timely filed if commenced at any time prior to one (1) year after the expiration or termination of the Term hereof or prior to the expiration of the statutory limitation period that would be applicable except for this Section 14.10, whichever period expires later.

14.11 Waiver of Notice. Except as otherwise expressly provided in this Section 14, Tenant hereby expressly waives, so far as permitted by law, the service of any notice of intention to enter or re-enter provided for in any statute, or of the institution of legal proceedings to that end, and Tenant, for and on behalf of itself and all persons claiming through or under Tenant, also waives any right of redemption or

relief from forfeiture under California Code of Civil Procedure Sections 1174 or 1179, or under any other present or future law, if Tenant is evicted or City takes possession of the Premises by reason of any default by Tenant hereunder.

## 15. SURRENDER

Tenant shall at the end of the Term surrender to City the Premises and all Alterations, additions and improvements thereto in the same condition as when received, ordinary wear and tear and damage by fire, earthquake, act of God, or the elements excepted. Subject to City's right to require removal pursuant to Section 7 [Investments; Alterations] hereof, all Alterations and improvements installed in the Premises by Tenant (other than Tenant's trade fixtures), shall, without compensation to Tenant, then become City's property free and clear of all claims to or against them by Tenant or any third person. In the event that Tenant shall fail to remove its personal property, including trade fixtures, on or before the Expiration Date, such personal property shall become City's property free and clear of all claims to or against them by Tenant or any third person. In such event, City shall not be responsible for any Losses related to such personal property, and City may sell or otherwise dispose of such personal property.

## 16. HAZARDOUS MATERIALS

16.1 Definitions. As used herein, the following terms shall have the meanings hereinafter set forth:

(a) "**Environmental Laws**" shall mean any federal, state, local or administrative law, rule, regulation, order or requirement relating to industrial hygiene, environmental conditions or Hazardous Materials, whether now in effect or hereafter adopted, including the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. Sections 9601, et seq.), the Resources Conservation and Recovery Act of 1976 (42 U.S.C. Section 9601, et seq.), the Clean Water Act (33 U.S.C. Section 1251, et seq.), the Safe Drinking Water Act (14 U.S.C. Section 401, et seq.), the Hazardous Materials Transportation Act (49 U.S.C. Section 1801, et seq.), the Toxic Substance Control Act (15 U.S.C. Section 2601, et seq.), the California Hazardous Waste Control Law (California Health and Safety Code Section 25100, et seq.), the Porter-Cologne Water Quality Control Act (California Water Code Section 13000, et seq.), and the Safe Drinking Water and Toxic Enforcement Act of 1986 (California Health and Safety Code Section 25249.5, et seq.

(b) "**Hazardous Material**" shall mean any material that, because of its quantity, concentration or physical or chemical characteristics, is deemed by any federal, state or local governmental authority to pose a present or potential hazard to human health or safety or to the environment. "**Hazardous Material**" includes, without limitation, any material or substance defined as a "hazardous substance," or "pollutant" or "contaminant" pursuant to any Environmental Law; any asbestos and asbestos containing materials; petroleum, including crude oil or any fraction thereof, natural gas or natural gas liquids; and any materials listed in the Airport's TI Guide.

(c) "**Release**" when used with respect to Hazardous Material shall include any actual or imminent spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into or inside the Building, or in, on, under or about the Property.

(d) **"Pre-Existing Condition"** means the existence of any Hazardous Materials on the Premises immediately prior to the Commencement Date.

16.2 Tenant's Covenants. Neither Tenant nor any Tenant Entity shall cause any Hazardous Material to be brought upon, kept, used, stored, generated or disposed of in, on or about the Premises or the Airport, or transported to or from the Premises or the Airport; provided that Tenant may use such substances that as are customarily used in a rental car operation so long as such use is in compliance with all applicable Environmental Laws and the Airport's TI Guide.

Tenant shall handle Hazardous Materials discovered or introduced on the Premises during the Term in compliance with all Environmental Laws and the Airport's TI Guide. Tenant shall protect its employees and the general public in accordance with all Environmental Laws.

In the event Tenant becomes aware of the actual or possible Release of Hazardous Materials on the Premises or elsewhere on the Airport, Tenant shall promptly give notice of the same to City. Without limiting the generality of the foregoing, Tenant shall give notice to City of any of the following: (i) notice of a Release of Hazardous Materials given by Tenant, any subtenant, or other occupant to any governmental or regulatory agency; (ii) notice of a violation or potential or alleged violation of any Environmental Law received by Tenant, any subtenant, other occupant on the Premises from any governmental or regulatory agency; (iii) any inquiry, investigation, enforcement, cleanup, removal, other action that is instituted or threatened by a government or regulatory agency; (iv) any claim that is instituted or threatened by a third party against Tenant, any subtenant, or other occupant on the Premises that relates to Hazardous Materials; and (v) any notice of termination, expiration, or material amendment to any environmental operating permit or license necessary for the use of the Premises.

At Director's request, Tenant shall provide information necessary for City to confirm that Tenant is complying with the foregoing covenants.

16.3 Environmental Indemnity. Tenant shall indemnify, defend, and hold harmless City from and against any and all Losses arising during or after the Term as a result of or arising from: (a) a breach by Tenant of its obligations contained in the preceding Section 16.2 [Tenant's Covenants], or (b) any Release of Hazardous Material from, in, on or about the Premises or the Airport caused by the act or omission of Tenant or any Tenant Entity, or (c) the existence of any Hazardous Materials on the Premises, except to the extent that Tenant can demonstrate that such Hazardous Materials constitutes a Pre-Existing Condition.

16.4 Environmental Audit. Upon reasonable notice, Director shall have the right but not the obligation to conduct or cause to be conducted by a firm acceptable to Director, an environmental audit or any other appropriate investigation of the Premises for possible environmental contamination. Such investigation may include environmental sampling and equipment and facility testing, including the testing of secondary contamination. No such testing or investigation shall limit Tenant's obligations hereunder or constitute a release of Tenant's obligations therefor. Tenant shall pay all costs associated with said investigation in the event such investigation shall disclose any Hazardous Materials contamination as to which Tenant is liable hereunder.

16.5 Closure Permit. Prior to the termination or expiration of this Lease, Director shall have the right to require Tenant to file with the City an application for a Closure Permit for decontamination of the site and investigation and removal of all Hazardous Materials in compliance with the Airport's TI Guide, the Airport Rules, and all Laws. The Closure Permit may require a plan for long-term care and surveillance

of any contamination allowed to remain at the Premises or Airport property and an acknowledgment of responsibility and indemnification for any and all Losses associated with any such contamination. Without limiting the foregoing provision, City reserves the right to require Tenant to, and in such event Tenant shall, at Tenant's sole cost and expense, decontaminate the Premises and remove any Hazardous Materials discovered during the Term, except those Hazardous Materials which constitute Pre-Existing Conditions. Such removal shall be performed to the Director's reasonable satisfaction.

16.6 Environmental Compliance Requirements.

(a) RACs will be required to comply with all Airport, San Mateo County, State of California, and Federal environmental laws and regulations applicable to RAC operations. Compliance with specific laws, regulations, and ordinances will be required for items including, but not limited to, wastewater discharges into Airport's wastewater collection systems ; storm water pollution prevention; underground and above ground storage tanks for petroleum products and other hazardous materials; hazardous materials business plan; spill prevention, control, and countermeasure plan; and facility emergency response plan. RAC's shall obtain all required environmental permits such as underground storage tank permit and Title V air emission permit from the appropriate regulatory agencies and shall prepare and submit all required environmental compliance plans such as storm water pollution prevention plan and spill prevention, control, and countermeasure plan to the appropriate regulatory agencies. RAC's are required to submit a copy of all environmental permits and environmental compliance plans within 60 days from the start of the Lease and within 30 days from the date of renewal or modification of such plans or permits to Airport Environmental Services at the address shown below. RAC's are also required to submit a copy of any Notices of Violations received from any government agency relevant to noncompliance with environmental laws, regulations, permits, etc. to Airport Environmental Services within five working days from the date of receipt of such notices to:

Airport Environmental Services
Bureau of Design and Construction
P.O. Box 8097
San Francisco, CA 94128

(b) Compliance with California Global Warming Solution Act of 2006. The Act requires the State Air Resources Board to, among other tasks, carry out the following tasks:

i. Establish a statewide GHG emissions cap for 2020, based on 1990 emissions by January 1, 2008.

ii. Adopt mandatory reporting rules for significant sources of greenhouse gases by January 1, 2008.

iii. Adopt a plan by January 1, 2009 indicating how emission reductions will be achieved from significant GHG sources via regulations, market mechanisms and other actions.

iv. Adopt regulations by January 1, 2011 to achieve the maximum technologically feasible and cost-effective reductions in GHGs, including provisions for using both market mechanisms and alternative compliance mechanisms.

The City and County of San Francisco has established a more ambitious goal for reducing the GHG emissions from the City facilities and operations to 20% below the 1990 emission levels by year 2012. The RAC's are required to comply with the California Air Resources Board's (CARB) regulations for implementing the Global Warming Solutions Act of 2006 in accordance with the time schedule to be established by the CARB. RAC's are also encouraged to make voluntary attempts to achieve the GHG emissions reduction goal that Airport is committed to achieving by or before 2012. RAC's are required to submit to the Airport a copy of all documents and reports required to be submitted to the CARB under the provisions of the Global Warming Solutions Act within 30 days from the date of submittal of such reports to CARB.

(c) Compliance with Notices of Violations of Environmental laws and Regulations. RAC's are required to promptly comply with any notices of violation of environmental laws, regulations, permits, or applicable environmental plan provisions. RAC's shall bear responsibility for any fines imposed on the Airport or compliance costs borne by the Airport as a result of the violation of any environmental laws and regulations by such tenant(s).

(d) Environmental Sustainability Requirements. Airport published an Environmental Sustainability Report (**"ESR"**) in June 2007 documenting the Airport's environmental footprint and detailing our many environmental achievements including reductions in GHG emissions, abatement of aircraft noise, control of pollutant discharges to the Bay, protection of endangered species' habitat at the Airport, etc. The complete text of Airport's 2007 Environmental Sustainability Report can be found at the following web site: http://www.flysfo.com/web/export/sites/default/download/about/reports/pdf/ESReport.pdf.

The 2007 sustainability report was focused on Airport operations and facilities and did not include any information on the tenants' environmental achievements. Airport plans to issue updates of the ESR at two year intervals. In the future editions of the ESR Airport will request the RACs for information on various sustainability measures carried out by the RAC's at their AIRPORT facilities. RAC's are encouraged to implement measures such as purchasing more fuel efficient cars, purchasing electric cars, using more efficient indoor lighting systems, etc to demonstrate their commitment to environmental sustainability at the Airport.

## 17. EMINENT DOMAIN

17.1 Definitions. For purposes of this Section 17, the following capitalized terms shall have the following meanings:

(a) **"Award"** means all compensation, sums or value paid, awarded or received for a Taking, whether pursuant to judgment, agreement, settlement or otherwise.

(b) **"Date of Taking"** means the earlier of: (a) the date upon which title to the portion of the Premises taken passes to and vests in the condemnor, and (b) the date on which Tenant is dispossessed

(c) **"Taking"** means a taking or damaging, including severance damage, by eminent domain, inverse condemnation or for any public or quasi-public use under applicable Laws. A Taking

may occur pursuant to the recording of a final order of condemnation, or by voluntary sale or conveyance in lieu of condemnation or in settlement of a condemnation action.

17.2 General. If during the Term or during the period between the execution of this Lease and the Commencement Date, any Taking of all or any part of the Premises or any interest in this Lease occurs, the rights and obligations of the parties hereunder shall be determined pursuant to this Section 17. City and Tenant intend that the provisions hereof govern fully in the event of a Taking and accordingly, the Parties each hereby waives any right to terminate this Lease in whole or in part under Sections 1265.120 and 1265.130 of the California Code of Civil Procedure or under any similar Law now or hereafter in effect.

17.3 Total Taking; Automatic Termination. If a Total Taking of the Premises occurs, then this Lease shall terminate as of the Date of Taking.

17.4 Partial Taking; Election to Terminate. If a Taking of any portion (but less than all) of the Premises occurs, then this Lease shall terminate in its entirety if all of the following exist: (a) the partial Taking renders the remaining portion of the Premises untenantable or unsuitable for continued use by Tenant for the Permitted Use; (b) the condition rendering the Premises untenantable or unsuitable either is not curable or is curable but City is unwilling or unable to cure such condition; and (c) City elects to terminate.

If a partial Taking of a material portion of the Terminal occurs, City shall have the right to terminate this Lease in its entirety.

City's elections to terminate this Lease pursuant to this Section 18 shall be exercised by City's giving notice to Tenant on or before the date that is one hundred twenty (120) days after the Date of Taking, and thereafter this Lease shall terminate upon on the thirtieth (30th) day after such notice is given.

17.5 Tenant Monetary Obligations; Award. Upon termination of this Lease pursuant to an election under Section 17.4 [Partial Taking; Election to Terminate] above, then: (a) Tenant's obligation to pay Base Rent shall continue up until the date of termination, and thereafter shall cease, and (b) City shall be entitled to the entire Award in connection therewith (including any portion of the Award made for the value of the leasehold estate created by this Lease), and Tenant shall have no claim against City for the value of any unexpired term of this Lease, provided that Tenant may make a separate claim for compensation, and Tenant shall receive any Award made specifically to Tenant, for Tenant's relocation expenses or the interruption of or damage to Tenant's business or damage to Tenant's personal property.

17.6 Partial Taking; Continuation of Lease. If a partial Taking of the Premises occurs and this Lease is not terminated in its entirety under Section 17.4 [Partial Taking; Election to Terminate] above, then this Lease shall terminate as to the portion of the Premises so taken, but shall remain in full force and effect as to the portion not taken, and the rights and obligations of the Parties shall be as follows: (a) the Minimum Annual Guarantee shall be adjusted by Director to reflect the Taking, and (b) City shall be entitled to the entire Award in connection therewith (including, but not limited to, any portion of the Award made for the value of the leasehold estate created by this Lease). Tenant shall have no claim against City for the value of any unexpired Term of this Lease, provided that Tenant may make a separate claim for compensation. Tenant shall retain any Award made specifically to Tenant for Tenant's relocation expenses or the interruption of or damage to Tenant's business or damage to Tenant's personal property.

17.7 Temporary Takings. Notwithstanding anything to contrary in this Section, if a Taking occurs with respect to all or any part of the Premises for a limited period of time not in excess of one hundred eighty (180) consecutive days, this Lease shall remain unaffected thereby, and Tenant shall continue to pay Rent, and to perform all of the terms, conditions and covenants of this Lease. In the event of such temporary Taking, City shall be entitled to receive any Award.

## 18. CITY AND OTHER GOVERNMENTAL PROVISIONS

18.1 MacBride Principles - Northern Ireland. Pursuant to San Francisco Administrative Code §12.F.5, the City and County of San Francisco urges companies doing business in Northern Ireland to move towards resolving employment inequities, and encourages such companies to abide by the MacBride Principles. The City and County of San Francisco urges San Francisco companies to do business with corporations that abide by the MacBride Principles. By signing below, the person executing this Lease on behalf of Tenant acknowledges that he or she has read and understood this section.

18.2 Charter. The terms of this Lease shall be governed by and subject to the budget and fiscal provisions of the Charter of the City and County of San Francisco.

18.3 Tropical Hardwood and Virgin Redwood Ban. The City and County of San Francisco urges companies not to import, purchase, obtain or use for any purpose, any tropical hardwood, tropical hardwood wood product, virgin redwood or virgin redwood wood product. Except as expressly permitted by the application of Sections 802(b) and 803(b) of the San Francisco Environmental Code, Tenant shall not provide any items to the construction of Alterations, or otherwise in the performance of this Lease which are tropical hardwoods, tropical hardwood wood products, virgin redwood, or virgin redwood wood products. In the event Tenant fails to comply in good faith with any of the provisions of Chapter 8 of the San Francisco Environmental Code, Tenant shall be liable for liquidated damages for each violation in any amount equal to Tenant's net profit on the contract, or five percent (5%) of the total amount of the contract dollars, whichever is greater.

18.4 No Representations. Tenant acknowledges and agrees that neither City nor any person on behalf of City has made, and City hereby disclaims, any representations or warranties, express or implied, regarding the business venture proposed by Tenant at the Airport, including any statements relating to the potential success or profitability of such venture. Tenant represents and warrants that it has made an independent investigation of all aspects of the business venture contemplated by this Lease and the Permitted Use.

18.5 Effect of City Approvals. Notwithstanding anything to the contrary herein, Tenant acknowledges and agrees that City is entering into this Lease as a landowner, and not as a regulatory agency with police powers. Accordingly, any construction, alterations, or operations contemplated or performed by Tenant hereunder may require further authorizations, approvals, or permits from governmental regulatory agencies, including the Airport's Quality Control Department. Nothing in this Lease shall limit Tenant's obligation to obtain such other authorizations, approvals, or permits. No inspection, review, or approval by City pursuant to this Lease shall constitute the assumption of, nor be construed to impose, responsibility for the legal or other sufficiency of the matter inspected, reviewed, or approved. In particular, but without limiting the generality of the foregoing, in approving plans and specifications for Alterations, City (a) is not warranting that the proposed plan or other action complies with applicable Laws, and (b) reserves its right to insist on full compliance in that regard even after its approval has been given or a permit has been issued.

18.6 Limitation on Damages. Notwithstanding anything to the contrary herein, in no event will City or any City Entity be liable to Tenant or any Tenant Entity for any consequential, incidental, or special damages, or special damages, or lost revenues or lost profits.

18.7 Sponsor's Assurance Agreement. This Lease shall be subordinate and subject to the terms of any "Sponsor's Assurance Agreement" or any like agreement heretofore or hereinafter entered into by City and any agency of the United States of America.

18.8 Federal Nondiscrimination Regulations.

(a) Tenant understands and acknowledges that City has given to the United States of America, acting by and through the Federal Aviation Administration, certain assurances with respect to nondiscrimination, which have been required by Title VI of the Civil Rights Act of 1964, as effectuated by Title 49 of the Code of Federal Regulations, Subtitle A - Office of the Secretary of Transportation, Part 21, as amended, as a condition precedent to the government making grants in aid to City for certain Airport programs and activities, and that City is required under said Regulations to include in every Lease or concession pursuant to which any person or persons other than City, operates or has the right to operate any facility on the Airport providing services to the public, the following covenant, to which Tenant agrees as follows: "Tenant in its operation at and use of San Francisco International Airport, covenants that (1) no person on the grounds of race, color, or national origin shall be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities; (2) that in the construction of any improvements on, over, or under such land and the furnishing of services thereon, no person on the grounds of race, color, or national origin shall be excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination, and (3) that the grantee, licensee, permittee, etc., shall use the Premises in compliance with all other requirements imposed by or pursuant to Title 49, Code of Federal Regulations, Subtitle A, Office of the Secretary of Transportation, Part 21, Nondiscrimination in Federally-Assisted Programs of the Department of Transportation Effectuations of Title VI of the Civil Rights Act of 1964, and as said regulations may be amended."

(b) (i) This Lease is subject to the requirements of the U.S. Department of Transportation's regulations, 49 CFR part 23. The concessionaire or contractor agrees that it will not discriminate against any business owner because of the owner's race, color, national origin, or sex in connection with the award or performance of any concession agreement, management contract, or subcontract, purchase or lease agreement, or other agreement covered by 49 CFR part 23. (ii) The concessionaire or contractor agrees to include the above statements in any subsequent Lease agreement or contract covered by 49 CFR part 23 that it enters and causes those businesses to similarly include the statements in the further agreements.

18.9 Federal Affirmative Action Regulations. Tenant assures that it will undertake an affirmative action program as required by 14 CFR Part 152, Subpart E, to insure that no person shall on the grounds of race, creed, color, national origin, or sex be excluded from participating in any employment activities covered in 14 CFR Part 152, Subpart E. Tenant assures that no person shall be excluded on these grounds from participating in or receiving the services or benefits of any program or activity covered by this subpart. Tenant assures that it will require that its covered sub-organizations provide assurances to

Tenant that they similarly will undertake affirmative action programs and that they will require assurances from their sub-organizations, as required by 14 CFR Part 152, Subpart E, to the same effect.

18.10 Federal Disadvantaged Business Enterprises (DBE) Regulations. In accordance with the Federal regulations, 49 CFR Part 23, participation by Disadvantaged Business Enterprises (DBEs) in Airport Concessions (March 22, 2005), on-Airport car rental companies must:

(a) Submit annual achievement reports to the Airport DBE Liaison Officer on or before December 1st of each year. This report should include the number and dollar amounts spent with certified ACDBEs for purchases of automobiles, supplies, goods and/or consultant services. A copy of the FAA reporting form is attached.

(b) Every three years, beginning in 2009, each on-site car rental company must submit an ACDBE participation goal to the Airport for review by Airport DBE Liaison Officer. This goal must be submitted every three years in October 1st. A copy of the Federal Regulations can be found at: http://a257.g.akamaitech.net/7/257/2422/01jan20051800/edocket.access.gpo.gov/2005/pdf/05-5530.pdf

18.11 City's Nondiscrimination Ordinance.

(a) In the performance of this Lease, Tenant agrees not to discriminate against any employee, City and County employee working with Permittee, applicant for employment Tenant, or against any person seeking accommodations, advantages, facilities, privileges, services, or membership in all business, social, or other establishments or organizations operated by Tenant, on the basis of the fact or perception of a person's race, color, creed, religion, national origin, ancestry, age, height, weight, sex, sexual orientation, gender identity, domestic partner status, marital status, disability or Acquired Immune Deficiency Syndrome or HIV status (AIDS/HIV status), or association with members of such protected classes, or in retaliation for opposition to discrimination against such classes.

(b) Tenant shall include in all subleases and other subcontracts relating to the Premises hereunder a non-discrimination clause in substantially the form of subsection (a) above. In addition, Tenant shall incorporate by reference in all subleases and other subcontracts the provisions of Sections 12B.2 (a), 12B.2(c)-(k), and 12C.3 of the San Francisco Administrative Code and shall require all subtenants and other subcontractors to comply with such provisions. Tenant's failure to comply with the obligations in this subsection shall constitute a material breach of this Lease.

(c) Tenant does not as of the date of this Lease and will not during the Term, in any of its operations in San Francisco, where the work is being performed for the City, or elsewhere within the United States, discriminate in the provision of bereavement leave, family medical leave, health benefits, membership or membership discounts, moving expenses, pension and retirement benefits or travel benefits, as well as any benefits other than the benefits specified above, between employees with domestic partners and employees with spouses, and/or between the domestic partners and spouses of such employees, where the domestic partnership has been registered with a governmental entity pursuant to state or local law authorizing such registration, subject to the conditions set forth in Section 12B.2(b) of the San Francisco Administrative Code.

(d) Tenant hereby represents that prior to execution of this Lease (i) Tenant executed and submitted to the Human Rights Commission of the City and County of San Francisco (the "HRC") the "Chapter 12B Declaration: Nondiscrimination in Contracts and Benefits" form (Form HRC-12B-101)", with supporting documentation, and (ii) the HRC approved such form.

(e) The provisions of Chapters 12B and 12C of the San Francisco Administrative Code relating to non-discrimination by parties contracting for the lease of City property are incorporated in this Section by reference and made a part of this Lease as though fully set forth herein. Tenant shall comply fully with and be bound by all of the provisions that apply to this Lease under such Chapters of the Administrative Code, including but not limited to the remedies provided in such Chapters. Without limiting the foregoing, Tenant understands that pursuant to Section 12B.2(h) of the San Francisco Administrative Code, a penalty of $50 for each person for each calendar day during which such person was discriminated against in violation of the provisions of this Lease may be assessed against Tenant and/or deducted from any payments due Tenant.

18.12 Conflict of Interest. Through its execution of this Lease, Tenant acknowledges that it is familiar with the provisions of section 15.103 of City's Charter, Article III, Chapter 2 of City's Campaign and Governmental Conduct Code, and sections 87100 et seq and sections 1090 et seq. of the Government Code of the State of California, and certifies that it does not know of any facts which constitute a violation of said provision and agrees that if it becomes aware of any such fact during the term of this Lease it shall immediately notify Landlord.

18.13 Prevailing Rates of Wage. Tenant shall abide by Airport Commission Policy No. 80-0031, requiring that Tenant pay generally prevailing rates of salaries, wages, and employee benefits, to its employees working at San Francisco International Airport pursuant to this Lease.

18.14 Declaration Regarding Airport Private Roads. Tenant hereby acknowledges and agrees that all roads existing at the date of execution hereof within the boundaries of the Airport, as shown on the current official Airport plan and as it may be revised, are the private property and private roads of the City and County of San Francisco, with the exception of that portion of the old Bayshore Highway which runs through the southern limits of the City of South San Francisco and through the northern portion of the Airport to the intersection with the North Airport Road as shown on said Airport Plan, and with the exception of that portion of the North Airport Road which runs from the off and on ramps of the State Bayshore Freeway to the intersection with said old Bayshore Highway as shown on said Airport Plan. It further acknowledges that any and all roads hereafter constructed or opened by City within the Airport boundaries will be the private property and road of City, unless otherwise designated by appropriate action.

18.15 No Relocation Assistance; Waiver of Claims. Tenant acknowledges that it will not be a displaced person at the time this Lease is terminated or expires by its own terms, and Tenant fully releases, waives, and discharges forever any and all claims or other Losses, against and covenants not to sue City or any City Entity under any Laws, including any and all claims for relocation benefits or assistance from City under federal and state relocation assistance laws. Without limiting Section 5 [Assignment or Subletting], Tenant shall cause any Transferee to expressly waive entitlement to any and all relocation assistance and benefits in connection with this Lease. Tenant shall indemnify, defend, and hold harmless City for any and all Losses arising out of any relocation assistance or benefits payable to any Transferee.

18.16 Drug-Free Workplace. Tenant acknowledges that pursuant to the Federal Drug-Free Workplace Act of 1989, the unlawful manufacture, distribution, possession or use of a controlled substance is prohibited on City premises. Any violation of this prohibition by Tenant or any Tenant Entity shall constitute a default hereunder.

18.17 Compliance with Americans With Disabilities Act. Tenant acknowledges that, pursuant to the ADA, programs, services and other activities provided by a public entity, whether directly or through a contractor, must be accessible to the disabled public. Tenant shall provide the services specified in this Lease in a manner that complies with the ADA and any and all other applicable federal, state and local disability rights legislation. Tenant agrees not to discriminate against disabled persons in the provision of services, benefits or an activity provided under this Lease and further agrees that any violation of this prohibition on the part of Tenant, its employees, agents or assigns shall constitute a material breach of this Lease.

18.18 Sunshine Ordinance. In accordance with S.F. Administrative Code Section 67.24(e), contractors' bids, responses to RFPs and all other records of communications between the City and persons or firms seeking contracts shall be open to inspection immediately after a contract has been awarded. Nothing in this provision requires the disclosure of a private person's or organization's net worth or other proprietary financial data submitted for qualification for a contract or other benefits until and unless that person or organization is awarded the contract or benefit. Information provided which is covered by this paragraph will be made available to the public upon request.

18.19 Pesticide Prohibition. Tenant shall comply with the provisions of Section 308 of Chapter 3 of the San Francisco Environment Code (the "**Pesticide Ordinance**") which (i) prohibit the use of certain pesticides on City property, (ii) require the posting of certain notices and the maintenance of certain records regarding pesticide usage and (iii) require Tenant to submit to the Airport an integrated pest management ("**IPM**") plan that (a) lists, to the extent reasonably possible, the types and estimated quantities of pesticides that Tenant may need to apply to the Premises during the terms of this Lease, (b) describes the steps Tenant will take to meet the City's IPM Policy described in Section 300 of the Pesticide Ordinance and (c) identifies, by name, title, address and telephone number, an individual to act as the Tenant's primary IPM contact person with the City. In addition, Tenant shall comply with the requirements of Sections 303(a) and 303(b) of the Pesticide Ordinance.

18.20 First Source Hiring. Tenant shall comply with the San Francisco First Source Hiring Ordinance (Board of Supervisors Ordinance No. 264-98) in cooperation with the Airport Commission Office of Employment and Community Partnerships pursuant to the First Source Hiring Agreement entered into between the Airport Commission and the Tenant concurrently herewith, and incorporated herein by reference.

18.21 Labor Peace/Card Check Rule. Without limiting the generality of other provisions herein requiring Tenant to comply with all Airport Rules, Tenant shall comply with the Airport's Labor Peace/Card Check Rule, adopted on February 1, 2000, pursuant to Airport Commission Resolution No. 00-0049 (the "**Labor Peace/Card Check Rule**"). Capitalized terms not defined in this provision are defined in the Labor Peace/Card Check Rule. To comply with the Labor Peace/Card Check Rule, Tenant shall, among other actions: (a) Enter into a Labor Peace/Card Check Agreement with any Labor Organization which requests such an agreement and which has registered with the Airport Director or his/her designee, within thirty (30) days after the Labor Peace/Card Check Agreement has been requested; (b) Not less than thirty (30) days prior to the modification of this Lease, Tenant shall provide notice by mail to any Labor Organization or federation of labor organizations which have registered with the

Director or his/her designee ("**registered labor organization**"), that Tenant is seeking to modify or extend this Lease; (c) Upon issuing any request for proposals, invitations to bid, or similar notice, or in any event not less than thirty (30) days prior to entering into any Subcontract, Tenant shall provide notice to all registered labor organizations that Tenant is seeking to enter into such Subcontract; and (d) Tenant shall include in any subcontract with a Subcontractor performing services pursuant to any Covered Contract, a provision requiring the Subcontractor to comply with the requirements of the Labor Peace/Card Check Rule. If Airport Director determines that Tenant shall have violated the Labor Peace/Card Check Rule, Airport Director shall have the option to terminate this Lease, in addition to exercising all other remedies available to him/her.

18.22 Requiring Minimum Compensation. Tenant agrees to comply fully with and be bound by all of the provisions of the Minimum Compensation Ordinance (MCO), as set forth in San Francisco Administrative Code Chapter 12P (Chapter 12P), including the remedies provided, and implementing guidelines and rules. The provisions of Chapter 12P are incorporated herein by reference and made a part of this Lease as though fully set forth. The text of the MCO is available on the web at http://www.sfgov.org/site/olse_index.asp. Capitalized terms used in this Section and not defined in this Lease shall have the meanings assigned to such terms in Chapter 12P. Consistent with the requirements of the MCO, Tenant agrees to all of the following:

(a) For each hour worked by a Covered Employee during a Pay Period on the property covered by this Lease, Tenant shall provide to the Covered Employee no less than the Minimum Compensation, which includes a minimum hourly wage and compensated and uncompensated time off consistent with the requirements of the MCO. For the hourly gross compensation portion of the MCO, Tenant shall pay a minimum of $11.03 an hour beginning January 1, 2008. Rates may be adjusted each January 1st, thereafter; and employers must pay the then current rate.

(b) Tenant shall not discharge, reduce in compensation, or otherwise discriminate against any employee for complaining to the City with regard to Tenant's compliance or anticipated compliance with the requirements of the MCO, for opposing any practice proscribed by the MCO, for participating in proceedings related to the MCO, or for seeking to assert or enforce any rights under the MCO by any lawful means.

(c) Tenant understands and agrees that the failure to comply with the requirements of the MCO shall constitute a material breach by Tenant of the terms of this Lease. The City, acting through the Contracting Department, shall determine whether such a breach has occurred.

(d) If, within 30 days after receiving written notice of a breach of this Lease for violating the MCO, Tenant fails to cure such breach or, if such breach cannot reasonably be cured within such period of 30 days, Tenant fails to commence efforts to cure within such period, or thereafter fails diligently to pursue such cure to completion, the City, acting through the Contracting Department, shall have the right to pursue the following rights or remedies and any rights or remedies available under applicable law:

i. The right to charge Tenant an amount equal to the difference between the Minimum Compensation and any compensation actually provided to a Covered Employee, together with interest on such amount from the date payment was due at the maximum rate then permitted by law;

ii. The right to set off all or any portion of the amount described in Subsection (d)(i) of this Section against amounts due to Tenant under this Lease;

iii. The right to terminate this Lease in whole or in part;

iv. In the event of a breach by Tenant of the covenant referred to in Subsection (b) of this Section, the right to seek reinstatement of the employee or to obtain other appropriate equitable relief; and

v. The right to bar Tenant from entering into future contracts with the City for three (3) years.

vi. Each of the rights provided in this Subsection (d) shall be exercisable individually or in combination with any other rights or remedies available to the City. Any amounts realized by the City pursuant to this subsection shall be paid to the Covered Employee who failed to receive the required Minimum Compensation.

(e) Tenant represents and warrants that it is not an entity that was set up, or is being used, for the purpose of evading the intent of the MCO.

(f) Tenant shall keep itself informed of the current requirements of the MCO, including increases to the hourly gross compensation due Covered Employees under the MCO, and shall provide prompt written notice to all Covered Employees of any increases in compensation, as well as any written communications received by the Tenant from the CITY, which communications are marked to indicate that they are to be distributed to Covered Employees.

(g) Tenant shall provide reports to the City in accordance with any reporting standards promulgated by the City under the MCO, including reports on subtenants.

(h) The Tenant shall provide the City with access to pertinent records after receiving a written request from the City to do so and being provided at least five (5) business days to respond.

(i) The City may conduct random audits of Tenant. Random audits shall be (i) noticed in advance in writing; (ii) limited to ascertaining whether Covered Employees are paid at least the minimum compensation required by the MCO; (iii) accomplished through an examination of pertinent records at a mutually agreed upon time and location within ten (10) days of the written notice; and (iv) limited to one audit of Tenant every two years for the duration of this Lease. Nothing in this Lease is intended to preclude the City from investigating any report of an alleged violation of the MCO.

(j) Any sublease entered into by Tenant and another party shall require that party to comply with the requirements of the MCO and shall contain contractual obligations substantially the same as those set forth in this Section. Tenant shall notify the Department of Administrative Services when it enters into such a sublease and shall certify to the Department of Administrative Services that it has notified the sub-tenant of the obligations under the MCO and has imposed the requirements of the MCO on the sub-tenant through the provisions of the subcontract. It is Tenant's obligation to ensure that any sub-tenants of any tier under this Lease comply with the requirements of the MCO. If any sub-tenant under this Lease fails to comply, City may pursue any of the remedies set forth in this Section against Tenant.

(k) Any contract entered into by Tenant and another party to perform services on the property covered by this Lease shall require that party to comply with the requirements of the MCO and shall contain contractual obligations substantially the same as those set forth in this Section. Tenant shall notify the Department of Administrative Services when it enters into such a contract and shall certify to the Department of Administrative Services that it has notified the contractor of the obligations under the MCO and has imposed the requirements of the MCO on the contractor through the provisions of the subcontract. It is Tenant's obligation to ensure that any such contractors comply with the requirements of the MCO. If such a contractor fails to comply, City may pursue any of the remedies set forth in this Section against Tenant.

(l) Each Covered Employee is a third-party beneficiary with respect to the requirements of subsections (a) and (b) of this Section, and may pursue the following remedies in the event of a breach by Tenant of subsections (a) and (b), but only after the Covered Employee has provided the notice, participated in the administrative review hearing, and waited the 21-day period required by the MCO. Tenant understands and agrees that if the Covered Employee prevails in such action, the Covered Employee may be awarded: (1) an amount equal to the difference between the Minimum Compensation and any compensation actually provided to the Covered Employee, together with interest on such amount from the date payment was due at the maximum rate then permitted by law; (2) in the event of a breach by Tenant of subsections (a) or (b), the right to seek reinstatement or to obtain other appropriate equitable relief; and (3) in the event that the Covered Employee is the prevailing party in any legal action or proceeding against Tenant arising from this Lease, the right to obtain all costs and expenses, including reasonable attorney's fees and disbursements, incurred by the Covered Employee. Tenant also understands that the MCO provides that if Tenant prevails in any such action, Tenant may be awarded costs and expenses, including reasonable attorney's fees and disbursements, from the Covered Employee if the court determines that the Covered Employee's action was frivolous, vexatious or otherwise an act of bad faith.

(m) If Tenant is exempt from the MCO when this Lease is executed because the cumulative amount of agreements with this department for the fiscal year is less than $25,000 ($50,000 for nonprofits), but Tenant later enters into a Lease or agreements that cause Tenant to exceed that amount in a fiscal year, Tenant shall thereafter be required to comply with the MCO under this Lease. This obligation arises on the effective date of the agreement that causes the cumulative amount of agreements between the Tenant and this department to exceed $25,000 ($50,000 for nonprofits) in the fiscal year.

18.23 Airport Intellectual Property. Pursuant to Resolution No. 01-0118, adopted by the Airport Commission on April 18, 2001, the Airport Commission affirmed that it will not tolerate the unauthorized use of its intellectual property, including the AIRPORT logo, CADD designs, and copyrighted publications. All proposers, bidders, contractors, tenants, permittees, and others doing business with or at the Airport (including subcontractors and subtenants) may not use the Airport intellectual property, or any intellectual property confusingly similar to the Airport intellectual property, without the Airport Director's prior consent.

18.24 Requiring Health Benefits for Covered Employees. Unless exempt, Tenant agrees to comply fully with and be bound by all of the provisions of the Health Care Accountability Ordinance (HCAO), as set forth in San Francisco Administrative Code Chapter 12Q (Chapter 12Q), including the implementing regulations, as the same may be amended or updated from time to time. The provisions of Chapter 12Q

are incorporated herein by reference and made a part of this Lease as though fully set forth herein. The text of the HCAO is currently available on the web at http://www.sfgov.org/site/olse_index.asp. Capitalized terms used in this Section and not defined in this Lease shall have the meanings assigned to such terms in Chapter 12Q.

(a) For each Covered Employee Tenant shall provide the applicable health benefit set forth in Section 12Q.3 of the HCAO. If Tenant chooses to offer the health plan option, such health plan shall meet the minimum standards set forth by the San Francisco Health Commission.

(b) Notwithstanding the above, if Tenant meets the requirements of a "small business" as described in Section 12Q.3 (d) of the HCAO, it shall have no obligation to comply with part (a) above.

(c) Tenant's failure to comply with the requirements of the HCAO shall constitute a material breach by Tenant of this Lease. If, within 30 days after receiving City's written notice of a breach of this Lease for violating the HCAO, Tenant fails to cure such breach or, if such breach cannot reasonably be cured within such 30-day period, Tenant fails to commence efforts to cure within such period, or thereafter fails diligently to pursue such cure to completion, City shall have the remedies set forth in Section 12Q.5 (f) (1-5). Each of these remedies shall be exercisable individually or in combination with any other rights or remedies available to City.

(d) Any Sublease or Contract regarding services to be performed on the Premises entered into by Tenant shall require the Subtenant or Contractor and Subcontractors, as applicable, to comply with the requirements of the HCAO and shall contain contractual obligations substantially the same as those set forth in this Section. Tenant shall notify the Purchasing Department when it enters into such a Sublease or Contract and shall certify to the Purchasing Department that it has notified the Subtenant or Contractor of the obligations under the HCAO and has imposed the requirements of the HCAO on the Subtenant or Contractor through written agreement with such Subtenant or Contractor. Tenant shall be responsible for ensuring compliance with the HCAO by each Subtenant, Contractor and Subcontractor performing services on the Premises. If any Subtenant, Contractor or Subcontractor fails to comply, City may pursue the remedies set forth in this Section against Tenant based on the Subtenant's, Contractor's, or Subcontractor's failure to comply, provided that the Contracting Department has first provided Tenant with notice and an opportunity to cure the violation.

(e) Tenant shall not discharge, reprimand, penalize, reduce the compensation of, or otherwise discriminate against, any employee for notifying City of any issue relating to the HCAO, for opposing any practice proscribed by the HCAO, for participating in any proceedings related to the HCAO, or for seeking to assert or enforce any rights under the HCAO by any lawful means.

(f) Tenant represents and warrants that it is not an entity that was set up, or is being used, for the purpose of evading the requirements of the HCAO.

(g) Tenant shall keep itself informed of the requirements of the HCAO, as they may change from time to time.

(h) Upon request, Tenant shall provide reports to City in accordance with any reporting standards promulgated by City under the HCAO, including reports on Subtenants, Contractors, and Subcontractors.

(i) Within five (5) business days after any request by City, Tenant shall provide City with access to pertinent records relating to any Tenant's compliance with the HCAO. In addition, City and its agents may conduct random audits of Tenant at any time during the term of this Lease. Tenant agrees to cooperate with City in connection with any such audit.

18.25 Notification of Limitations on Contributions. San Francisco Campaign and Governmental Conduct Code (the "Conduct Code") Section 1.126 prohibits any person who contracts with the City for selling or leasing any land or building to or from the City whenever such transaction would require the approval by a City elective officer or the board on which that City elective officer serves, from making a contribution to such an officer, or candidate for such an office, or committee controlled by such officer or candidate at any time from the commencement of negotiations for such contract until the termination of negotiations for such contract or three months has elapsed from the date the contract is approved by the City elective officer, or the board on which that City elective officer serves. San Francisco Ethics Commission Regulation 1.126-1 provides that negotiations are commenced when a prospective contractor first communicates with a City officer or employee about the possibility of obtaining a specific contract. This communication may occur in person, by telephone or in writing, and may be initiated by the prospective contractor or a City officer or employee. Negotiations are completed when a contract is finalized and signed by the City and the contractor. Negotiations are terminated when the City and/or the prospective contractor end the negotiation process before a final decision is made to award the contract. Through its execution of this Lease, Tenant acknowledges that it is familiar with the provisions of Article III, Chapter 2 of City's Campaign and Governmental Conduct Code, and sections 87100 et seq and sections 1090 et seq. of the Government Code of the State of California, and certifies that it does not know of any facts which constitute a violation of said provisions and agrees that if it becomes aware of any such fact during the term of this Lease it shall immediately notify City.

18.26 Food Service Waste Ordinance. San Francisco's Food Service Waste Reduction Ordinance, Ordinance No. 295-06, SF Environment Code Chapter 16 (Ordinance) requires restaurants, retail food vendors, City departments, City contractors and City lessees to use biodegradable/compostable or recyclable disposable food service ware when selling or distributing prepared foods, unless there is no "affordable" alternative. The Ordinance also prohibits such businesses and the City from using disposable food service ware made from polystyrene (Styrofoam™). Violation of the Ordinance may result in contractual damages, a criminal fine, administrative penalty, or other civil enforcement action.

## 19. GENERAL PROVISIONS

19.1 Notices. Except as otherwise specifically provided in this Lease, any notice, consent, request, demand, or other correspondence given under this Lease shall be in writing and given by delivering the notice in person or by commercial courier, or by sending it by first-class mail, certified mail, return receipt requested, or overnight courier, return receipt requested, with postage prepaid, to: (a) Tenant at Tenant's Notice Address; or (b) City at City's Notice Address; or (c) such other address as either Tenant or City may designate as its new address for such purpose by notice given to the other in accordance with this Section. Any notice hereunder shall be deemed to have been given and received and effective two (2) days after the date when it is mailed, if sent by first-class, certified mail, one day after the date when it is mailed if sent by overnight courier, or upon the date personal delivery is made. For convenience of the parties, copies of notices may also be given be facsimile to the number set forth in the Summary or such

other number as may be provided from time to time; however, neither party may give official or binding notice by facsimile.

19.2 No Implied Waiver. No failure by either party to insist upon the strict performance of any obligation of the other party under this Lease or to exercise any right, power or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or of such term, covenant or condition. No express written waiver of any default or the performance of any provision hereof shall affect any other default or performance, or cover any other period of time, other than the default, performance or period of time specified in such express waiver.

19.3 Entire Agreement. The parties intend that this Lease (including all of the attached exhibits, which are made a part of this Lease) shall be the final expression of their agreement with respect to the subject matter hereof and may not be contradicted by evidence of any prior or contemporaneous written or oral agreements or understandings. The parties further intend that this Lease shall constitute the complete and exclusive statement of its terms and that no extrinsic evidence whatsoever (including prior drafts hereof and changes therefrom) may be introduced in any judicial, administrative or other legal proceeding involving this Lease.

19.4 Amendments. Except as specifically provided herein, neither this Lease nor any term or provisions hereof may be changed, waived, discharged or terminated, except by a written instrument signed by the party against which the enforcement of the change, waiver, discharge or termination is sought.

19.5 Interpretation of Lease. The captions preceding the articles and sections of this Lease and in the table of contents have been inserted for convenience of reference only and such captions shall in no way define or limit the scope or intent of any provision of this Lease. This Lease has been negotiated at arm's length and between persons sophisticated and knowledgeable in the matters dealt with herein and shall be interpreted to achieve the intents and purposes of the parties, without any presumption against the party responsible for drafting any part of this Lease. Provisions in this Lease relating to number of days shall be calendar days. Use of the word "**including**" shall mean "including, without limitation." References to statutes, sections, ordinances or regulations are to be construed as including all statutory, ordinance, or regulatory provisions consolidating, amending, replacing, succeeding or supplementing the statute, section, ordinance or regulation. Whenever the singular number is used in this Lease and when required by the context, the same includes the plural, the plural includes the singular, and the masculine gender includes the feminine and neuter genders, and the word "person" shall include corporation, partnership, firm, limited liability company, and association.

19.6 Nature of Lease. Under no circumstances will City be expected or required to make any payment of any kind with respect to Tenant's use or occupancy of the Premises, except as may be otherwise expressly set forth herein. Except as may be specifically and expressly provided otherwise in this Lease, no occurrence or situation arising during the Term, nor any present or future Law, whether foreseen or unforeseen, shall relieve Tenant from its liability to pay all of the sums required by this Lease, or relieve Tenant from any of its other obligations under this Lease, or give Tenant the right to terminate this Lease in whole or in part. Tenant waives any rights now or hereafter conferred upon it by any existing or future Law to terminate this Lease or to receive any abatement, diminution, reduction, or suspension of payment of such sums, on account of such occurrence or situation.

19.7 Successors and Assigns. Subject to the provisions of Section 5 [Assignment or Subletting], the terms, covenants and conditions contained in this Lease shall bind and inure to the benefit of Tenant and City and, except as otherwise provided herein, their personal representatives and successors and assigns.

19.8 No Third-Party Beneficiaries. There are no third-party beneficiaries to this Lease.

19.9 No Joint Venture. It is expressly agreed that City is not, in any way or for any purpose, a partner of Tenant in the conduct of Tenant's business or a member of a joint enterprise with Tenant, and does not assume any responsibility for Tenant's conduct or performance of this Lease.

19.10 Brokers. Neither party has had any contact or dealings regarding the leasing of the Premises, nor any communication in connection therewith, through any licensed real estate broker or other person who could claim a right to a commission or finder's fee in connection with the lease contemplated herein. In the event that any broker or finder perfects a claim for a commission or finder's fee based upon any such contact, dealings or communication, the party through whom the broker or finder makes his/her claim shall be responsible for such commission or fee and shall indemnify, defend, and hold harmless the other party from any and all Losses incurred by the indemnified party in defending against the same. The provisions of this Section shall survive any termination or expiration of this Lease.

19.11 Severability. If any provision of this Lease or the application thereof to any person, entity or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such provision to persons, entities or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each other provision of this Lease shall be valid and be enforceable to the full extent permitted by law.

19.12 Governing Law. This Lease shall be construed and enforced in accordance with the laws of the State of California and the Charter of the City and County of San Francisco.

19.13 Attorneys' Fees. In the event that either City or Tenant fails to perform any of its obligations under this Lease or in the event a dispute arises concerning the meaning or interpretation of any provision of this Lease, the defaulting party or the party not prevailing in such dispute, as the case may be, shall pay any and all costs and expenses incurred by the other party in enforcing or establishing its rights hereunder (whether or not such action is prosecuted to judgment), including, without limitation, court costs and reasonable attorneys' fees. For purposes of this Lease, reasonable fees of attorneys of City's Office of the City Attorney shall be based on the fees regularly charged by private attorneys with the equivalent number of years of experience in the subject matter area of the law for which the City Attorney's services were rendered who practice in the City of San Francisco in law firms with approximately the same number of attorneys as employed by the Office of the City Attorney. Without limiting the generality of the foregoing, Tenant shall also pay all costs and expenses incurred by City related to City's participation in or monitoring of any Tenant bankruptcy, insolvency, or similar proceeding involving creditors' rights generally and any proceeding ancillary thereto. This Section shall survive expiration or earlier termination of this Lease.

19.14 Cumulative Remedies. All rights and remedies of either party hereto set forth in this Lease shall be cumulative, except as may otherwise be provided herein.

19.15 Time of Essence. Time is of the essence with respect to all provisions of this Lease in which a definite time for performance is specified.

19.16 Reservations by City. City may (a) at any time, upon reasonable advance written or oral notice, enter the Premises to show the Premises to prospective tenants or other interested parties, to post notices of non-responsibility, to remeasure the Premises, to repair any part of the Premises or adjoining areas, to install equipment for adjoining areas, and for any other lawful purpose; (b) without advance notice, enter the Premises to conduct an environmental audit, operational audit, or general inspection, or in an emergency. City shall use reasonable efforts to minimize disruption in Tenant's business. Such entry shall not constitute a forcible or unlawful entry into or a detainer of the Premises, or an eviction, actual or constructive of Tenant from the Premises. City reserves the exclusive right to use all areas of the Airport not comprising the Premises, and the exterior walls and roofs the Premises. City reserves the exclusive right to use such areas together with the right to install, maintain, use, repair, and replace pipes, ducts, conduits, wires, columns, and structural elements serving other parts of the Airport in and through the Premises. This reservation in no way affects maintenance obligations imposed in this Lease.

19.17 Survival of Indemnities. Expiration or termination of this Lease shall not affect the right of either party to enforce any and all indemnities and representations and warranties given or made to the other party under this Lease, nor shall it effect any provision of this Lease that expressly states it shall survive termination hereof. Each party hereto specifically acknowledges and agrees that, with respect to each of the indemnities contained in this Lease, the indemnitor has an immediate and independent obligation to defend the indemnitees from any claim which actually or potentially falls within the indemnity provision even if such allegation is or may be groundless, fraudulent or false, which obligation arises at the time such claim is tendered to the indemnitor by the indemnitee. Further, Tenant's obligation to make payments to City in respect of accrued charges (including those which have not yet been billed) and to make repairs (including those relating to the return of the Premises to City) which are accrued at the expiration or earlier termination of this Lease shall survive the expiration or earlier termination of this Lease.

19.18 Quiet Enjoyment and Title. Tenant, upon paying the Rent hereunder and performing the covenants hereof, shall peaceably and quietly have, hold and enjoy the Premises and all appurtenances during the full Term as against all persons or entities claiming by and through City. Tenant expressly acknowledges that Tenant's right to quiet possession of the Premises does not preclude City's right to make changes and additions to the Airport, including the Premises, and to do work in the Premises as permitted by this Lease.

19.19 No Right of Redemption. Tenant waives any right of redemption or reinstatement of Tenant under any present or future case law or statutory provision (including Code of Civil Procedure Sections 473 and 1179 and Civil Code Section 3275) in the event Tenant is dispossessed from the Premises for any reason. This waiver applies to future statutes enacted in addition or in substitution to the statutes specified herein.

19.20 Accord and Satisfaction. The payment by Tenant or the receipt by City of a lesser amount than the rent stipulated in this Lease may be, at City's sole option, deemed to be on account of the earliest due stipulated rent, or deemed to be on account of rent owing for the current period only, notwithstanding any instructions by or on behalf of Tenant to the contrary, which instructions shall be null and void, and no endorsement or statement on any check or any letter accompanying any such check or payment will be deemed an accord and satisfaction, and City may accept such check or payment without prejudice to City's right to recover the balance of such rent or payment or pursue any other remedy available in this Lease, at law or in otherwise, including possession of the Premises. City may accept any partial payment from Tenant without invalidation of any contractual notice required to be given herein (to the extent such contractual notice is required) and without invalidation of any notice given or required to be given

pursuant to applicable law. In such event, if City shall receive any such partial payment after it shall have commenced an action against Tenant, City may amend its action as contemplated by Section 1161.1(c) of the California Civil Code to reflect any such partial payment, and no such payment shall limit any of City's rights to continue the action.

19.21 Joint and Several Liability. The liabilities hereunder of the entities and/or person(s) comprising Tenant shall be joint and several.

19.22 Estoppel Statements. Within ten (10) business days after receipt of request therefor by City, Tenant shall deliver, in recordable form, an estoppel statement certifying that this Lease is in full force and effect; the date of Tenant's most recent payment of Rent, and that Tenant has no defenses or offsets outstanding, or stating those claimed, and any other information reasonably requested. Failure to deliver said statement within the specified period shall be conclusive upon Tenant that: (i) this Lease is in full force and effect, without modification except as may be represented by City; (ii) there are no uncured defaults in City's performance and Tenant has no right of offset, counterclaim or deduction against Rent hereunder; and (iii) no more than one month's Base Rent has been paid in advance. Notwithstanding the conclusiveness of Tenant's failure to deliver such statement, Tenant's failure shall constitute a breach of this Lease.

19.23 Authority. If Tenant signs as a corporation, a limited liability company, or a partnership, each of the persons executing this Lease on behalf of Tenant does hereby covenant and warrant that Tenant is a duly authorized and existing entity, that Tenant has and is duly qualified to do business in California, that Tenant has full right and authority to enter into this Lease, and that each and all of the persons signing on behalf of Tenant are authorized to do so. Upon City's request, Tenant shall provide City evidence reasonably satisfactory to City confirming the foregoing representations and warranties.

19.24 Consents. If City is required to reasonably grant consent or approval, but does not do so, Tenant's sole and exclusive remedy is to seek specific performance and in no event will City be liable for any monetary damages.

19.25 Options Personal. If and to the extent Tenant has an option to extend the Term of this Lease, such option is personal to the original Tenant and may be exercised only by the original Tenant while occupying the Premises who does so without the intent of thereafter making any Transfer, and may not be exercised by or assigned, voluntarily or involuntarily, by or to any person or entity other than Tenant, unless the foregoing prohibition is waived by Director. The options, if any, herein granted to Tenant are not assignable separate and apart from this Lease, nor may any option be separated from this Lease in any manner, either by reservation or otherwise.

19.26 Counterparts. This Lease may be executed in two or more counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

19.27 Most Favored Nations. In the event that any contract granted by City to any other automobile rental operator shall contain any terms and conditions more favorable to such operator than the terms and conditions herein described (other than the number of allocated parking spaces and the location of the concession area, etc.), then, at the option of Tenant, this Agreement shall be amended to include such favorable terms and any offsetting burdens that may impose on any such other Tenant. The intent of this provision is to ensure that Tenant will be able to compete on terms as equal as possible with all other automobile rental car operators and to ensure that no other Tenant shall enjoy any rights or privileges more favorable to such Tenant than those enjoyed by the Tenant herein.

IN WITNESS WHEREOF, the parties have executed this Lease as of the Effective Date.

**TENANT:** [signatories to also initial Summary]

The Hertz Corporation,
a Delaware corporation

By:

Name: Simon Ellis
(type or print)

Title: Vice President, Global Real Estate & Concessions

**CITY:** [signatories to also initial Summary]

CITY AND COUNTY OF SAN FRANCISCO,
a municipal corporation,
acting by and through its Airport Commission

John L. Martin
Airport Director

**AUTHORIZED BY AIRPORT COMMISSION**

Resolution No.: 08-0153

Adopted: August 19, 2008

Attest:
Secretary
Airport Commission

**APPROVED AS TO FORM:**
DENNIS J. HERRERA,
City Attorney

By:
Deputy City Attorney

S:\Commission\RDM\TENANTS\Hertz 2009\Agmts\Lease 08-0153.doc
11.13.08

**LIST OF EXHIBITS**

EXHIBIT A – Description of Premises

EXHIBIT B – Summary of City's Maintenance Responsibility

EXHIBIT C-1 – Form of Performance Bond

EXHIBIT C-2 – Form of Letter of Credit

**EXHIBIT A**
**PREMISES**

A. Exclusive Space:

i. 9,462 square feet of garage space on Level(s) 1 through 4 of the Rental Car Center, of which 8,633 square feet shall be Administrative Space and 829 square feet shall be Counter Space.

ii. 343,609 square feet shall be for ready stalls on Levels 1, 2 and 4 of the Rental Car Center.

iii. 217,551 square feet shall be in the QTA and Roof Area, of which 39,383 shall be in the Fuel/Wash Canopy Area, 99,525 square feet shall be Lot 1 Surface Area, 65,618 shall be in the Rear Lot, and 13,025 shall be on Level 5.

B. Common Use Space:

i. 35,090 square feet of garage space on Level(s) 1 - 4 of the Rental Car Center.

ii. 65,186 square feet shall be in the QTA & Roof Area.

C. Limited Common Use Space:

i. 15,023 square feet of garage space on Level 2 of the Rental Car Facility.

**Rental Car Facility, Level 1**






LEGEND
Hertz

Figure 7
LEVEL 1 - EXISTING ON-GRADE VEHICLE STAGING AREA
SFO Rental Car Center
San Francisco International Airport
November 24 2008

JACOBS CONSULTANCY
Aviation Management Consulting

**Rental Car Facility, Level 2**



## Rental Car Facility, Level 3



**Rental Car Facility, Level 4**



**Rental Car Facility, Counter Locations and Back Office, Level 4**



**Rental Car Facility, Level 5 (Roof)**



**Rental Car Facility, QTA**



# EXHIBIT B
# SUMMARY OF CITY'S MAINTENANCE RESPONSIBILITY

**Public Areas** are limited to the public lobbies, public bathrooms, public elevators and escalators, stairwells, emergency tunnel, and the Police substation in the Garage. No public areas exist in the QTA.

**Airport Exclusive Areas** are limited to Airport dedicated rooms, i.e., mechanical rooms, inventory and storage rooms, electrical distribution rooms, selected janitorial closets, elevator and escalator machine rooms, special monitoring systems for all fixed equipment.

**The Airport's obligation to maintain the facility components, as specified on page 2 of Exhibit B, is limited to Public Areas and/or Airport Exclusive Areas. The Tenant is obliged to maintain all facility components located within the Premises.**

| | Public Areas | Airport Exclusive Areas | All |
|---|---|---|---|
| ❑ Acoustical Tile, Hangers, Frame work | X | X | |
| ❑ ADA Signage and Visual Communication Systems | X | | |
| ❑ Airport Closed Circuit Television Systems (ACCTB) | X | | |
| ❑ All preconditioned Air, Air Handling Units | X | X | |
| ❑ All Utility Mains | | | X |
| ❑ Automatic Doors | X | | |
| ❑ Building Management System | | | X |
| ❑ Bus Canopy | N/A | | |
| ❑ Ceilings | X | X | |
| ❑ Custodial Cleaning | X | X | |
| ❑ Doors, Closets, Hinges, Hardware, Locks | X | X | |
| ❑ Drainage Exterior Building | | | X |
| ❑ Duct Smoke Detectors | X | X | |
| ❑ Electrical Distribution System | X | X | |
| ❑ Electrical Inspections | | | X |
| ❑ Electrical Rooms | | | X |
| ❑ Elevator Machine Rooms | X | | |
| ❑ Emergency Generator System | | | X |
| ❑ Emergency Lighting | X | X | |
| ❑ Entrance, Exit, Site, Roadway Repairs on McDonnell Road | | | X |
| ❑ Escalators | X | | |
| ❑ Exhaust Pans in Public Restrooms | X | | |
| ❑ Exit Signage | X | X | |
| ❑ Expansion and Seismic Joints and Thresholds | | | X |
| ❑ Exterior Lighting and Signage on Garage | X | X | |
| ❑ Filter Changes | X | X | |
| ❑ Fire Detection Systems | X | X | |
| ❑ Fire Hydrants | | | X |
| ❑ Fire Safety Inspections | | | X |
| ❑ Fire Sprinklers | X | X | |
| ❑ Fire Valves and Alarms | | | X |
| ❑ Floor Drains, Gutters | X | X | |
| ❑ Floors, Carpet, Vinyl Tile, Terrazzo, Ceramic Tile, Concrete | X | X | |
| ❑ Hot and Chilled Water Systems | | | X |
| ❑ Hot Water Heaters, Boilers | | | X |
| ❑ Exterior Landscaping & Irrigation on McDonnell Road | X | | |
| ❑ Lighting (Mass and Spot Re-lamping) | X | | |
| ❑ Locks | X | X | |
| ❑ Public Elevators and Elevator Emergency Communications Systems | | | X |
| ❑ Mechanical Inspections | | | X |
| ❑ Mechanical Room Equipment | X | X | |
| ❑ Mixing Boxes (VAV) | X | X | |
| ❑ Panic Hardware | X | X | |
| ❑ Plumbing Inspections | | | X |
| ❑ Public Telephone Areas | SERVICE PROVIDER | | |
| ❑ Pumps, Sewage, Drainage (Excludes Industrial Waste) | X | | |
| ❑ Re-striping and Re-painting Bus Staging Areas | X | | |
| ❑ Restroom Plumbing | X | | |
| ❑ Roofing, Flashing | | | X |
| ❑ Stairwells | | | X |
| ❑ Structural Maintenance | | | X |
| ❑ Touch-Up Painting, Interior and Exterior | X | X | |
| ❑ Windows Interior and Exterior | X | X | |
| ❑ Water Fountains | X | | |
| ❑ Water Main | | | X |

# EXHIBIT C-1
# FORM OF PERFORMANCE BOND FOR AIRPORT LEASES/PERMITS

____________________________________ (Surety)

KNOW ALL MEN BY THESE PRESENT:

That we, ________________________________________, as Principal, and __________________, a corporation duly organized and existing under and by virtue of the laws of the State of _______________, as Surety, are held and firmly bound unto the City and County of San Francisco, acting by and through its Airport Commission, as Obligee, in the sum of ____________________ Dollars ($_____________) lawful money of the United States of America, to be paid to the City and County of San Francisco, acting by and through its Airport Commission, for which payment, well and truly to be made, we bind ourselves, our heirs, executors and successors, jointly and severally, firmly by these presents.

WHEREAS, the Principal has entered into one or more leases, permits, or agreements with the City and County of San Francisco, Airport Commission (collectively, the "**Agreements**").

NOW, THEREFORE, the condition of this obligation is such that if the Principal shall perform all terms of the Agreements (which by reference are made a part hereof), including the payment of rent or fees, in accordance with the terms of such Agreements, then this obligation shall be null and void, otherwise to remain in full force and effect; and shall be effective ____________________.

This bond may be called upon by Obligee by a notice sent to the Surety in person or by registered mail, overnight mail, overnight courier service, or other courier service sent to our offices at: ________________________________________.

Any such call by Obligee shall include a statement signed by the Airport Director of the Airport Commission of the City and County of San Francisco, or his/her designee, to the effect that any of the following events has occurred or is continuing:

b) Principal has defaulted under one or more of the Agreements; or

c) Principal has become insolvent, or has taken the benefit of any present or future insolvency statute, or has made a general assignment for the benefit of creditors, or has filed a voluntary petition in bankruptcy, or a petition or answer seeking an arrangement for its reorganization, or the readjustment of its indebtedness under the federal bankruptcy laws, or under any other law or statute of the United States or any state thereof, or any jurisdiction available to Principal, or has consented to the appointment of a receiver, trustee, or liquidator of any or substantially all of its property; or

d) A petition under any of the federal bankruptcy laws or an action under any present or future insolvency law or statute has been filed against Principal; or

e) This bond is cancelled, terminated, or not renewed, and City has not received an acceptable replacement letter of credit or bond at least thirty (30) days prior to the cancellation, termination, or expiration date.

We shall honor and pay on such call within ten (10) days after receipt.

We shall give you notice in writing by registered mail at least forty-five (45) days prior to the cancellation date, termination date or expiration date of this bond, if any is stated, of our intention to cancel, terminate, or non-renew this bond. In the event we fail to give such notice promptly, then this bond shall be deemed renewed for an additional one-year period.

Signed, sealed and dated this _______________ day of _______________.

Principal: By: ______________________________________________

Title: ______________________________________________

Seal: ______________________________________________

Surety Company: By: ______________________________________________

Title: ______________________________________________

Seal: ______________________________________________

(Attach Notary Public Certificate and Attorney-in-Fact form)

# EXHIBIT C-2
# FORM OF LETTER OF CREDIT FOR AIRPORT LEASES/PERMITS

Date______________________

Irrevocable Letter of Credit No.________

Airport Commission
City and County of San Francisco
Att'n: Deputy Director, Business & Finance
San Francisco International Airport
International Terminal, No. Shoulder Bldg., 5/F
PO Box 8097
San Francisco, CA 94128

Ladies and Gentlemen:

We hereby establish an irrevocable letter of credit in your favor in the amount of ________________________________ United States Dollars (US$______________) for the account of ________________________ ("Account Party"), available by your draft at sight, when accompanied by the following document:

A statement signed by the Airport Director of the Airport Commission of the City and County of San Francisco, or his/her designee, to the effect that any of the following events has occurred or is continuing:

a) Account Party has defaulted under the one or more agreements with the City and County of San Francisco, acting by and through its Airport Commission at San Francisco International Airport; or

b) Account Party has become insolvent, or has taken the benefit of any present or future insolvency statute, or has made a general assignment for the benefit of creditors, or has filed a voluntary petition in bankruptcy, or a petition or answer seeking an arrangement for its reorganization, or the readjustment of its indebtedness under the federal bankruptcy laws, or under any other law or statute of the United States or any state thereof, or any jurisdiction available to Account Party, or has consented to the appointment of a receiver, trustee, or liquidator of any or substantially all of its property; or

c) A petition under any of the federal bankruptcy laws or an action under any present or future insolvency law or statute has been filed against Account Party; or

d) This letter of credit is cancelled or not renewed, and City has not received an acceptable replacement letter of credit or bond at least thirty (30) days prior to the cancellation or expiration date.

Drafts drawn under and in compliance with the terms of this letter of credit will be duly honored by us upon presentation and delivery of the statement specified above. Partial draws are permitted. Such drafts may be presented in person or by registered mail, overnight mail, overnight courier service, or other courier service sent to our offices at: ________________________________________.

We shall give you notice in writing by registered mail at least forty-five (45) days prior to the cancellation date or expiration date of this letter of credit, if any is stated, of our intention to cancel or non-renew this letter of credit. In the event we fail to give such notice promptly, then this letter of credit shall be deemed renewed for an additional one-year period. Notwithstanding the foregoing, this letter of credit shall finally expire on ______________________, 20_.

Sincerely,

_____________________________________

**EXHIBIT 4**

10-K 1 thc2014form10-k.htm 10-K
Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2014**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission File Number 001-07541**

# THE HERTZ CORPORATION
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware**<br>(State or other jurisdiction of incorporation or organization) | **13-1938568**<br>(I.R.S. Employer Identification Number) |

**999 Vanderbilt Beach Road - 3rd Floor**
**Naples, Florida 34108**
**(239) 552-5800**
(Address, including Zip Code, and telephone number, including area code, of registrant's principal executive offices)

**Securities registered pursuant to Section 12(b) of the Act: None**

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☐ No ☒

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☐ No ☒

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ | Non-accelerated filer<br>(Do not check if a smaller reporting company) | ☒ | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

All of the common equity of the registrant is held by an affiliate, therefore, the aggregate market value of the registrant's common equity held by non-affiliates at June 30, 2014 is $0.

As of June 30, 2015, 100 shares of the registrant's common stock were outstanding.

**Documents Incorporated by reference: None**

Table of Contents

THE HERTZ CORPORATION AND SUBSIDIARIES

## INTRODUCTORY NOTE

*Unless the context otherwise requires in this Annual Report on Form 10-K, or "Annual Report" we use the following defined terms:*

- *(i) "Hertz" means The Hertz Corporation, our primary operating company and a direct wholly-owned subsidiary of Hertz Investors, Inc., which is wholly-owned by Hertz Global Holdings, Inc.;*
- *(ii) "Hertz Holdings" means Hertz Global Holdings, Inc., our top-level holding company;*
- *(iii) "the Company," "we," "us" and "our" mean The Hertz Corporation and its consolidated subsidiaries;*
- *(iv) "Dollar Thrifty" means Dollar Thrifty Automotive Group, Inc., a consolidated subsidiary of the Company since being acquired in late 2012;*
- *(v) "HERC" means Hertz Equipment Rental Corporation, Hertz's wholly-owned equipment rental subsidiary, together with our various other wholly-owned international subsidiaries that conduct our industrial, construction, material handling and entertainment equipment rental business;*
- *(vi) "Donlen" means Donlen Corporation, a consolidated subsidiary of the Company. Donlen conducts our fleet leasing and management services.*
- *(vii) "cars" means cars, crossovers and light trucks (including sport utility vehicles and, outside North America, light commercial vehicles);*
- *(viii) "program cars" means cars purchased by car rental companies under repurchase or guaranteed depreciation programs with car manufacturers;*
- *(ix) "non-program cars" means cars not purchased under repurchase or guaranteed depreciation programs for which we are exposed to residual risk;*
- *(x) "company-operated" rental locations are those through which we, or an agent of ours, rent cars that we own or lease;*
- *(xi) "equipment" means industrial, construction and material handling equipment;*
- *(xii) *"Total RPD" means total revenue per transaction day;*
- *(xiii) *"Dollar Utilization" means revenue derived from the rental of equipment divided by the cost of the equipment including additional capitalized refurbishment costs (with the basis of refurbished assets reset at the refurbishment date);*
- *(xiv) *"Time Utilization" means the percentage of time an equipment unit is on-rent during a given period.*

** Represents a Non-GAAP financial measure that is defined and reconciled to the most comparable U.S.GAAP financial measure, where applicable, in the "Results of Operations and Selected Operating Data by Segment" section of our Management's Discussion & Analysis ("MD&A").*

## *CAUTIONARY NOTE REGARDING FORWARD LOOKING STATEMENTS*

*Certain statements contained or incorporated by reference in this Annual Report and in reports we subsequently file with the United States Securities and Exchange Commission, or the "SEC," on Forms 10-K, 10-Q, file or furnish on Form 8-K, and in related comments by our management, include "forward-looking statements." Forward-looking statements include information concerning our liquidity and our possible or assumed future results of operations, including descriptions of our business strategies. These statements often include words such as "believe," "expect," "project," "potential," "anticipate," "intend," "plan," "estimate," "seek," "will," "may," "would," "should," "could," "forecasts" or similar expressions. These statements are based on certain assumptions that we have made in light of our experience in the industry as well as our perceptions of historical trends, current conditions, expected future developments and other factors we believe are appropriate in these circumstances. We believe these judgments are reasonable, but you should understand that these statements are not guarantees of performance or results, and our actual results could differ materially from those expressed in the forward-looking statements due to a variety of important factors, both positive and negative, that may be revised or supplemented in subsequent reports on SEC Forms 10-K, 10-Q and 8-K.*

*Some important factors that could affect our actual results and cause them to differ materially from those expressed in forward-looking statements include, among others, those that may be disclosed from time to time in subsequent reports filed with the SEC, those described under "Risk Factors" set forth in Item 1A of this Annual Report, and the following, which were derived in part from the risks set forth in Item 1A of this Annual Report:*

THE HERTZ CORPORATION AND SUBSIDIARIES

**EXPLANATORY NOTE (Continued)**

On November 10, 2014, the Audit Committee, in consultation with our management, concluded that additional proposed adjustments arising out of the review were material to our 2012 and 2013 financial statements and that, as a result, our 2012 and 2013 financial statements also would require restatement. Those restated financial statements are included in Item 8 of this Annual Report on Form 10-K. Throughout this Annual Report, the misstatements resulting in the restatement of the Company's financial statements are referred to as "restatement matters".

The second process, which we commenced in June 2014, involved an internal investigation of certain matters related to the accounting during prior periods. The investigation was undertaken by outside counsel, along with independent counsel for the Audit Committee. Counsel received assistance from outside consultants and new senior accounting and compliance personnel. The internal investigation is complete, although our outside counsel and the independent counsel to the Audit Committee continue to provide forensic and investigative support in connection with certain proceedings discussed in Item 3, "Legal Proceedings" and in Item 8, Note 14, "Contingencies and Off-Balance Sheet Commitments" to the consolidated financial statements in this Annual Report on Form 10-K involving our restatements and related accounting for prior periods.

Based on the internal investigation, our review of our financial records, and other work completed by our management, the Audit Committee has concluded that there were four categories of material weaknesses in our internal control over financial reporting that contributed to the material misstatements in the 2011, 2012 and 2013 consolidated financial statements. These four categories of material weaknesses as of December 31, 2014 are described below. For further information regarding management's assessment of internal control over financial reporting, please see Item 9A, "Controls and Procedures," in this Annual Report on Form 10-K.

***Control Environment***

As of December 31, 2014, we did not maintain an effective control environment primarily attributable to the following identified material weaknesses:

- Our investigation found that an inconsistent and sometimes inappropriate tone at the top was present under the then existing senior management that did not in certain instances result in adherence to accounting principles generally accepted in the United States of America ("GAAP") and Company accounting policies and procedures. In particular, our former Chief Executive Officer's management style and temperament created a pressurized operating environment at the Company, where challenging targets were set and achieving those targets was a key performance expectation. There was in certain instances an inappropriate emphasis on meeting internal budgets, business plans, and current estimates. Our former Chief Executive Officer further encouraged employees to focus on potential business risks and opportunities, and on potential financial or operating performance gaps, as well as ways of ameliorating potential risks or gaps, including through accounting reviews. This resulted in an environment which in some instances may have led to inappropriate accounting decisions and the failure to disclose information critical to an effective review of transactions and accounting entries, such as certain changes in accounting methodologies, to the appropriate finance and accounting personnel or our Board, Audit Committee, or independent registered public accounting firm.

- We did not have a sufficient complement of personnel with an appropriate level of knowledge, experience, and training commensurate with our financial reporting requirements to ensure proper selection and application of GAAP in certain circumstances.

- We did not establish clear reporting structures, reporting lines, and decisional authority responsibilities in the organization.

- We did not design effective controls over the non-fleet procurement process, which was exacerbated by the lack of training of field personnel as part of our Oracle enterprise resource planning ("ERP") system implementation during 2013.

These material weaknesses in the control environment resulted in certain instances of inappropriate accounting decisions and inappropriate changes in accounting methodology and contributed to the following additional material weaknesses:

THE HERTZ CORPORATION AND SUBSIDIARIES

**EXPLANATORY NOTE (Continued)**

- We did not design and maintain effective controls over certain accounting estimates. Specifically, we did not design and maintain controls over the effective review of the models, assumptions, and data used in developing estimates or changes made to assumptions and data, related to information technology expenditures; reserve estimates associated with allowances for uncollectible amounts receivable for renter obligations related to damaged vehicles; and accrued unbilled revenue.

- We did not design and maintain effective controls over the review, approval, and documentation related to journal entries.

- We did not design and maintain effective controls over changes to our policies and procedures over GAAP, as well as the review, approval, and documentation related to the application of GAAP.

***Risk Assessment***

We did not effectively design controls in response to the risks of material misstatement. This material weakness contributed to the following additional material weaknesses:

- We did not design effective controls over certain business processes including our period-end financial reporting process. This includes the identification and execution of controls over the preparation, analysis, and review of significant account reconciliations and closing adjustments required to assess the appropriateness of certain account balances at period end.

***Information and Communication***

As of December 31, 2014, we did not maintain effective controls over information and communications. Specifically, we did not have an adequate process for internally communicating information between the accounting department and other operating departments necessary to support the proper functioning of internal controls. This material weakness led to misstatements in the capitalization and timing of depreciation of non-fleet capital.

***Monitoring***

We did not design and maintain effective monitoring controls related to the design and operational effectiveness of our internal controls. Specifically, we did not maintain personnel and systems within the internal audit function that were sufficient to ensure the adequate monitoring of control activities. This control deficiency resulted in some instances of the internal audit function's failure to identify or sufficiently follow through on the analysis of certain inappropriate accounting decisions and changes in accounting methodology.

Our incorrect accounting was caused by the foregoing control deficiencies, along with a complex mix of structural and environmental factors. One of those factors was the tone set and pressures imposed by our former Chief Executive Officer, which were inappropriate in certain instances, and may have been a factor influencing one or more employees to record an accounting entry now determined to be improper. Other factors affecting the overall historic accounting environment and employees included the distraction caused by the multiple, conflicting business initiatives; challenges related to managing complex, inefficient legacy systems; the lack of a sufficient complement of personnel with an appropriate level of knowledge, experience, and training with GAAP; unclear reporting structures, reporting lines, and decisional authority in the organization; and other matters. Taken together, these factors fostered a control environment and other control deficiencies that in some instances enabled inappropriate accounting.

One or more of the foregoing control deficiencies contributed to the restatement of our financial statements for the years 2012 and 2013 and each of the quarters of 2013, including the misstatements of direct operating expenses, accounts payable, accrued liabilities, allowance for doubtful accounts, prepaid expenses and other assets,and non-fleet property and equipment and the related accumulated depreciation. Additionally, the foregoing control deficiencies could result in material misstatements of the consolidated financial statements that would not be prevented or detected. Accordingly, our management has determined that these control deficiencies constitute material weaknesses.

Management has assessed our internal control over financial reporting at December 31, 2014 and identified the material weaknesses described above and, accordingly, has concluded that our internal control over financial reporting was not effective at December 31, 2014. In addition, our Chief Executive Officer and Chief Financial Officer have evaluated