UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIFFANY HODGES, et al.,<br><br>                    Plaintiffs,<br><br>          v.<br><br>THE HERTZ CORPORATION, et al.,<br><br>                    Defendants. | Case No.  17-cv-03785-DMR<br><br>**ORDER RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 61 |

This is a wrongful death action arising out of the death of Neil Lewis who was killed during an incident on July 7, 2015.  Plaintiff Tiffany Hodges is the guardian ad litem to Lewis's minor children and sole heirs, D. Lewis and J. Lewis.  Plaintiffs Karen Joyce Lewis and Alfredo Lewis are Lewis's parents.  Plaintiffs filed this survival and wrongful death action against Defendants The Hertz Corporation ("Hertz"), Firefly Rent A Car LLC ("Firefly"), Rental Car Transport, LLC ("RCT"),[1] DTG Operations, Inc. ("DTG") and Dollar Thrifty Automotive Group, Inc. ("Dollar Thrifty") (collectively "Defendants").  Defendants now move for summary judgment, or in the alternative, for partial summary judgment on all of Plaintiffs' claims.  [Docket No. 61.]  The court heard oral argument on September 13, 2018.  Having considered the parties' oral argument and written submissions, the court grants the motion in part and denies it in part.

I.      **EVIDENTIARY OBJECTIONS**

Defendants object to the entirety of Plaintiffs' expert evidence, namely the Declaration of Lloyd D. Rae (Docket No. 73-1); the Expert Report of Kathleen Bonczyk, Esq. (Ex. 12); the Report of Aviation Security Expert Jeffrey C. Price, MA, CM (Ex. 32); and the Report of Premises Liability Expert Ron Martinelli, Ph.D., CLS (Ex. 36).  Defendants also object to Exhibits 1, 2, 3-9, and 11-36 attached to the Declaration of Joseph P. Brent ("Brent Decl.").  Plaintiffs filed

---

[1] Plaintiffs voluntarily dismissed RCT on January 31, 2018.  [Docket No. 27.]

United States District Court
Northern District of California

an administrative motion for leave to file the Supplemental Brent Declaration, which addresses

Defendants' objections to all but Exhibit 17 and attempts to cure the evidentiary deficiencies

identified by Defendants.  [Docket No. 82.]  Exhibit 17 is addressed in Plaintiffs' Objections to

New Evidence (Docket No. 79), which is discussed below.

### A.  Expert Declarations

Since the court did not consider Plaintiffs' expert declarations in determining whether

summary judgment is proper, Defendants' objections are denied as moot.

### B.  Exhibits 1, 3-9, 11, 13-31, 33-35

Defendants object to Exhibits 1, 3-9, 11, 13-31, and 33-35 primarily on the grounds that

they are not authenticated.  Defendants also object on the basis of hearsay and lack of personal

knowledge, but fail to make any arguments to support those objections.  The court will therefore

ignore the hearsay and personal knowledge objections for purposes of this motion.

The authenticity objections are overruled.  Defendants argue that, even though the exhibits

are attached to and described in the Brent Declaration, there is no "evidence" to substantiate "what

any of the attached documents are or who any of the people are."  Defs.' Reply at 1:20-22.

However, it is clear from the description of each exhibit, and the exhibit themselves, that the

documents are what they purport to be.  *See* Fed. R. Evid. 901(b)(4) (a document's "appearance,

contents, substance, internal patterns, or other distinctive characteristics of the item, taken together

with all the circumstances" is evidence sufficient to satisfy the authentication requirement).

Additionally, many of these exhibits are Hertz's own documents and witness deposition

testimony, and are also attached as exhibits to Defendants' request for judicial notice, so

Defendants' objections are not well-taken.  *See, e.g*., Exs. 1, 8-9, 13-15, 18, 30, and 31.  The court

notes that Defendants' complaint about Plaintiffs' alleged failure to proffer evidence to

authenticate these exhibits is also perplexing given that Defendants offered no evidence to

authenticate many of their own exhibits.

Defendants cite *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) for

the proposition that unauthenticated documents cannot be considered in a motion for summary

judgment.  This is incorrect.  The Ninth Circuit later clarified that at the summary judgment stage,

2

the focus is not on the "admissibility of the evidence's form," but rather on the "admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003) (citing cases); *see also JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016) ("[A]t summary judgment a district court may consider hearsay evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony.") (citing *Fraser*). Accordingly, district courts in this circuit have routinely overruled authentication and hearsay challenges at the summary stage where the evidence could be presented in an admissible form at trial, following *Fraser*. *See, e.g.*, *Lawrence v. City & Cty. of San Francisco*, 258 F. Supp. 3d 977, 986 (N.D. Cal. 2017) (overruling objections to admissibility of police reports on authentication and hearsay grounds at summary judgment because the contents of the report "may be presented in an admissible form at trial"); *Faulks v. Wells Fargo & Co.*, 231 F. Supp. 3d 387, 397-98 (N.D. Cal. 2017) (overruling objections to admissibility of exhibit at summary judgment because "it is possible that the facts underlying [the exhibit] could be admissible at trial").[2]

Defendants object to Rodney Williams's juvenile records (Exhibit 17) on the grounds that it is an unauthorized disclosure. The juvenile dependency court released these records pursuant a protective order which specified that the records could only be used in Williams's murder case, and permitted no other disclosure or use. Defs.' Reply at 5:6-22; Ex. 17 (Protective Order). Plaintiffs explain that they obtained Williams's juvenile record from the appellate record in his state court appeal from his murder conviction. Plt.'s Opp'n at 7:27-8:1; Plt.'s Objects. to New Evidence at 2:24-3:19 [Docket No. 79.] According to Plaintiffs, since the appellate record is open

---

[2] Defendants also quote the Eighth Circuit's decision in *Hoffman v. Applicators Sales and Serv., Inc.*, 439 F.3d 9, 15 (1st Cir. 2006) for the proposition that "documents do not automatically become part of the record because they are products of discovery." This is a blatant miscite of the holding in that case. The quote occurs in a passage discussing the plaintiff's submission of several Bates-numbered pages from the defendants' discovery disclosures *for the first time on appeal. Id.* The plaintiff argued that the documents should nevertheless be considered for the first time on appeal because they reflected data disclosed by defendants during discovery. *Id*. The Eighth Circuit rejected that argument, stating that the plaintiff "overlook[ed] the crucial point that documents do not automatically become a part of the record [on appeal] simply because they are the products of discovery." *Id*. The quote, or the passage in which it occurs, clearly does not address the point Defendants attempt to make.

and available to the public, Williams's juvenile record may be used in other cases.

Plaintiffs' argument contravenes California law. California Welfare & Institutions Code Section 827(a)(4) provides that "[a] juvenile case file, any portion thereof, and information relating to the content of the juvenile case file, may not be disseminated by the receiving agencies to any persons or agencies, other than those persons or agencies authorized to receive documents pursuant to this section." Cal. Welf. & Inst. Code § 827(a)(4). Additionally, "a juvenile case file, any portion thereof, and information relating to the content of the juvenile case file, may not be made as an attachment to any other documents without the prior approval of the presiding judge of the juvenile court, unless it is used in connection with and in the course of a criminal investigation or a proceeding brought to declare a person a dependent child or ward of the juvenile court." *Id.* Plaintiffs did not obtain prior approval of the presiding judge of the juvenile court. The fact that Defendants directed Plaintiffs to Williams's trial and appellate record for copies of his criminal history does not overcome the specific statutory requirement that Plaintiffs obtain a prior court order to use his juvenile records for a use not specified in the protective order. Plaintiffs cite to no case, nor could this court locate any, in which a court found that a court order authorizing the attachment of the juvenile records in an unrelated case was not necessary. Defendants' objection to Exhibit 17 is sustained.

In sum, the court overrules Defendants' objections as to Exhibits 1, 3-9, 11, 13-31, and 33-35. The court sustains the objection to Exhibit 17. Plaintiffs' administrative motion for leave to file the supplemental declaration is denied as moot.

## II.     REQUEST FOR JUDICIAL NOTICE

The parties each submitted a request for judicial notice ("RJN"). Defendants' unopposed request asks that the court take judicial notice of Exhibit 6(A) through (F). [Docket No. 62-6 (Defs.' RJN).] Plaintiffs' opposed request asks that the court take judicial notice of Exhibits 1 and 2. [Docket No. 73-2 (Plt.'s RJN).]

Federal Rule of Evidence 201 permits a court to take judicial notice of facts not subject to reasonable dispute and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). "[A] court may take judicial notice of

'matters of public record.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (citing *Mack v. S. Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986), abrogated on other grounds by *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991)).

The court grants Defendants' unopposed request for judicial notice of Exhibit 6(A), which is Plaintiffs' original complaint filed in San Francisco Superior Court, *Hodges et al. v. The Hertz Corp. et al.*, No. CGC 17-55304 (San Francisco Super. Ct).

The court grants Defendants' unopposed request as to Exhibits 6(B) through 6(F) because they are documents filed in Rodney Williams's state criminal proceedings including the state proceeding arising out of the incident underlying this action (Lewis's death), and are relevant to the issues raised in Defendants' motion. *See U.S. ex rel Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (Courts "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.") (internal quotation marks and citations omitted).  Exhibits 6(B) through 6(E) are the Clerk's Certificate for Discharge and Minutes filed in Rodney Williams' prior state criminal proceedings.  Exhibit 6(F) is a compilation of excerpts from the trial testimony of Rodney Williams and Kenya Bishop in the state criminal proceeding arising out of Lewis's death, *The People of the State of California v. Rodney Williams*, No. SF 399267A (San Mateo Super. Ct). Judicial notice of Exhibit 6(F) is limited to the existence of the documents and the existence of the facts contained therein, and not the truth of the matters stated in them.  *Lee*, 250 F.3d at 690.

The court grants Plaintiffs' request for judicial notice of Exhibit 1 because it is a matter of public record.  Exhibit 1 is Sections 2A.170 and 2A.173 of the San Francisco Administrative Code.  *Chew v. City & Cty. of San Francisco*, No. 13-CV-05286-MEJ, 2016 WL 631924, at *1 (N.D. Cal. Feb. 17, 2016), aff'd, 714 F. App'x 687 (9th Cir. 2017) (taking judicial notice of "official municipal enactments, ordinances, and statutes" including portions of San Francisco Administrative Code).

The court grants Plaintiffs' request as to Exhibit 2, but only as to the existence of the documents, the date of the documents, and the existence of the contents contained therein, but not

for the truth of the matters asserted in the contents. Exhibit 2 consists of portions of the Resolution, Budget and Legislative Analyst Report/Agency Cover Letter and/or Report of the San Francisco Board of Supervisors regarding the approval of leases for Defendants at San Francisco International Airport. *See Cal. Sportfishing Prot. All. v. Shiloh Grp.*, *LLC*, 268 F. Supp. 3d 1029, 1038 (N.D. Cal. 2017) (Courts may take judicial notice of records and reports of administrative bodies, but only as to the "existence of the documents themselves including the findings therein . . . and not the contents of the documents for the truth of the matters asserted"); *see also Catholic League for Religious & Civil Rights v. City and Cty. of San Francisco*, 464 F. Supp. 2d 938, 941 (N.D. Cal. 2006) (taking judicial notice of San Francisco Board of Supervisors Resolutions).

Defendants object to Plaintiffs' request for judicial notice of Exhibit 2 on grounds of hearsay, authenticity, and lack of personal knowledge. Since the court takes judicial notice only as to the existence of the contents of Exhibit 2, and not the truth of the matters contained therein, Defendants' hearsay and lack of personal knowledge objections are overruled as moot. Defendants' authenticity objection is overruled because Defendants do not explain why the accuracy of Exhibit 2 cannot readily be determined by resort to the San Francisco Board of Supervisors' records, which are public. *See Yamauchi v. Cotterman*, 84 F. Supp. 3d 993, 1009 (N.D. Cal. 2015) (overruling authenticity objection because the document in question was "filed as part of the public record" and could also be "verified as authentic in the [c]ourt's own docket records" among other reasons).

## III.    BACKGROUND

This wrongful death action arises out of a July 7, 2015 incident involving RCT employees Neil Lewis and Rodney Williams that occurred near a Hertz rental car facility at San Francisco International Airport ("SFO") and resulted in Lewis's death. RCT is in the business of providing "hikers" to rental car companies such as Hertz. Hikers transport rental cars to and from rental car facilities and the airport. Williams and Lewis were RCT hikers who transported Hertz rental vehicles between Hertz's rental facility and SFO. On the day of the incident, Williams and Lewis each drove Hertz vehicles to an area near the Hertz rental car facility at SFO and engaged in a physical altercation. During the fight, Williams fatally stabbed Lewis. Williams subsequently

was convicted of second degree murder for Lewis's death.  Plaintiffs seek to hold Defendants

liable for Lewis's death.  They assert various theories of negligence, including Defendants' failure

to require RCT to adhere to reasonable hiring practices such as conducting pre-employment

criminal background checks, and failure to adequately supervise and control RCT.

### A.    Facts

#### 1.    Hertz's Corporate Structure

Hertz, DTG, Dollar Thrifty and Firefly are rental car companies that own and operate their

own rental car brands.[3]  In 2012, Hertz acquired DTG and Dollar Thrifty; as a result, Hertz owns

the Dollar and Thrifty rental car brands.[4]  Hertz owns and operates the Hertz, Dollar, and Thrifty

brands under one corporate structure, allegedly in addition to the Firefly brand.[5]  Thus, contractors

who perform work for one brand can bill the work to another brand because it makes no functional

difference.

#### 2.    Hertz's Operations at SFO

Hertz operates the Hertz, Dollar, and Thrifty on-site rental car facilities at SFO pursuant to

lease agreements with the City and County of San Francisco.  *See* Lease Agreement for Rental Car

Operations by and between The Hertz Corporation, as tenant, and City and County of San

Francisco Acting By and Through Its Airport Commission, as landlord (Ex. 1) to Brent Decl.

("Hertz SFO Lease Agreement"), § 3.1 ("Tenant shall use the Premises for the operation of a

rental car business pursuant to the Lease and for no other purpose ("**Permitted Use**").") (bold in

---

[3]  Defendants' reply brief contains a conclusory paragraph titled, "No Liability for Firefly, DTG, Operations, Inc., Dollar Thrifty Automotive Group."  Defendants argue that Firefly, DTG, and Dollar Thrifty should be dismissed because Plaintiffs fail to explain how these entities are connected to the incident underlying this action.  Reply at 15:11-17.  The court declines to dismiss these Defendants at this time.  Defendants did not clearly move for summary judgment on this basis and may not raise arguments for the first time on reply.

[4]  Although the parties did not clearly explain the relationship between DTG and Dollar Thrifty, and seem to interchangeably refer to them as "Dollar Thrifty," it appears that DTG and Dollar Thrifty are separate but related companies, and both companies operate the Dollar and Thrifty rental car brands.  Firefly is a Hertz subsidiary that owns and operates the Firefly rental car brand.

[5]  Plaintiffs cite to deposition testimony in which Harvey purportedly explains that Firefly's corporate status is the same as DTG and Dollar Thrifty, but they do not provide those pages of Harvey's deposition in the excerpts filed as Exhibit 2.

original); Lease Agreement for Rental Car Operations by and between DTG Operations, Inc. and City and County of San Francisco Acting By and Through Its Airport Commission (Ex. 3) to Brent Decl. ("DTG SFO Lease Agreement"), § 3.1 (same).[6] Hertz operates the Firefly rental car facility, which is off-airport, pursuant to a business permit with the City and County of San Francisco. Off-Airport Rental Car Business Permit by and between Firefly Rent A Car, LLC dba Firefly as Permittee and City and County of San Francisco Acting By and Through Its Airport Commission (Ex. 5) to Brent Decl. ("Firefly SFO Business Permit"), Summary at p.i (listing Hertz's address as Firefly's address), § 4.1 ("Permittee shall be entitled to conduct off-airport rental car services on the terms and conditions of this Permit . . . . ") (under seal).

Pursuant to the SFO Lease Agreements, Hertz and DTG agreed that their use, including their "Tenant's Entity's" use and operation of the leased rental car facilities would comply "at all times with all Laws," which include various federal, state and municipal safety-related laws including SFO's Rules and Regulations referred as the Airport Rules. Hertz SFO Lease Agreement, § 3.14; DTG SFO Lease Agreement, § 3.14.[7] The SFO Lease Agreements define a "Tenant Entity" as a "principal, affiliate, contractor, employee, agent, licensee, or invitee." Hertz SFO Lease Agreement, § 2.1; DTG SFO Lease Agreement, § 2.1. Contractors such as RCT are tenant entities for the purposes of the SFO Lease Agreements and are therefore required to comply with all applicable laws.

### 3. Hertz's Contracts with Hiker Companies

During the relevant time period, Hertz hired three companies to provide hikers for its SFO rental car facility: RCT, FleetLogix (July 1, 2014 - April 2016), and EDS Facility Services, Ltd. ("EDS") (November 9, 2016 to the present). FleetLogix and EDS signed a Master Service Agreement ("MSA") with Hertz, but RCT did not. *See* FleetLogix MSA (Ex. 11) to Brent Decl. (under seal); EDS MSA (Ex. 28) to Brent Decl. (under seal).

Pursuant to the MSAs, FleetLogix and EDS, who are "Suppliers," agreed to provide

---

[6] These collectively are referred to as the "SFO Lease Agreements."

[7] Since Firefly's business permit is for off-airport services, it does not contain similar provisions.

"Transporters/Service Agent services to the Hertz location" at SFO, and to "provide the Services using Supplier Employees who met "each of the Hertz requirements as set forth herein or as may be requested from time to time." FleetLogix MSA, Ex. A, ¶ 8 at HERTZ 00709; EDS MSA, Ex. A, ¶ 8 at HERTZ 00757. Such Hertz requirements included "perform[ing] the Services in a safe and sufficient manner; agree[ing] to comply with each of Hertz' policies, rules and regulations regarding conduct, appearance, and behavior while performing the Services or on Hertz premises or facilities," and "passing a pre-employment criminal record check." *Id.* FleetLogix and EDS also each "warrant[ed] and covenant[ed] that it [had] in place appropriate procedures for conducting background checks" and "other reasonable screening of Supplier Employees who [were] to perform the Services." FleetLogix MSA, § 4.12; EDS MSA, § 4.12.

### 4. Hertz's Relationship with RCT

Hertz's relationship with RCT began as a continuation of RCT's preexisting relationship with DTG. Prior to Hertz's acquisition of DTG and Dollar Thrifty, RCT provided hikers to DTG at its San Diego and SFO rental car facilities. Following the acquisition, DTG's supervisors communicated to Hertz's corporate management that RCT had a good reputation and history with DTG. Harvey, Hertz's Vice President, had a conversation with DTG's supervisors regarding RCT's performance to determine whether Hertz should continue DTG's relationship with RCT. DTG's supervisors told Harvey that RCT performed just fine. Based on these assurances, Hertz continued DTG's relationship with RCT and did not enter into a new agreement with RCT. Although it is not clear whether anyone reviewed RCT's contract with DTG on Hertz' behalf, Harvey testified that he personally did not review the contract because RCT was already a vendor for DTG, which was a reputable company. It is not clear whether Hertz inquired into whether DTG imposed requirements on vendors similar to those imposed by Hertz, including a pre-employment criminal background check. However, Harvey testified that he assumed that DTG had similar requirements including a pre-employment criminal background check, and did not further investigate because he did not feel it was necessary given that DTG was a reputable company.

The parties dispute whether and to what degree Hertz was involved in RCT's operations,

9

namely hiring, firing, and how RCT employees performed their job for Hertz. The court summarizes the relevant evidence in the discussion of the parties' arguments further below.

### 5. Williams's Employment at RCT

On September 22, 2014, Williams applied for a position as a car washer for RCT. Williams Application for Employment (Ex. 23) to Brent Decl. On the application, Williams checked the box stating that he had prior felony convictions, and noted that he "would explain later." *Id.* At the time Williams applied to RCT, he had two prior felony convictions, one for commercial burglary, and the other for possessing a concealed and unregistered firearm. Exs. 18 and 19 to Brent Decl. (Williams adult criminal record). He also had been arrested for murder and domestic violence on two separate occasions, but was not charged. Exs. 21 and 22 to Brent Decl. On September 27, 2014, a few days after applying to RCT, Williams was arrested on a domestic violence charge. Ex. 22 to Brent Decl.

RCT hired Williams as a car washer, but there is no evidence establishing his date of hire. Additionally, there is no evidence that RCT ever asked Williams about his prior felony convictions. Tom Coe, who is RCT's founder and manager, testified that he did not recall if Williams was interviewed or asked about his prior felony convictions. During his employment with RCT, Williams became a hiker.

### 6. The July 7, 2015 Incident

The July 7, 2015 incident stems from rising tensions between Lewis and Williams over Lewis's contact with Williams's girlfriend. According to the trial testimony of Lewis's co-workers and friends at Williams's murder trial, prior to July 7, Lewis complained that he had been receiving threats from a male co-worker (later identified as Williams), who believed that Lewis was texting his girlfriend. *See, e.g.*, Trial Testimony of Melvin Boyd, K. Bishop, M. Lewis (Exs. 33, 34 and 35) to Brent Decl. There is no evidence that Lewis told any RCT or Hertz manager about these threats prior to his death.

According to Williams, on the day of the incident, Lewis confronted him about their dispute at the end of their work shift, and said, "Go around the corner and handle it now." Williams Trial Test. (Ex. 6(f)) to Defs.' RJN at 693:4-17, 695:2-4. Both men, driving Hertz

vehicles, exited the Cowen street parking lot and made a right turn instead of making a left as hikers normally would do. They engaged in a fight, during which Lewis was fatally stabbed. Williams fled the scene, and was eventually arrested and convicted of Lewis's murder.

### B. Procedural History

On June 5, 2017, Plaintiffs filed this case against Defendants in San Francisco Superior Court. [Docket No. 1-1 (Compl. to Not. of Removal).] Defendants removed the action on June 30, 2017. Not. of Removal [Docket No. 1 (Not. of Removal).] Upon removal, Plaintiffs filed the operative amended complaint, which substituted DTG and Dollar Thrifty as Doe Defendants 1 and 2. [Docket No. 29 (Amended Compl.).] On August 9, 2018, Defendants filed this motion. [Docket No. 61.] Plaintiffs timely opposed. [Docket Nos. 72, 73.]

## IV. LEGAL STANDARD

A court shall grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the court must view the evidence in the light most favorable to the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted). A genuine factual issue exists if, taking into account the burdens of production and proof that would be required at trial, sufficient evidence favors the non-movant such that a reasonable jury could return a verdict in that party's favor. *Id*. at 248. The court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact. *See id*. at 249.

To defeat summary judgment once the moving part has met its burden, the nonmoving party may not simply rely on the pleadings, but must produce significant probative evidence, by affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, supporting the claim that a genuine issue of material fact exists. *TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). In other words, there must exist more than "a scintilla of evidence" to support the non-moving party's claims, *Anderson*, 477 U.S. at 252; conclusory assertions will not suffice. *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Similarly, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the

11

record, so that no reasonable jury could believe it, a court should not adopt that version of the facts" when ruling on the motion. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## V.   CLAIMS NO LONGER AT ISSUE

In their opposition, Plaintiffs do not address Defendants' arguments regarding punitive damages, and therefore concede that claim. Accordingly, the court grants summary judgment in favor of Defendants on the punitive damages claim.

## VI.   DISCUSSION

Defendants move for summary judgment on all claims. First, they argue that they are not vicariously liable for the actions of RCT and its employee Williams as a matter of law. Next, Defendants argue that they are not liable for the actions of RCT and Williams on a theory of direct negligence because they did not owe any legal duty to Lewis. Plaintiffs contend that there are genuine disputes of material facts as to whether Defendants are vicariously liable for the actions and/or inactions of RCT and its employee Williams. They also argue that Defendants owed a duty to Lewis to use due care, and there are triable disputes regarding foreseeability and causation that preclude summary judgment on the direct negligence claim.

### A.   Hertz's Vicarious Liability

Defendants argue that they have no vicarious liability for the acts of Williams, who was an RCT employee. Their arguments build from the premise that a hirer (Hertz) of an independent contractor (RCT) is not generally liable for the actions of the independent contractor under California law. Defendants concede that there are a number of exceptions to the "no hirer liability" rule, but assert that Plaintiffs cannot demonstrate that they meet any of the six exceptions that they anticipate Plaintiffs will raise. For their part, Plaintiffs concede that RCT is an independent contractor and that Defendants generally are not liable for the actions of independent contractors such as RCT. Instead, they argue that there are genuine disputes of material fact as to three exceptions to the no-hirer liability rule: the exception outlined in *Hooker v. Department of Transportation*, 27 Cal. 4th 198 (2002) ("*Hooker* exception"); a non-delegable duty based on the fact that Defendants' rental car business is operated pursuant to a public franchise ("public franchise exception"); and a non-delegable duty created by the SFO Lease Agreements

("contractual relationship exception").

1. **The *Hooker* Exception**

The common law provides that a "'person who hire[s] an independent contractor generally [is] not liable to third parties for injuries caused by the contractor's negligence in performing the work.'" *SeaBright Ins. Co. v. US Airways, Inc*., 52 Cal. 4th 590, 598(2011) (quoting *Privette v. Superior Court*, 5 Cal. 4th 689, 693 (1993)). "Central to this rule of nonliability [is] the recognition that a person who hired an independent contractor ha[s] 'no right of control as to the mode of doing the work contracted for.'" *Id.* (quoting *Privette*, 5 Cal. 4th at 693). However, there are a number of exceptions to this rule. *Id.* One such exception is described in *Hooker v. Department of Transportation*, 27 Cal. 4th 198 (2002), and is commonly known as the "*Hooker* exception."

*Hooker* involved the death of a crane operator who was employed by a general contractor that had been hired by Caltrans to construct an overpass. 27 Cal. 4th at 202. The crane operator would retract the outriggers on the crane in order to allow Caltrans and other construction vehicles to pass. *Id.* A Caltrans representative at the jobsite observed that crane operators retracted the outriggers to permit other vehicles to pass, and allowed this practice to continue. *Id.* at 203. On the day of his death, the crane operator retracted the outriggers and left the crane. *Id.* at 202. When he returned, he attempted to swing the crane's arm without reextending the outriggers, which caused the crane to tip over. *Id.* He fell to the pavement and sustained fatal injuries. *Id.* His widow sued Caltrans for negligently exercising its retained control over the jobsite. *Id.* at 201.

The California Supreme Court declined to find Caltrans liable, holding that "a hirer of an independent contractor is not merely liable to an employee of the contractor merely because the hirer retained control over safety conditions at a worksite." *Id.* at 202. It clarified that "the hirer is liable to an employee of a contractor insofar as a hirer's exercise of retained control *affirmatively contributed* to the employee injuries." *Id.* (emphasis in original). In so holding, the California Supreme Court found that while the plaintiff raised triable disputes as to whether Caltrans retained control over the safety conditions at the worksite, she failed to raise triable disputes as to whether Caltrans "actually exercised the retained control so as to affirmatively contribute to the death" of

her husband. *Id.* It explained that affirmative contribution could be demonstrated by a hirer's active participation or by its negligent omissions. *Id.* at 212 n.3, 215. The *Hooker* court defined "active participation" as occurring when a general contractor "'is actively involved in, or asserts, control over, the manner of performance of the contracted work[;] [s]uch an assertion of control occurs, for example, when the principal employer *directs* that the contracted work be done by use of a certain mode or otherwise interferes with the means and method by which the work is to be accomplished.'" *Id.* at 215 (quoting *Thompson v Jess*, 979 P.2d 322, 327 (Utah 1999) (emphasis in original).

As to affirmative contribution through negligent omission, the *Hooker* court explained a hirer's liability as follows: "For example, if the hirer promises to undertake a particular safety measure, then the hirer's negligent failure to do so should result in liability if such negligence leads to an employee injury." 27 Cal. 4th at 212 n.3.

*Hooker* itself involved the active participation theory. The California Supreme Court found that there was no evidence that Caltrans directed, "in the sense of ordered," the decedent to retract the outriggers in order to permit vehicles to pass. *Id.* at 213. Instead, the evidence showed that Caltrans permitted its own and other construction vehicles to use the overpass while the crane was being operated, and due to the overpass's narrowness, the crane operator was regularly required to retract the outriggers to permit the traffic to pass. *Id.* The court observed that simply "permitting traffic to use the overpass while the crane was being operated" was not sufficient to establish Caltrans's "active participation" or direction of the work. *Id.* at 215. According to the *Hooker* court, at most, the evidence demonstrated that "Caltrans safety personnel were aware of an unsafe practice and failed to exercise the authority to correct it." *Id.*

In sum, under the *Hooker* exception, the hirer of an independent contractor is liable to an employee of the contractor if the "hirer retained control over the safety conditions at the worksite," and its "exercise of retained control affirmatively contributed to the employee injuries." *Id.* at 202 (emphasis in original omitted). A hirer may affirmatively contribute to the injuries of an independent contractor's employee by active participation in the manner of the work, or by negligently failing or omitting to undertake or perform a promised safety measure.

Plaintiffs assert that Defendants are liable based on the negligent omission theory. Plt.'s Opp'n at 18:7-19:7. However, because Plaintiffs' arguments implicate certain theories discussed in cases addressing the active participation theory, the court briefly discusses those cases, along with cases addressing the negligent omission theory.[8]

California courts routinely have found that the hirer of an independent contractor actively directs a contractor or the employee of the contractor where the hirer supplies the contractor with defective equipment, or controls a material aspect of the worksite. *See, e.g.*, *McKown v. Wal-Mart Stores, Inc*., 27 Cal. 4th 219, 225 (2002) (holding that "when a hirer of an independent contractor, by negligently furnishing unsafe equipment to the contractor, affirmatively contributes to the injury of an employee of the contractor, the hirer should be liable to the employee for the consequences of the hirer's own negligence"); *Regalado v. Callaghan*, 3 Cal. App. 5th 582, 596–97, review denied (Dec. 21, 2016) (affirming verdict against homeowner for injuries to the employee of the contractor hired by the homeowner because the evidence showed that the homeowner was responsible for obtaining permits for the vault and propane line that contributed to the explosion that injured the employee, participated in the construction work of the pool, and represented that the construction passed county inspection); *Ray v. Silverado Constructors*, 98 Cal. App. 4th 1120, 1132–34 (2002) (reversing summary judgment in case involving death of subcontractor's employee who was killed by construction debris blown from a bridge as he was clearing other debris from the roadway; finding triable disputes existed as to whether the general contractor exercised "retained control" over safety where the general contractor contractually reserved exclusive control over closing the roadway and prevented subcontractor from closing it without written consent).

However, where a contractor "passively permit[s] an unsafe condition to occur," California courts have concluded that such inaction does not constitute affirmative contribution without more. *Tverberg v. Fillner Constr*., 202 Cal. App. 4th 1439, 1446 (2012), review denied (Apr. 11,

---

[8] The parties provided little assistance to the court, as their briefing was particularly cursory on the *Hooker* exception. There are key active participation and negligent omissions case that they should have discussed in their papers, beyond the two cases (one per side) that they cited.

15

2012); *see also Hooker*, 27 Cal. 4th at 215 (explaining that simply "permitting traffic to use the overpass while the crane was being operated" was not sufficient to show "active participation" or direction of decedent's work); *Brannan v. Lathrop Constr. Assocs., Inc.*, 206 Cal. App. 4th 1170, 1178 (2012) (finding that general contractor's act of scheduling, permitting the scaffold in question to remain on the jobsite, and permitting masonry work to continue despite the rain did not constitute affirmative contribution). Accordingly, "the failure to institute specific safety measures is not actionable unless there is some evidence that the hirer or the contractor had agreed to implement these measures." *Tverberg*, 202 Cal. App. 4th at 1446; *see also Kinney v. CSB Const., Inc.*, 86 Cal. App. 4th 840, 39 (2001), as modified on denial of reh'g (Feb. 26, 2001) (holding that "a general contractor owes no duty of care to an employee of a subcontractor to prevent or correct unsafe procedures or practices to which the contractor did not contribute by direction, induced reliance, or other affirmative conduct"); *Michael v. Denbeste Transportation, Inc.*, 137 Cal. App. 4th 1082, 1096–97 (2006) (the subcontractor's employee failed to raise a triable dispute regarding affirmative contribution where the general contractor's agreement with property owner that it was "responsible for site safety" did not constitute a "promise[] to [the subcontractor] undertake a specific safety measure").

As to the negligent omission theory, there is a dearth of case law addressing when a hirer may be liable for negligently failing to undertake or perform a promised safety measure. The few existing cases demonstrate that a hirer's promise to undertake a particular safety measure may be explicit or implicit.

For example, in *Tverberg*, the employee of a subcontractor sued the general contractor for injuries he sustained when he fell into a hole made for a bollard (concrete post). 202 Cal. App. 4th at 1443. Prior to the employee's arrival at the job site, another subcontractor had dug deep holes for the bollards, which were next to the employee's work area. *Id*. On two occasions, the employee asked the general contractor's lead person to cover the holes, to which the contractor's lead replied that he did not have the necessary equipment to do so. *Id*. As the employee walked from his truck toward his work area, he fell into an open bollard hole and was injured. *Id*. The trial court granted summary judgment in favor of the general contractor. The California Court of

Appeal reversed, finding a triable dispute as to whether the general contractor retained control over the worksite in such a way that it affirmatively contributed to the employee's injuries. *Id*. at 1447-49. Specifically, the court found that there were triable disputes as to whether the contractor's active participation or negligent omissions contributed to the employee's injuries.

Regarding the contractor's negligent omissions, the court explained that certain testimony "allow[ed] the inference that [the contractor] affirmatively assumed the responsibility for the safety of the workers near the bollard holes, and discharged that responsibility in a negligent manner, resulting in injury." *Id*. at 1148. The contractor's lead person testified that there was no need to cover the open bollard holes and that the stakes and safety ribbons were sufficient protection for the workers. The court found that evidence that the contractor did not cover the holes in response to the employee's request because the necessary equipment was not available could demonstrate affirmative contribution by negligent omission. *Id*. The court reasoned that this evidence raised the inference that the "[contractor] intended to cover the bollard holes when the needed equipment became available," and could amount to an implicit agreement to cover the bollard holes as a safety measure. *Id*.; *see also Khosh v. Staples Construction Co., Inc.*, 4 Cal. App. 4th 712, 718 (2016) (explaining that the hirer in *Tverberg* was liable "when it did not cover holes at a construction site after it impliedly agreed to do so in response to the plaintiff's employer's request"). The *Tverberg* court held that under these circumstances, the contractor's failure to cover the holes could be construed as a negligent omission. 202 Cal. App. 4th at 1448.

In *Browne v. Turner Construction Co.*, 127 Cal. App. 4th 1334 (2005), cited by Plaintiffs, the employee of a subcontractor was injured in a fall from a ladder while working on a project. He sued the property owner and the general contractor for acting negligently in removing two means by which the fall could have been prevented. *Id*. The trial court granted summary judgment to the defendants on the ground that their conduct did not affirmatively contribute to the plaintiff's injuries under the *Hooker* exception. The California Court of Appeal reversed, holding that "the furnishing and abrupt withdrawal of safety equipment" could constitute "negligent performance of a voluntary undertaking, affirmatively contributing" to the employee's injuries and thereby subjecting defendants to liability. *Id*. at 1337. The Court of Appeal explained that "[w]hether

17

defendants furnished these systems gratuitously or out of obligation, once they did so they assumed a duty not to increase the risk of harm to plaintiff either by acting negligently or by inducing reliance which increased the harm." *Id*. at 1348.

### a. Retained Control

In sum, under the *Hooker* exception, Hertz may be liable to Lewis, the deceased employee of RCT, if Hertz retained control over RCT in a manner that affirmatively contributed to Lewis's death, either through Hertz's active participation or negligent omission. Defendants first contend that there is no evidence that Hertz retained control over any material aspects of RCT's operations, including the hiring, firing, training, and scheduling of RCT employees. Plaintiffs disagree, arguing that the record is replete with evidence showing that Hertz exercised control in almost every facet of RCT's operations. Having reviewed the record, the court finds that there are triable disputes as to whether Hertz retained control over RCT's performance of its work, including safety-related issues.

For example, there are triable disputes as to whether Hertz could direct RCT to fire an RCT employee.[9] Defendants proffer evidence from RCT's founder and manager (Coe), and Hertz's Rule 30(b)(6) deponent (Valentine) to support the position that only RCT could fire its own employees. However, Defendants' own evidence allows for an inference that Hertz retained control over material aspects of RCT's operations. For example, according to Valentine, "Hertz's managers [did not] have the authority to discipline contractors," but could require that contractor's employees be removed from Hertz's premises, even permanently if necessary. Valentine Depo. (Ex. 10) to Brent Decl. at 94:11-95:10. Hertz could also insist that a contractor pull a particular employee out of service, which did not necessarily involve termination, since the employee could return for work the next day. *Id*. at 94:7-10. In addition, Plaintiffs point to at least one instance where Hertz directed an RCT manager to fire an employee. According to Leslie Smith, who worked for RCT from 2012 to 2016 and was a leader driver and manager, Hertz instructed RCT to fire an RCT employee who was involved in a three-car collision with two other Hertz vehicles.

---

[9] Plaintiffs appear to concede that RCT controls the hiring of its own employees since they do not address this practice in their opposition.

Such conflicts and nuances in the evidence must be evaluated by the finder of fact at trial.

There are also triable disputes as to whether Hertz controlled the manner in which RCT hikers performed their work for Hertz. For example, Defendants contend that Hertz was not otherwise involved in the daily operations of RCT, and cite as examples the fact that Hertz was not involved in the scheduling of specific RCT drivers for the hours they needed, and Hertz did not communicate with RCT employees. However, Smith testified that she and Lewis and Williams did "whatever Hertz told [them] to do." Smith Depo. (Ex. 25) to Brent Decl. at 56:17-21; Smith Decl. ¶ 4. Smith testified that she and other lead drivers received direction on what to do with the rental vehicles at SFO from Hertz or DTG dispatchers and managers, and that she would then tell other RCT employees including Lewis and Williams what their jobs were for the day. She also testified that if Hertz needed RCT employees to perform a task, it could ask for a specific employee by name. On occasion, a Hertz dispatcher asked an RCT employee named Ratish to take customers to the airport, because Ratish was known as a peaceful and kind person.

There are also triable disputes as to whether Hertz required RCT hikers to perform their work in a safe manner. Such disputes could form the basis for a reasonable jury to infer that Defendants retained control over the safety conditions of the job. Hertz's Rule 30(b)(6) deponent testified that Hertz expected contractors such as RCT to follow Hertz's safety precautions including its lot rules, as well as rules relating to the speed limit, seat belts, parking in certain locations, driving in certain traffic patterns, and leaving keys at a certain place or in the car. Smith testified that Hertz and DTG controlled how she and other RCT employees, including Lewis and Williams, performed their work in many ways, including how to drive their vehicles. Smith testified that Hertz's instructions to RCT employees included how fast they could drive Hertz vehicles, where they could drive Hertz vehicles, the routes they could take inside SFO with Hertz vehicles, the places where they could park Hertz vehicles, the places they could wash Hertz vehicles, the stalls in which they had to park Hertz vehicles, which Hertz vehicles should be washed, when the headlights had to be turned on in Hertz vehicles, when to set the parking brake, when RCT employees could listen to the radio in Hertz vehicles, what settings to leave the air condition/heat fan on, when RCT employees had to wear seat belts, where to smoke cigarettes

(RCT employees were not permitted to smoke cigarettes in Hertz vehicles), and how and when to clean the interior of Hertz vehicles. She also testified that Hertz instructed RCT on proper attire for its employees driving Hertz vehicles; specifically, RCT employees could not wear shorts and men could not wear baggy pants or hats.

In sum, there are triable disputes on the question of whether Defendants retained control over safety conditions for RCT hikers.

### b. Affirmative Contribution

Defendants next argue that even if Hertz retained control over RCT safety conditions, there is no evidence that Hertz retained control in a manner that affirmatively contributed to Lewis's death. Defendants assert that Williams's murder of Lewis was an independent act that was completely unrelated to the control that Defendants exercised over RCT's work. Plaintiffs counter that Defendants affirmatively contributed to Lewis's death by failing to implement specific safety measures on RCT, including pre-employment criminal background checks, even though Defendants implemented such procedures on its two other hiker contractors.

Under California law, "the failure to institute specific safety measures is not actionable unless there is some evidence that the hirer or the contractor had agreed to implement these measures." *Tverberg*, 202 Cal. App. 4th at 1446; *see also Kinney*, 86 Cal. App. 4th at 39; *Michael*, 137 Cal. App. 4th at 1096–97. Therefore, unless there is evidence from which a reasonable jury could infer that Defendants agreed to implement a specific safety measure, Defendants cannot be held liable for negligently failing to implement that safety measure.

Plaintiffs cite to *Browne* to support their argument that Defendants affirmatively removed safeguards that were normally in place that would have prevented Lewis's death. In *Browne*, the California Court of Appeal found that the general contractor was liable for furnishing and then withdrawing the safety equipment that resulted in the employee's fall. 127 Cal. App. 4th at 1337. Although Plaintiffs failed to cite *Tverberg*, it is factually closer than *Browne*, since there is no evidence in this case that Defendants affirmatively required a safety policy or procedure with RCT and then withdrew it. *Tverberg* involved a contractor's failure to cover open bollard holes in response to the injured employee's request, because the necessary equipment was not available to

comply with the request. The California Court of Appeal found that the contractor's response that it did not have the necessary equipment to comply with the request could be construed as an implicit agreement that it would have undertaken the safety measure had the equipment become available. 202 Cal. App. 4th at 1448. Thus, *Tverberg* held that a reasonable jury could find that the contractor's failure to cover the bollard holes in the absence of the available equipment constituted a negligent omission of an implicit duty or responsibility. *Id*.

In this case, there is a triable dispute as to whether Hertz implicitly agreed or promised to undertake a specific safety measure, namely requiring all contractors including RCT to perform pre-employment criminal background checks on its employees. The record shows that Hertz had a business practice of requiring contractors such as RCT to sign an MSA. *See* FleetLogix MSA (Ex. 11) to Brent Decl. (under seal); EDS MSA (Ex. 28) to Brent Decl. (under seal). Pursuant to the MSAs, the contractors each agreed to "provide the Services using Supplier Employees who met "each of the Hertz requirements as set forth herein or as may be requested from time to time." FleetLogix MSA, Ex. A, ¶ 8 at HERTZ 00709; EDS MSA, Ex. A, ¶ 8 at HERTZ 00757. Such Hertz requirements include "passing a pre-employment criminal record check." *Id*. The contractors were also required to "warrant and covenant that it [had] in place appropriate procedures for conducting background checks" and "other reasonable screening of Supplier Employees who [were] to perform the Services." FleetLogix MSA, § 4.12; EDS MSA, § 4.12. The record also shows that Hertz did not investigate whether RCT required pre-employment criminal background checks because it assumed that it did, based on RCT's prior relationship with DTG. Given that Hertz had a specific safety policy that required its contractors to sign MSAs which mandated that contractor employees had to pass pre-employment criminal background checks, a reasonable jury could infer that Hertz implicitly agreed to impose that policy on RCT. Similar to the contractor's implicit promise to cover the bollard holes in *Tverberg*, a jury could infer that Hertz implicitly promised that it would enforce a pre-employment criminal background check requirement on RCT. Hertz's negligent omission in failing to ensure that RCT imposed a criminal background check requirement permitted RCT to hire Williams, who had a significant criminal history. Thus, a reasonable jury could conclude that Hertz's negligent omission

affirmatively contributed to Lewis's death.

Defendants cite *Montgomery v. United States*, 772 F. Supp. 2d 1256 (S.D. Cal. 2011), but it is factually inapposite. The facts make clear that *Montgomery* is an active participation rather than negligent omission case. In *Montgomery*, a contract nurse at a naval hospital brought a negligence action against the United States arising out of a slip and fall accident that occurred on the premises. The district court granted summary judgment to the United States, finding that the plaintiff had failed to raise triable disputes as to whether the United States exercised any control it may have retained so as to affirmatively contribute to the plaintiff's injury. *Id*. at 1263. The district court explained that the plaintiff failed to provide any evidence that the saline solution upon which she slipped ended up on the operating room's floor because the United States retained control over the safety conditions in the hospital. *Id*.

Defendants also argue that the California Supreme Court's decision in *Camargo v. Tjaarda Dairy*, 25 Cal. 4th 1235 (2001) "bar[s] an employee of an independent contractor from bringing a negligent hiring action against the hirer of the contractor." *Camargo*, 25 Cal. 4th at 1238. However, the instant case is not a negligent hiring action in the sense described by *Camargo*. In *Camargo*, the employee of an independent contractor "was killed when his tractor rolled over." 25 Cal. 4th at 1238. The decedent's family sued the hirer of the contractor on the theory that the hirer was "*negligent in hiring* [the contractor] because they failed to determine whether [the decedent] was qualified to operate the tractor safely." *Id*. (italics in original). In holding that the hirer was not liable, the court examined the negligent hiring exception in Restatement Second of Torts, section 411:

> An employer is subject to liability for physical harm to third persons caused by his *failure to exercise reasonable care to employ a competent and careful contractor* (a) to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or (b) to perform any duty which the employer owes to third persons.

Restatement (Second) of Torts § 411 (1965) (emphasis added). The theory dismissed in *Camargo* was that the hirer negligently hired *the contractor*. *Camargo*, 25 Cal. 4th at 1238. The language of section 411 also makes clear that the negligent hiring exception to the "no hirer liability" rule is about the hirer's negligence in hiring a contractor, not a particular employee of a contractor. Here,

Plaintiffs do not argue that Hertz negligently hired its contractor, RCT. Although Defendants are correct that Plaintiffs could not succeed on a negligent hiring theory under *Camargo*, Plaintiffs have presented triable disputes that Hertz is liable under the retained control exception to the "no hirer liability" rule.

In sum, the court finds that there are triable disputes as to whether Defendants are vicariously liable to Plaintiffs on the theory that Hertz negligently exercised its retained control through negligent omission to impose a safety rule on RCT that it imposed on its other hiker contractors. The court therefore denies summary judgment on this basis. As the case may proceed to trial due to the existence of material disputed facts regarding application of the *Hooker* exception, the court declines to rule on the two other exceptions to the "no hirer liability" rule proffered by Plaintiffs (i.e., non-delegable duties based on contractual relationship and public authority/franchise). **The court expresses serious doubt that either of the two remaining exceptions apply here. If Plaintiffs intend to pursue either of these two remaining theories of exception to the "no hirer liability" rule, they must notify Defendants within two days (by October 31, 2018) so that Defendants have an opportunity to challenge the theor(ies) at the pretrial stage. If Plaintiffs do not timely notify Defendants of the intent to pursue the theor(ies), the court will assume that Plaintiffs have abandoned the theor(ies).**

### B. Hertz's Direct Negligence

Defendants argue that they are not liable to Lewis on a direct negligence theory because they owed no duty to Lewis. They also assert that even if the court concludes that a duty exists, Plaintiffs cannot satisfy the causation element of a negligence claim because Williams's stabbing of Lewis is a superseding cause that cuts the causal link between Defendants and Lewis. Plaintiffs disagree, contending that Defendants owed a duty to Lewis to use due care based on Hertz's own business practices, and the special relationship between Defendants and Lewis created by the SFO Lease Agreements. They also argue that there are triable disputes regarding foreseeability and causation that preclude summary judgment.

#### 1. Duty

##### a. Legal Principles

"[N]egligence is conduct which falls below the standard established by law for the protection of others." *Burns v. Neiman Marcus Grp., Inc.*, 173 Cal. App. 4th 479, 487–88 (2009), as modified (May 20, 2009). "The threshold element of a cause of action for negligence is the existence of a duty to use due care toward an interest of another that enjoys legal protection against unintentional invasion." *Id.* The question of duty is one of law. *Regents of Univ. of Cal. v. Superior Court*, 4 Cal. 5th 607, 618 (2018); *Vasilenko v. Grace Family Church*, 3 Cal. 5th 1077, 1083–84 (2017).

California law establishes the general duty of each person to exercise, in his or her activities, reasonable care for the safety of others. Cal. Civ. Code, § 1714(a); *Cabral v. Ralphs Grocery Co.*, 51 Cal. 4th 764, 768 (2011) (citing Cal. Civ. Code, § 1714(a)); *T.H. v. Novartis Pharm. Corp.*, 4 Cal. 5th 145, 163 (2017) (same). "[I]n the absence of a statutory provision establishing an exception to the general rule of Civil Code section 1714, courts should create [a duty] only where [it is] clearly supported by public policy." *Cabral*, 51 Cal. 4th at 771; *see also Bily v. Arthur Young & Co.*, 3 Cal.4th 370, 397 (1992) (Courts use the "concept of duty to limit generally the otherwise potentially infinite liability which would follow from every negligent act . . . ."); *Burns*, 173 Cal. App. 4th at 487 ("California courts have explicitly rejected the concept of universal duty.").

To determine whether a duty exists, courts consider the following factors, known as the "*Rowland* factors": "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." *Rowland v. Christian*, 69 Cal. 2d 108, 113 (1968). When applying the *Rowland* factors, the question is not whether the specific facts support an exception to the general duty of reasonable care, but "whether carving out an entire category of cases from that general duty rule is justified by clear considerations of policy." *Vasilenko*, 3 Cal. 5th at 1083 (quoting *Cabral v. Ralphs Grocery Co.*, 51 Cal. 4th 764, 722 (2011)). Unlike the

other elements of negligence—breach, injury, and causation—which are necessarily fact-dependent, the "[a]nalysis of duty occurs at a higher level of generality." *Vasilenko*, 3 Cal. 5th at 1083 (citing *Cabral*, 51 Cal. 4th at 774).

### b. Analysis

Plaintiffs assert that Defendants owed a duty to Lewis on two bases: 1) as a third-party beneficiary to the SFO Lease Agreements; and 2) by failing to enforce their own standard business practices on RCT.

Plaintiffs argue that the SFO Lease Agreement created a special relationship between Hertz and Lewis because Sections 3.09 and 3.14 intended to benefit Lewis. Under these sections, Hertz agreed that it and its contractors such as RCT would comply with all laws including a number of workplace safety laws, and that it would not conduct business that interfered with airport safety. Hertz SFO Lease Agreement, §§ 3.09, 3.14. Plaintiffs contend that Lewis would have clearly benefitted from Defendants' obligation to ensure that RCT complied with all workplace safety laws, including complying with Hertz's own standard business practice to require contractors to perform pre-employment criminal background checks as part of the hiring process.

Plaintiffs' arguments fail. With respect to their theory that Lewis is a third-party beneficiary to the SFO Lease Agreements, Plaintiffs present no evidence that the SFO Lease Agreements were intended to benefit the employees of contractors to the lease holder. In fact, the SFO Lease Agreements specifically and unambiguously state that there "are no third-party beneficiaries to this Lease." *See, e.g.*, Hertz SFO Lease Agreement, § 19.8. Given the agreement's explicit disclaimer of any third-party beneficiaries, the court finds that Plaintiffs' interpretation of the SFO Lease Agreements is untenable and cannot be the basis for a duty under California law.

Plaintiffs next argue that Defendants "created a risk of harm" to Lewis by negligently failing to enforce their standard business practices on RCT, specifically the requirement to conduct pre-employment criminal background checks as part of the hiring process. Plaintiffs point to evidence that Hertz had an established business practice of requiring its other hiker contractors to perform pre-employment criminal background checks in the hiring process, but that it negligently

25

United States District Court
Northern District of California

failed to enforce that requirement on RCT.  Plaintiffs contend that Hertz's decision not to require

such background checks allowed RCT to hire Williams, which resulted in the death of Lewis.   As

discussed above, the court can only find that Defendants owed a duty of care to Lewis by applying

the *Rowland* factors and determining at a generalized (rather than fact-specific) level that

imposing such a duty is justified by clear considerations of policy.  Here, Plaintiffs make no effort

to apply the *Rowland* factors, and the court is not required to guess at what their arguments might

be.  Plaintiffs' argument fails on that basis alone.

Instead of addressing the *Rowland* factors, Plaintiffs rely on general language regarding

duty in *Seo v. All-Makes Overhead Doors*, 97 Cal. App. 4th 1193, 1202–03 (2002) to support their

"creation of risk" argument.  *Seo* is factually inapposite, and in fact held that the defendant "gate

repair company did not owe a duty to the subtenant [plaintiff] to warn the owner of the property of

design defects unrelated to the repairs."  *Id*. at 1193.  Plaintiffs cite no case where a court

concluded that a duty existed under circumstances similar to those presented here.

Therefore, the court finds that Plaintiffs have not established that Defendants owed a duty

to Lewis.[10]  Because the court has concluded that a duty does not exist, it need not consider the

remaining elements of negligence, foreseeability and causation.

In sum, the court grants summary judgment in favor of Defendants as to the direct

negligence claim.

### C.      Plaintiffs' Objections to Defendants' Reply

In their reply, Defendants responded to the arguments in Plaintiffs' opposition, and

attached additional evidence that was not included in the moving papers.  Reply [Docket No. 75.]

Plaintiffs filed a document entitled "Objections to New Evidence" pursuant to Local Rule 7-3(d),

and included their own rebuttal arguments and evidence.  [Docket No. 79.]

Local Rule 7-3(d) prohibits a party from filing additional memoranda, papers, or letters

once a reply is filed without court approval unless new evidence has been submitted in the reply.

---

[10] Plaintiffs also argue in one conclusory sentence that Hertz is directly liable to Lewis for
negligence per se because it aided and abetted RCT in violation of Airport Rule 9.2.  Plt.'s Opp'n
at 21:15-17.  Since Plaintiffs' complaint does not plead or allege a negligence per se claim, the
court declines to consider this new theory.

Civ. L.R. 7-3(d)(1). If a new evidence is submitted with the reply, the plaintiff may file an objection to the reply evidence, "which may not exceed 5 pages of text, stating its objections to the new evidence, [and] which may not include further argument on the motion." *Id.*

Plaintiffs' submission is problematic. Although styled as an "Objection to New Evidence," Plaintiffs' filing amounts to an unauthorized sur-opposition in disguise. It contains no objections to the new evidence. Indeed, Plaintiffs' concluding paragraph asks the court to deny Defendants' motion, as opposed to sustaining its objections to the new evidence. Plt.'s Objects. at 4:9-11. Since Plaintiffs did not obtain prior leave to court to file a sur-opposition, it would be within the court's discretion to disregard it. Civ. L.R. 7-3(d); *see, e.g., Heineke v. Santa Clara Univ.*, No. 17-CV-05285-LHK, 2018 WL 3368455, at *1 (N.D. Cal. July 10, 2018) (granting motion to strike unauthorized sur-opposition).

To the extent that Plaintiffs' objections can be construed as a request to strike evidence presented in a reply brief, the court has the discretion to consider new evidence presented on reply, particularly if the new evidence appears to be a reasonable response to the opposition. *See Edgen Murray Corp. v. Vortex Marine Constr., Inc.*, No. 18-CV-01444-EDL, 2018 WL 4203801, at *3 (N.D. Cal. June 27, 2018) (declining to strike reply declaration because the new evidence in the declaration was "filed to respond to Plaintiff's opposition and is consistent with the evidence and arguments presented in the original motion"). The court exercises its discretion and considers Defendants' new evidence because it responds to Plaintiffs' opposition and is consistent with the argument and evidence presented in the moving papers. In the interest of having a complete record, the court also considers Plaintiffs' responses to the new evidence.

## VII. CONCLUSION

In conclusion, the court grants in part and denies in part Defendants' motion.


**IT IS SO ORDERED.**

Dated: October 29, 2018



_____
Donna M. Ryu
United States Magistrate Judge